# IN THE UNITED STATES COURT OF APPEALS
# FOR THE SEVENTH CIRCUIT

PEOPLE OF THE STATE OF ILLINOIS, *EX REL.* KWAME RAOUL, ATTORNEY GENERAL OF THE STATE OF ILLINOIS,

*Plaintiff-Appellee*,

*v.*

3M COMPANY,

*Defendant-Appellant*,

On Appeal from the
United States District Court for the Central District of Illinois
Case No. 4:25-cv-4189-SLD-RLH | Hon. Sara Darrow

## APPENDIX OF APPELLANT 3M COMPANY

Amir C. Tayrani
Jonathan C. Bond
John W. Tienken
GIBSON, DUNN & CRUTCHER LLP
1700 M Street NW
Washington, DC 20036

Elizabeth A. Kiernan
GIBSON, DUNN & CRUTCHER LLP
2001 Ross Avenue, Suite 2100
Dallas, Texas 75201

Lauren R. Goldman
  *Counsel of Record*
Justine Goeke
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY 10166
(212) 351-2375
LGoldman@gibsondunn.com

*Counsel for Defendant-Appellant 3M Company*

## CIRCUIT RULE 30(d) CERTIFICATION

All of the materials required by Seventh Circuit Rule 30(a) are included in the appendix bound with the appellant's brief. All of the materials required by Seventh Circuit Rule 30(b) are included in this separately bound appendix.

*/s/ Lauren R. Goldman*
Lauren R. Goldman

# APPENDIX TABLE OF CONTENTS

## *Short Appendix*

Remand Order (ECF No. 19)..................................................... A1

Judgment (ECF No. 20).......................................................... A14

## *Appendix*

Docket, *People of the State of Illinois ex rel. Kwame Raoul v. 3M Co.*, 4:25-cv-04189 (C.D. Ill.)............................................ A15

Notice of Appeal (ECF No. 21) ............................................ A20

Text Order (ECF Jan. 27, 2026)........................................... A22

Notice of Appeal (ECF No. 31) ............................................ A24

Notice of Removal (ECF No. 1) ........................................... A26

*Illinois ex rel. Raoul v. 3M Co.*, No. 23-3031, 111 F.4th 846 (7th Cir. 2024)....................................................................... A61

*Illinois ex rel. Raoul v. 3M Co.*, No. 4:22-cv-04075, 693 F. Supp. 3d 948 (C.D. Ill. 2023) ........................................................ A65

Transcript of Seventh Circuit Oral Argument in *Illinois ex rel. Raoul v. 3M Co.*, No. 23-3031, 111 F.4th 846 (7th Cir. 2024) (ECF No. 1-2)....................................................................... A77

First Amended Complaint (ECF No. 1-4)........................... A107

Defendant 3M Company's First Set of Requests for Admission to Plaintiff (ECF No. 1-5) .................................................... A174

People of the State of Illinois' Responses and Objections to Defendant 3M Company's First Set of Requests for Admission to Plaintiff (ECF No. 1-6)............................................... A182

## U.S. District Court
## CENTRAL DISTRICT OF ILLINOIS (Rock Island)
## CIVIL DOCKET FOR CASE #: 4:25−cv−04189−SLD−RLH

People of the State of Illinois, ex rel. Kwame Raoul, Attorney General of the State of Illinois v. 3M Company
Assigned to: Chief Judge Sara Darrow
Referred to: Magistrate Judge Ronald L Hanna
Case in other court:  CA7, 25−03133
                  26−01381
Cause: 28:1442 Notice of Removal

Date Filed: 10/23/2025
Date Terminated: 11/26/2025
Jury Demand: Both
Nature of Suit: 893 Environmental Matters
Jurisdiction: Federal Question

**Plaintiff**

**People of the State of Illinois, ex rel. Kwame Raoul, Attorney General of the State of Illinois**

represented by **Daniel Rock Flynn**
DICELLO LEVITT GUTZLER LLP
6th Floor
10 North Dearborn Street
Chicago, IL 60602
312−214−7900
Email: dflynn@dicellolevitt.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Stephen J Sylvester**
OFFICE OF THE ILLINOIS ATTORNEY GENERAL
Suite 1800
69 West Washington Street
Chicago, IL 60602
312−814−5396
Email: stephen.sylvester@ilag.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Anna C Skinner**
DiCELLO LEVITT GUTZLER LLC
Unit 324
350 East Short Street
Lexington, KY 40507
859−585−2121
Email: askinner@dicellolevitt.com
*ATTORNEY TO BE NOTICED*

**Gregory Michael Utter**
CALLOW & UTTER, LLC
Suite 170
8044 Montgomery Road
Cincinnati, OH 45236
513−659−3130
Email: gmutter@callowandutter.com
*ATTORNEY TO BE NOTICED*

**Joseph M. Callow , Jr**
CALLOW & UTTER, LLC
Suite 170
8044 Montgomery Road
Cincinnati, OH 45236
513−659−3130
Email: jcallow@callowandutter.com
*ATTORNEY TO BE NOTICED*

A15

V.

**Defendant**

| | | |
|---|---|---|
| **3M Company** | represented by | **Daniel L. Ring** |

JENNER & BLOCK LLP
353 North Clark Street
Chicago, IL 60654
312–923–2625
Email: DRing@jenner.com
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 10/23/2025 | 1 | NOTICE OF REMOVAL from Rock Island County Circuit Court, case number 2022LA16 (Filing fee $ 405 receipt number AILCDC−4854242), filed by 3M Company. (Attachments: # 1 Civil Cover Sheet Identifying Related Case: 22−cv−04075, # 2 Exhibit A, # 3 Exhibit B, # 4 Exhibit C, # 5 Exhibit D, # 6 Exhibit E, # 7 Exhibit F − 1, # 8 Exhibit F − 2, # 9 Exhibit F − 3, # 10 Exhibit F − 4)(Ring, Daniel) (Entered: 10/23/2025) |
| 10/23/2025 | 2 | Exhibit re 1 Notice of Removal, *Exhibit F − 5* by 3M Company. (Ring, Daniel) (Entered: 10/23/2025) |
| 10/23/2025 | 3 | Exhibit re 1 Notice of Removal, *Exhibit G − 1* by 3M Company. (Ring, Daniel) (Entered: 10/23/2025) |
| 10/23/2025 | 4 | Exhibit re 1 Notice of Removal, *Exhibit G − 2* by 3M Company. (Ring, Daniel) (Entered: 10/23/2025) |
| 10/23/2025 | 5 | Exhibit re 1 Notice of Removal, *Exhibit G − 3* by 3M Company. (Ring, Daniel) (Entered: 10/23/2025) |
| 10/23/2025 | 6 | Federal Rule of Civil Procedure 7.1 Disclosure Statement by 3M Company. (Ring, Daniel) (Entered: 10/23/2025) |
| 10/24/2025 | 7 | Exhibit re 1 Notice of Removal, *Exhibit G − 4* by 3M Company. (Ring, Daniel) (Entered: 10/24/2025) |
| 10/24/2025 | 8 | Exhibit re 1 Notice of Removal, *Exhibit G − 5* by 3M Company. (Ring, Daniel) (Entered: 10/24/2025) |
| 10/24/2025 | 9 | NOTICE of Appearance of Attorney by Daniel Rock Flynn on behalf of People of the State of Illinois, ex rel. Kwame Raoul, Attorney General of the State of Illinois (Flynn, Daniel) (Entered: 10/24/2025) |
| 10/24/2025 | 10 | NOTICE of Appearance of Attorney by Anna C Skinner on behalf of People of the State of Illinois, ex rel. Kwame Raoul, Attorney General of the State of Illinois (Skinner, Anna) (Entered: 10/24/2025) |
| 10/27/2025 | 11 | MOTION PLAINTIFFS MOTION FOR STATUS CONFERENCE AND/OR EXPEDITED BRIEFING SCHEDULE ON THE PEOPLES MOTION FOR REMAND by Plaintiff People of the State of Illinois, ex rel. Kwame Raoul, Attorney General of the State of Illinois. Responses due by 11/10/2025 (Flynn, Daniel) (Entered: 10/27/2025) |
| 10/29/2025 | | TEXT ORDER entered by Chief Judge Sara Darrow on October 29, 2025. Plaintiff's 11 Motion for Status Conference and/or Expedited Briefing Schedule on the People's Motion for Remand is DENIED. Plaintiff does not specify what type of expedited briefing schedule it seeks. Plaintiff may file its motion for remand as soon as it desires. Defendant's response will be due within fourteen days of service of the motion. See Civil LR 7.1(B)(2). Any motion for leave to file a reply would be due within 7 days of service of the response. Id. 7.1(B)(3). Out of respect for the state court's case management order and trial setting, the Court is unlikely to grant extensions of these deadlines. (AV) (Entered: 10/29/2025) |

| 10/31/2025 | 12 | NOTICE of Appearance of Attorney by Stephen J Sylvester on behalf of All Plaintiffs (Sylvester, Stephen) (Entered: 10/31/2025) |
|---|---|---|
| 10/31/2025 | 13 | NOTICE of Appearance of Attorney by Joseph M. Callow, Jr on behalf of People of the State of Illinois, ex rel. Kwame Raoul, Attorney General of the State of Illinois (Callow, Joseph) (Entered: 10/31/2025) |
| 10/31/2025 | 14 | NOTICE of Appearance of Attorney by Gregory Michael Utter on behalf of People of the State of Illinois, ex rel. Kwame Raoul, Attorney General of the State of Illinois (Utter, Gregory) (Entered: 10/31/2025) |
| 11/06/2025 | 15 | MOTION to Remand by Plaintiff People of the State of Illinois, ex rel. Kwame Raoul, Attorney General of the State of Illinois. Responses due by 11/20/2025 (Attachments: # 1 Exhibit Memorandum in Support of Motion to Remand, # 2 Exhibit A – Notice of Removal)(Flynn, Daniel) (Entered: 11/06/2025) |
| 11/20/2025 | 16 | RESPONSE to Motion re 15 MOTION to Remand */ Defendant 3M Company's Opposition to Plaintiff People of the State of Illinois' Motion to Remand* filed by Defendant 3M Company. (Ring, Daniel) (Entered: 11/20/2025) |
| 11/20/2025 | 17 | MOTION to Stay *Pending the JPML's Final Decision Regarding Transfer of Case* by Defendant 3M Company. Responses due by 12/4/2025 (Attachments: # 1 Memorandum in Support of Motion for Stay)(Ring, Daniel) (Entered: 11/20/2025) |
| 11/24/2025 | 18 | NOTICE re 17 MOTION to Stay *Pending the JPML's Final Decision Regarding Transfer of Case* (Flynn, Daniel) (Entered: 11/24/2025) |
| 11/26/2025 | 19 | ORDER entered by Chief Judge Sara Darrow on November 26, 2025. Plaintiff People of the State of Illinois, ex rel. Kwame Raoul, Attorney General of the State of Illinois's ("the State") 15 Motion to Remand is GRANTED. This suit is remanded back to the Circuit Court of the Fourteenth Judicial Circuit, Rock Island County. The Clerk is directed to enter judgment and close the case. The Court GRANTS the State's request for attorney's fees. The State is DIRECTED to file a brief detailing the attorneys' fees it incurred litigating the motion to remand and supporting evidence by December 8, 2025. Defendant 3M Company can file a response addressing only the amount of the attorneys' fees by December 22, 2025. The 17 Motion to Stay is MOOT in light of the remand. The Court finds that an immediate remand is warranted here because the removal was unfounded and the State will be prejudiced by any further delay in the state case caused by a stay. Accordingly, the Court DISSOLVES the automatic stay under Federal Rule of Civil Procedure 62(a) immediately. The Court ORDERS the Clerk to effectuate the remand by mailing a certified copy of this order to the Clerk of the Circuit Court for the Fourteenth Judicial Circuit. See 28 U.S.C. 1447(c). See full written Order. (RES) (Entered: 11/26/2025) |
| 11/26/2025 | 20 | JUDGMENT entered. (RES) (Entered: 11/26/2025) |
| 11/26/2025 | | Remark: Certified copies of 19 Order, 20 Judgment, and docket sheet conventionally mailed to the Clerk of the Circuit Court for the Fourteenth Judicial Circuit. (RES) (Entered: 11/26/2025) |
| 11/26/2025 | 21 | NOTICE OF APPEAL as to 19 Order on Motion to Remand,,,,,, Order on Motion to Stay,,,,, by 3M Company. Filing fee $ 605, receipt number AILCDC−4876339. (Ring, Daniel) (Entered: 11/26/2025) |
| 11/26/2025 | 22 | Short Record of Appeal Sent to US Court of Appeals re 21 Notice of Appeal. (KLC) (Entered: 11/26/2025) |
| 11/26/2025 | 23 | NOTICE of Docketing Record on Appeal from USCA re 21 Notice of Appeal filed by 3M Company. USCA Case Number 25−3133. (KLC) (Entered: 11/26/2025) |
| 11/26/2025 | 24 | MOTION for Clarification Regarding Automatic Stay Pending Appeal by Defendant 3M Company. Responses due by 12/10/2025 (Attachments: # 1 Brief in Support of Motion)(Ring, Daniel) (Entered: 11/26/2025) |
| 12/01/2025 | | TEXT ORDER entered by Chief Judge Sara Darrow on December 1, 2025. On November 26, 2025, the Court entered 20 judgment remanding this case to the Circuit Court of the Fourteenth Judicial Circuit, Rock Island County. Defendant 21 appealed the judgment. Defendant also filed a 24 motion asking the Court to clarify whether 19 its remand order, see 19 Nov. 16, 2025 Order 11−−13, is automatically stayed pending |

| | | appellate review. Defendant requested a ruling on the motion by December 3, 2025. If Plaintiff intends to respond to Defendant's <u>24</u> motion for clarification, the Court DIRECTS it to do so by December 2, 2025. (JSH) (Entered: 12/01/2025) |
|---|---|---|
| 12/02/2025 | <u>25</u> | RESPONSE to Motion re <u>24</u> MOTION for Clarification Regarding Automatic Stay Pending Appeal filed by Plaintiff People of the State of Illinois, ex rel. Kwame Raoul, Attorney General of the State of Illinois. (Flynn, Daniel) (Entered: 12/02/2025) |
| 12/03/2025 | <u>26</u> | ORDER entered by Chief Judge Sara Darrow on December 3, 2025. Defendant 3M Company's <u>24</u> Motion for Clarification Regarding Automatic Stay Pending Appeal is DENIED. This case is not subject to an automatic stay pending appeal. (AV) (Entered: 12/03/2025) |
| 12/05/2025 | <u>27</u> | MDL Remark: ORDER VACATING CONDITIONAL TRANSFER ORDER (JJK) (Entered: 12/05/2025) |
| 12/08/2025 | <u>28</u> | MOTION for Attorney Fees by Plaintiff People of the State of Illinois, ex rel. Kwame Raoul, Attorney General of the State of Illinois. Responses due by 12/22/2025 (Attachments: # <u>1</u> Exhibit Declaration of Flynn, # <u>2</u> Exhibit DiCello Levitt Resume, # <u>3</u> Exhibit Declaration of Sylvester, # <u>4</u> Exhibit Time Report)(Flynn, Daniel) (Entered: 12/08/2025) |
| 12/22/2025 | <u>29</u> | RESPONSE to Motion re <u>28</u> MOTION for Attorney Fees filed by Defendant 3M Company. (Ring, Daniel) (Entered: 12/22/2025) |
| 01/27/2026 | | TEXT ORDER entered by Chief Judge Sara Darrow on January 27, 2026. The Court granted Plaintiff's request for attorneys' fees under 28 U.S.C. 1447(c). <u>19</u> Nov. 26, 2025 Order 10–11. At the Court's direction, Plaintiff provided a <u>28</u> brief requesting $304,261.00 in attorneys' fees and $2,387.15 in litigation expenses. Defendant 3M Company opposed Plaintiff's request for fees, see <u>16</u> Resp. Mot. Remand 22, but does not contest the amount of the fees Plaintiff seeks, <u>29</u> Resp. Br. Supp. 1. Despite Defendant's lack of objection, the Court DENIES Plaintiff's <u>28</u> request for $304,261.00 in attorneys' fees without prejudice. 28 U.S.C. 1447(c) allows a court to order "payment of just costs and any actual expenses, including attorney fees, incurred as a result of" an improper removal. The Seventh Circuit has held that under section 1447(c), a court may award only the attorneys' fees the party opposing removal actually incurred as a result of the removal. See Wis. v. Hotline Indus., Inc., 236 F.3d 363, 367–68 (7th Cir. 2000). Plaintiff's <u>28</u> brief does not reference this standard; instead, it applies the standard for statutes that allow for a reasonable attorney's fee. See <u>28</u> Br. Supp. 2–3. Plaintiff has not provided any evidence that the amount of fees it requests are fees it actually incurred. As to the private attorneys, Plaintiff provides no evidence that the rates identified are the rates at which the attorneys have charged Plaintiff. And as to the assistant attorney generals, the proper measure of actual fees incurred is likely "a proportional share of the salaries of [the] attorneys handling the removal" rather than standard market rates. Hotline, 236 F.3d at 368. Plaintiff has, however, provided sufficient evidence that $2,387.15 in PACER and Westlaw fees were actually incurred as a result of the removal. Flynn Decl. para. 33, Br. Supp. Ex. A, ECF No. 28–1. Accordingly, at this time, the Court GRANTS Plaintiff $2,387.15 in fees under 28 U.S.C. 1447(c). Plaintiff may file another brief detailing the amount of attorneys' fees it actually incurred by February 17, 2026. The Court recognizes that the amount of fees Plaintiff seeks is unopposed and that the Court has "discretion to tailor the documentation requirement according to the stakes involved," Hotline, 236 F.3d at 368 (quotation marks omitted), but it will not award over $300,000 in attorneys' fees for a case that was actively litigated on this Court's docket for less than two months without any proof that the large sum of attorneys' fees requested was actually incurred. (KLC) (Entered: 01/27/2026) |
| 02/17/2026 | <u>30</u> | MOTION for Attorney Fees by Plaintiff People of the State of Illinois, ex rel. Kwame Raoul, Attorney General of the State of Illinois. Responses due by 3/3/2026 (Attachments: # <u>1</u> Exhibit Time Sheet)(Flynn, Daniel) (Entered: 02/17/2026) |
| 02/25/2026 | <u>31</u> | NOTICE OF APPEAL as to Order on Motion for Attorney Fees,,,,,,,,, by 3M Company. Filing fee $ 605, receipt number AILCDC–4934591. (Ring, Daniel) (Entered: 02/25/2026) |
| 02/25/2026 | <u>32</u> | Short Record of Appeal Sent to US Court of Appeals re <u>31</u> Notice of Appeal. (BMG) (Entered: 02/25/2026) |

| 02/25/2026 | 33 | NOTICE of Docketing Record on Appeal from USCA re 31 Notice of Appeal filed by 3M Company. USCA Case Number 26–1381. (SKR) (Entered: 02/25/2026) |
|---|---|---|

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE CENTRAL DISTRICT OF ILLINOIS**

| | |
|---|---|
| PEOPLE OF THE STATE OF ILLINOIS, *ex rel*. KWAME RAOUL, Attorney General of the State of Illinois,<br><br>    Plaintiff,<br><br> v.<br><br>3M COMPANY, ET AL.,<br><br>    Defendants. | Civil Action No. 25-cv-4189 |

## <u>NOTICE OF APPEAL</u>

Pursuant to 28 U.S.C. §§ 1291 and 1447(d) and Rule 3 of the Federal Rules of Appellate Procedure, Defendant 3M Company hereby gives notice that it appeals to the United States Court of Appeals for the Seventh Circuit from the Order entered in the above-captioned case on November 26, 2025 (Dkt. 19), granting Plaintiff's Motion to Remand to State Court (Dkt. 15).

A20

Dated: November 26, 2025

Respectfully submitted,

*/s/ Lauren R. Goldman*

Lauren R. Goldman (*admission pending*)
Justine Goeke (*admission pending*)
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY 10166
Tel: (212) 351-2375
lgoldman@gibsondunn.com
jgoeke@gibsondunn.com

Jonathan C. Bond (*admission pending*)
GIBSON, DUNN & CRUTCHER LLP
1700 M Street, N.W.
Washington, D.C. 20036
Tel: (202) 955-8500
jbond@gibsondunn.com


*/s/ Daniel L. Ring*
Daniel L. Ring
JENNER & BLOCK LLP
353 N. Clark Street
Chicago, IL 60654
Tel: (312) 923-2625
DRing@jenner.com

*Counsel for Defendant 3M Company*

```
MIME-Version:1.0
From:ECF_Returns@ilcd.uscourts.gov
To:ECF_Notices
Bcc:
--Case Participants: Daniel L. Ring (1158119420@filings.docketbird.com,
docketing@jenner.com, dring@jenner.com, pfas_pleadings@gunster.com), Joseph M. Callow, Jr
(jcallow@callowandutter.com), Gregory Michael Utter (gmutter@callowandutter.com), Anna C
Skinner (6231766420@filings.docketbird.com, askinner@dicellolevitt.com), Daniel Rock Flynn
(5693057420@filings.docketbird.com, dflynn@dicellolevitt.com), Stephen J Sylvester
(stephen.sylvester@ilag.gov), Magistrate Judge Ronald L Hanna
(chambers.hanna@ilcd.uscourts.gov), Chief Judge Sara Darrow
(chambers.darrow@ilcd.uscourts.gov, sara_darrow@ilcd.uscourts.gov)
--Non Case Participants: Brian O'Connor Watson (bwatson@rshc-law.com)
--No Notice Sent:

Message-Id:5292964@ilcd.uscourts.gov
Subject:Activity in Case 4:25-cv-04189-SLD-RLH People of the State of Illinois, ex rel.
Kwame Raoul, Attorney General of the State of Illinois v. 3M Company Order on Motion for
Attorney Fees
Content-Type: text/html
```

## U.S. District Court

## CENTRAL DISTRICT OF ILLINOIS

**Notice of Electronic Filing**

The following transaction was entered on 1/27/2026 at 9:31 AM CST and filed on 1/27/2026

| | |
|---|---|
| **Case Name:** | People of the State of Illinois, ex rel. Kwame Raoul, Attorney General of the State of Illinois v. 3M Company |
| **Case Number:** | 4:25-cv-04189-SLD-RLH |
| **Filer:** | |

**WARNING: CASE CLOSED on 11/26/2025**

| | |
|---|---|
| **Document Number:** | No document attached |

**Docket Text:**

**TEXT ORDER entered by Chief Judge Sara Darrow on January 27, 2026. The Court granted Plaintiff's request for attorneys' fees under 28 U.S.C. 1447(c). [19] Nov. 26, 2025 Order 10–11. At the Court's direction, Plaintiff provided a [28] brief requesting $304,261.00 in attorneys' fees and $2,387.15 in litigation expenses. Defendant 3M Company opposed Plaintiff's request for fees, see [16] Resp. Mot. Remand 22, but does not contest the amount of the fees Plaintiff seeks, [29] Resp. Br. Supp. 1. Despite Defendant's lack of objection, the Court DENIES Plaintiff's [28] request for $304,261.00 in attorneys' fees without prejudice. 28 U.S.C. 1447(c) allows a court to order "payment of just costs and any actual expenses, including attorney fees, incurred as a result of" an improper removal. The Seventh Circuit has held that under section 1447(c), a court may award only the attorneys' fees the party opposing removal actually incurred as a result of the removal. See Wis. v. Hotline Indus., Inc., 236 F.3d 363, 367–68 (7th Cir. 2000). Plaintiff's [28] brief does not reference this standard; instead, it applies the standard for statutes that allow for a reasonable attorney's fee. See [28] Br. Supp. 2–3. Plaintiff has not provided any evidence that the amount of fees it requests are fees it actually incurred. As to the private attorneys, Plaintiff provides no evidence that the rates identified are the rates at which the attorneys have charged Plaintiff. And as to the assistant**

A22

6

**attorney generals, the proper measure of actual fees incurred is likely "a proportional share of the salaries of [the] attorneys handling the removal" rather than standard market rates. Hotline, 236 F.3d at 368. Plaintiff has, however, provided sufficient evidence that $2,387.15 in PACER and Westlaw fees were actually incurred as a result of the removal. Flynn Decl. para. 33, Br. Supp. Ex. A, ECF No. 28–1. Accordingly, at this time, the Court GRANTS Plaintiff $2,387.15 in fees under 28 U.S.C. 1447(c). Plaintiff may file another brief detailing the amount of attorneys' fees it actually incurred by February 17, 2026. The Court recognizes that the amount of fees Plaintiff seeks is unopposed and that the Court has "discretion to tailor the documentation requirement according to the stakes involved," Hotline, 236 F.3d at 368 (quotation marks omitted), but it will not award over $300,000 in attorneys' fees for a case that was actively litigated on this Court's docket for less than two months without any proof that the large sum of attorneys' fees requested was actually incurred. (KLC)**

**4:25–cv–04189–SLD–RLH Notice has been electronically mailed to:**

Joseph M. Callow, Jr     jcallow@callowandutter.com

Daniel Rock Flynn     dflynn@dicellolevitt.com, 5693057420@filings.docketbird.com

Stephen J Sylvester     stephen.sylvester@ilag.gov

Gregory Michael Utter     gmutter@callowandutter.com

Daniel L. Ring     DRing@jenner.com, 1158119420@filings.docketbird.com, docketing@jenner.com, pfas_pleadings@gunster.com

Anna C Skinner     askinner@dicellolevitt.com, 6231766420@filings.docketbird.com

**4:25–cv–04189–SLD–RLH Notice has been delivered by other means to:**

A23

E-FILED
Wednesday, 25 February, 2026  08:55:57 AM
Clerk, U.S. District Court, ILCD

**IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS**

PEOPLE OF THE STATE OF ILLINOIS, *ex rel*.
KWAME RAOUL, Attorney General of the State of
Illinois,

        Plaintiff,

   v.

3M COMPANY, ET AL.,

        Defendants.

Civil Action No. 25-cv-4189

## NOTICE OF APPEAL

Pursuant to 28 U.S.C. §§ 1291 and 1447(d) and Rule 3 of the Federal Rules of Appellate Procedure, Defendant 3M Company hereby gives notice that it appeals to the United States Court of Appeals for the Seventh Circuit from the Order entered in the above-captioned case on January 27, 2026 (text order), granting in part Plaintiff's request for litigation expenses as described in Plaintiff's Brief in Support of Attorneys' Fees and Litigation Expenses in Relation to the Motion to Remand (Dkt. 28).  Defendant 3M Company appeals the Order's grant of $2,387.15 to Plaintiff in litigation expenses under 28 U.S.C. § 1447(c).  Defendant 3M Company previously filed a notice of appeal from this Court's November 26, 2025, order granting remand and holding that Plaintiff is entitled to attorney fees and costs (Dkt. 19, 20, 21).  *See* 28 U.S.C. § 1447(d).

A24

Dated: February 25, 2026

Respectfully submitted,

*/s/ Lauren R. Goldman*

Lauren R. Goldman (*admission pending*)
Justine Goeke (*admission pending*)
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY 10166
Tel: (212) 351-2375
lgoldman@gibsondunn.com
jgoeke@gibsondunn.com

Jonathan C. Bond (*admission pending*)
GIBSON, DUNN & CRUTCHER LLP
1700 M Street, N.W.
Washington, D.C. 20036
Tel: (202) 955-8500
jbond@gibsondunn.com

*/s/ Daniel L. Ring*
Daniel L. Ring
JENNER & BLOCK LLP
353 N. Clark Street
Chicago, IL 60654
Tel: (312) 923-2625
DRing@jenner.com

*Counsel for Defendant 3M Company*

A25

## IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS

|  |  |
|---|---|
| PEOPLE OF THE STATE OF ILLINOIS, *ex rel.* KWAME RAOUL, Attorney General of the State of Illinois,<br><br>　　　　　　Plaintiff,<br><br>　　v.<br><br>3M COMPANY, ET AL.,<br><br>　　　　　　Defendants. | Civil Action No.　25-cv-4189<br><br><br>**NOTICE OF REMOVAL** |

Defendant 3M Company ("3M"), by undersigned counsel, hereby gives notice of the removal of this action, pursuant to 28 U.S.C. §§ 1442(a)(1) and 1446, from the State of Illinois Circuit Court of the Fourteenth Judicial Circuit, Rock Island County, to the United States District Court for the Central District of Illinois. As grounds for removal, 3M alleges as follows:

### PRELIMINARY STATEMENT

1.　　This case belongs in federal court. 3M has a federal defense that entitles it to removal under the federal officer removal statute. But, in an effort to avoid litigating this case in federal court, the State of Illinois ("State") previously made an extraordinary concession to the Seventh Circuit—that if even a "morsel of contamination is not from PFAS produced" at the 3M facility in Cordova, Illinois ("Cordova Facility"), then "the State's recovery is barred." *Illinois ex rel. Raoul v. 3M Co.*, 111 F.4th 846, 849 (7th Cir. 2024). Now, the State's own discovery responses reveal that it no longer intends to abide by its representations to the Seventh Circuit. In an about-face, the State now admits that it seeks to recover at sites near the Cordova Facility with PFAS contamination stemming from multiple sources, including in places that are also plausibly contaminated with PFAS from aqueous film-forming foam ("AFFF") manufactured pursuant to

A26

military specifications ("MilSpec"). This extraordinary reversal, coupled with 3M's plausible allegations of PFAS contamination from MilSpec AFFF in at-issue natural resources near the Cordova Facility, means that 3M can present a colorable federal government contractor defense and is entitled to remove this case. *See id.*; *see also Papp v. Fore-Kast Sales Co.*, 842 F.3d 805, 810–15 (3d Cir. 2016).

* * *

2.      AFFF is a firefighting foam that is highly effective for extinguishing fuel-based fires. At facilities on the banks of the Mississippi—both upriver and downriver from the Cordova Facility—MilSpec AFFF produced by 3M was plausibly discharged into the river. PFAS from that MilSpec AFFF commingled with PFAS from the Cordova facility, which itself is located along the banks of the Mississippi. And in particular, MilSpec AFFF used or otherwise released at the Savanna Army Depot (approximately 30 miles upstream from the Cordova Facility) and the Rock Island Arsenal (located approximately 25 miles downstream from the Cordova Facility) plausibly contributed to the contamination alleged by the State.

3.      Under the federal government contractor defense recognized in *Boyle v. United Technologies Corp.*, 487 U.S. 500 (1988), 3M is not subject to tort liability for its design and manufacture of MilSpec AFFF and its provision of warnings for the product. On that basis, 3M previously removed this case three years ago. 3M alleged that some of the PFAS contamination in the Mississippi River plausibly came from MilSpec AFFF used or stored at the Rock Island Arsenal. This Court remanded this case to state court, and the Seventh Circuit affirmed.

4.      In reaching its decision, the Seventh Circuit observed that "[i]f the contamination came from AFFF, then the government contractor defense could apply." *Raoul*, 111 F.4th at 848. And this is true, under the Seventh Circuit's earlier decision in *Baker v. Atlantic Richfield Co.*, 962

F.3d 937 (7th Cir. 2020), even where a complaint "expressly excluded 3M for liability for PFAS contamination sourced from AFFF." *Raoul*, 111 F.4th at 848. That is because the "the parties' dispute over 'whether the plaintiffs' injuries arose from products the defendants manufactured for the government … is just another example of a difficult causation question that a federal court should be the one to resolve.'" *Id.* at 849 (quoting *Baker*, 962 F.3d at 945 n.3).

5.      The State strained to distinguish *Baker* and defeat removal. To that end, the State made a "clear[] and unequivocal[]" concession at oral argument before the Seventh Circuit. Specifically, the State represented "*that it would not seek relief from 3M for mixed PFAS contamination*" and "expressly agreed that a fact finder will not need to apportion the PFAS contamination between sources." *Id.* (emphasis added). The Seventh Circuit reasoned that, in light of these absolute concessions, the State had expressly limited its theory of recovery to only those areas where "100% of [the] contamination" was "sourced from the Cordova Facility." *Id.* In the face of this unequivocal representation by the State, the appellate court reasoned that the government contractor defense did not apply in this action. *Id.*

6.      Since this case was remanded, however, the State's verified discovery responses reveal that its representations to the Seventh Circuit are no longer accurate in two principal ways.

7.      *First*, the State now denies—in direct contravention of its prior representations and the Seventh Circuit's decision—that it must prove that 100% of the PFAS detected at or around the Cordova Facility is derived from non-AFFF PFAS from the Cordova Facility in order to establish liability. The State's concession on this point at oral argument could not have been clearer. When asked, "You have to prove that, whatever location you're talking about, that all of

A28

the damage there arose from Cordova and nothing else?," counsel for the State responded, "That's correct." Exhibit A at 18:8–11.[1]

8.    In discovery responses that post-date the Seventh Circuit argument by over a year, the State now says instead that, even if other contamination is present, expert testimony can identify PFAS contamination caused by operations at the Cordova Facility. And according to the State, it need only establish that some PFAS contamination was caused by operations at the Cordova Facility. This revised "theory of recovery" flies in the face of the Seventh Circuit's holding that the "government contractor defense does not apply" because the State concedes that "3M is liable for PFAS contamination *only in areas where the contamination is wholly derived from the Cordova Facility*." *Raoul*, 111 F.4th at 849 (emphasis added).

9.    *Second*, with the exception of AFFF contamination from Rock Island Arsenal, the State now refuses to admit that it won't seek to recover where AFFF is present. In other words, the State admits that it seeks relief for alleged harm where PFAS derived from non-AFFF sources is plausibly alleged to be mixed with PFAS from the use or release of AFFF, just so long as the mixed AFFF did not originate from the Rock Island Arsenal. And the State now maintains that it will present expert testimony to try to rule out PFAS from the Rock Island Arsenal, but it need not rule out PFAS from sources other than the Rock Island Arsenal.

10.    Indeed, based on the State's discovery responses, it is clear that the State construes its oral argument representations as limited to a disclaimer of MilSpec AFFF *from the Rock Island Arsenal*. But that is neither what the State represented nor what the Seventh Circuit held. When pressed at oral argument, the State's concession was unmistakable: "this argument is the same

---

[1] Official audio available at https://media.ca7.uscourts.gov/sound/2024/dab.23-3031.23-3031_05_30_2024.mp3 (last visited Oct. 20, 2025).

whether … the something else that is 'not Cordova' that caused any given contamination. It doesn't matter whether that is MilSpec AFFF, whether 3M made it, or whether it's a completely different chemical . . .. If it's not from Cordova, then the State will not recover." Ex. A, 16:13–18. Based on that representation from the State, the Seventh Circuit held that "[i]f even a morsel of contamination is not from PFAS produced at the Cordova Facility (*such as* AFFF out of the Rock Island Arsenal), the State's recovery is barred." *Id.* at 849 (emphasis added). Rock Island was an example of a source of MilSpec AFFF, not the exclusive site the State needed to carve out in order to recover.

11.     Recent investigation by 3M has identified at least one additional site, the Savanna Army Depot (30 miles upriver from the Cordova Facility), at which MilSpec AFFF was used. And PFAS from the MilSpec AFFF used at the Savanna Army Depot plausibly commingled with the alleged PFAS contamination at sites for which the State seeks recovery in this case: those "at and around the Cordova facility – including, *without limitation*, to the surrounding land, water and natural resources; any Landfill, Public Water System, Water Treatment Facility, Well, Resource at Issue, and/or the Mississippi River – caused by PFAS contamination from the Cordova Facility." Exhibit E, The State's Responses and Objections to 3M's First Set of Requests for Admission ("RFA Responses"), at 5–6 (emphasis added). For example, PFAS from MilSpec AFFF have plausibly commingled in all areas of the Mississippi River for which the State seeks recovery from 3M in this action.

12.     The State's newly-narrowed concession in its RFA Responses, does not disclaim recovery for PFAS contamination from anywhere other than the Rock Island Arsenal, and thus does not reach PFAS contamination from MilSpec AFFF discharged from the Savanna Army Depot. Nor does the State's newly-narrowed concession disclaim recovery for PFAS in the

Mississippi River. This means that, under the State's new theory, the State seeks to recover for mixed PFAS contamination that plausibly includes PFAS from MilSpec AFFF used at the Savanna Army Depot or elsewhere.

13.    In light of the State's verified discovery responses and 3M's own investigation, it is now clear that the State seeks relief against 3M for mixed PFAS contamination, including in the Mississippi River, where MilSpec AFFF contamination from the Savanna Army Depot or elsewhere is plausibly commingled. Thus, a "factfinder will . . . need to apportion PFAS contamination between sources," *Raoul*, 111 F.4th at 849, yet "'another example of a difficult causation question that a federal court should be the one to resolve.'" *Id.* (quoting *Baker*, 962 F.3d at 945 n.3).

## BACKGROUND

### *The State's Action*

14.    The State filed this action on March 16, 2022, in the State of Illinois Circuit Court of the Fourteenth Judicial Circuit, Rock Island County, bearing Case No. 2022LA16. *See* Exhibit B, Summons and Complaint.[2]

15.    The State asserts that it brought this action to hold 3M liable "for its operation of . . . Cordova Facility in Rock Island County, Illinois" and "its discharge . . . of [PFAS] from the Cordova Facility." Exhibit C ("Am. Compl."), p. 1.

16.    The State alleges that 3M has owned and operated the Cordova Facility (located on the banks of the Mississippi River) since the 1970s, and that 3M manufactured and disposed of

---

[2] On March 21, 2025, the State filed an Amended Complaint after the state court partially granted 3M's Motion to Dismiss and dismissed the State's claims for unjust enrichment and air pollution under Section 9(a) of the Illinois Environmental Protection Act. The State repleaded these claims solely to preserve the issues for appeal.

PFAS and PFAS-containing products from the Cordova Facility, allegedly resulting in PFAS contamination of the State's environment and natural resources "at and around" the facility. *Id.* ¶ 105; *see id.* ¶¶ 34–48, 74. The State specifically alleges that 3M has discharged PFAS from the Cordova Facility into the Mississippi River (*id.* ¶¶ 105, 107–108, 129–136), and that PFAS has migrated into the environment from the Cordova Facility (*id.* ¶¶ 143, 178), causing contamination of the State's groundwater, surface waters, wetlands, and wildlife (*id.* ¶¶ 145–180), including the Mississippi River (*e.g.*, *id.* ¶ 129–136, 190–192).

17.    Among other forms of relief, the State seeks "monetary damages for the cost of identifying, monitoring, and remediating contamination caused by the release of PFAS from 3M's Cordova Facility and all damages to the State's environment and its natural resources because of the resulting contamination." *Id.* at p. 1. The State's requested damages include purported damages for all alleged contamination "at and around" the Cordova Facility (*e.g.*, *id.* ¶¶ 248, 259, pp. 55, 57), such as downstream harms caused by PFAS from the Cordova Facility, including damages to "groundwater, surface waters, wetlands, drinking water supplies, biota, wildlife, aquatic life, and their associated soils, sediments, and uses, and other State natural resources and property" (*id.* at p. 61).

18.    Based on allegations concerning 3M's manufacture and discharge of PFAS chemicals in the State of Illinois, the State asserts claims against 3M for multiple counts of violations of the Illinois Environmental Protection Act, 415 ILCS 5/1, *et seq.* (*id.* ¶¶ 181–232), for restoration under the Fish and Aquatic Life Code, 515 ILCS 5/5-5, and the Wildlife Code, 520 ILCS 5/1-10 (*id.* ¶¶ 233–244), and for negligence (*id.* ¶¶ 245–248), trespass (*id.* ¶¶ 249–259), and public nuisance (*id.* ¶¶ 260–264).

### *3M's Original Removal*

19.    3M originally removed this action to this Court on April 21, 2022, asserting federal

officer jurisdiction and federal enclave jurisdiction. *See* Notice of Removal, No. 4:22-cv-04075-

SLD-JEH, ECF No. 1 (C.D. Ill.).

20.    3M alleged that "PFAS contamination of natural resources due to releases from the

Cordova Facility into the Mississippi River could plausibly overlap with PFAS contamination

identified by the U.S. Army that stems from the use, storage, or disposal of MilSpec AFFF at the

Rock Island Arsenal." *See id.* ¶ 32. Thus, "the alleged PFAS contamination for which the State

seeks recovery in this action is plausibly attributable in part to MilSpec AFFF." *Id.* ¶ 33.

21.    On April 29, 2022, the State moved to remand this action. *See* Mot. to Remand, No.

4:22-cv-04075-SLD-JEH, ECF No. 3 (C.D. Ill.). The State argued that "[t]he fatal flaw with 3M's

argument is that the People do not seek in this matter to hold 3M liable for contamination from

MilSpec AFFF that the U.S. Army discharged from the Rock Island Arsenal," so the government

contractor defense that formed the basis of 3M's removal failed. Memo. in Supp. of Mot. to

Remand, No 4:22-cv-04075-SLD-JEH, ECF No. 4 at 2 (C.D. Ill.).

22.    On September 21, 2023, this Court granted the State's motion to remand. The Court

determined that 3M satisfied each element of the federal officer removal statute except that it could

not show it was sued for or relating to an act under color of federal authority. *Illinois ex rel. Raoul

v. 3M Co.*, 693 F. Supp. 3d 948, 956 (C.D. Ill. 2023). In determining that 3M could not meet that

requirement, the Court reasoned that the State "only seeks relief for PFAS contamination from the

Cordova Facility, not for PFAS contamination from other locations." *Id.* at 957. Because the State

had "renounce[ed] all claims stemming from a contractor's work for the federal government, it no

longer becomes necessary to assert the federal government contractor defense." *Id.* The Court's holding therefore depended on the State's disclaimer in its pleading. *See id.*

23.    3M appealed to the Seventh Circuit, which affirmed this Court's remand order. However, the Seventh Circuit based its ruling not on the scope of the State's disclaimer as presented to this Court, but on "the State's concessions on appeal." *Raoul*, 111 F.4th 848.

24.    The Seventh Circuit explained that "[i]f the contamination came from AFFF, then the government contractor defense could apply" even if the State "expressly excluded 3M from liability for PFAS contamination sourced from AFFF." *Id.*  For example, the court reasoned, "if a designated area of the Mississippi River is contaminated with PFAS from both the Cordova Facility and from AFFF, then a factfinder would need to apportion the contamination between that stemming from the Cordova Facility (which would not be subject to the government contractor defense) and that sourced from AFFF (which would potentially be subject to the defense)." *Id.* This would implicate the government contractor defense, providing federal jurisdiction.

25.    However, the "State clearly and unequivocally conceded at oral argument that it would not seek relief against 3M for mixed PFAS contamination" and "agreed that a factfinder will not need to apportion the PFAS contamination between sources." *Id.* at 849. The Seventh Circuit held that these concessions took this case "outside of the scope" of *Baker*, which had found federal officer removal proper. *Id.* These concessions also distinguished this case from one in which a state seeks recovery for mixed contamination, in which case 3M could assert its federal government contractor defense. *See id.* at 848–49. As the Seventh Circuit explained, remand was appropriate here based purely on the concession that "[i]f even a morsel of contamination is not from PFAS produced at the Cordova Facility (such as AFFF out of the Rock Island Arsenal), the State's recovery is barred." *Id.* at 849.

***Additional Facts Relevant To This Removal***

26.    On August 28, 2025, 3M served Requests for Admission on the State. Exhibit D, ("RFAs"). On September 24, 2025, the State served its RFA Responses, which were verified by one of the State's retained experts. Exhibit E, ("RFA Responses").

27.    In response to the first RFA, the State admitted "that it is possible that there is a potential for one or more PFAS to be present at measurable amounts with one or more other PFAS in a media." RFA Responses at 4. The State disclosed for the first time that it "anticipate[s] that expert testimony will identify PFAS contamination caused by operations at the Cordova Facility . . . and that the PFAS contamination at issue in this Action can be identified and traced back to the Cordova Facility, *even if there are other contaminants* in the same media." *Id.* (emphasis added).

28.    When asked in the second RFA to admit that the State "did not seek any recovery . . . for harm . . . where any PFAS, even a morsel, derived from AFFF use or Release is present," the State responded that "the People admit *only* that they are not seeking any recovery or relief in this Action for harm or damage derived from mil-spec AFFF contamination *from the Rock Island Arsenal*." *Id.* at 5 (emphasis added). The State added that it "intend[s] to seek in this Action recovery and relief for harm and damage to Illinois' environment and natural resources at and around the Cordova Facility – including, without limitation, to the surrounding land, water, and natural resources; Landfills, Public Water Systems, Water Treatment Facilities, Wells, Resources at Issue, and/or the Mississippi River – caused by PFAS contamination from the Cordova Facility." *Id.* at 5–6. The State otherwise offered a boilerplate denial. *Id.* at 6. In other words, the State failed to deny that it would seek recovery where any PFAS, even a morsel, derived from AFFF use or Release is present.

29.     And when asked in the fourth RFA to admit that the State did not "seek any recovery . . . for harm . . . where there is PFAS derived from the use or Release of AFFF that has mixed with PFAS unrelated to the use or Release of AFFF," the State again admitted that they "are not seeking any recovery" for harm "from mil-spec AFFF contamination from Rock Island Arsenal." *Id.* at 7. The State further provided that it "believe[s] that expert testimony can identify PFAS contamination caused by operations at the Cordova Facility . . . even if other contamination is present." *Id.* The State otherwise "denied" that it would not seek to recover for mixed AFFF and non-AFFF PFAS. *Id.* In other words, the State failed to deny that it would seek to recover for mixed AFFF and non-AFFF PFAS.

30.     In the sixth RFA, the State was asked to admit that it was "unable to show that 100% of the PFAS detected at or around the Cordova Facility is derived from non-AFFF PFAS or PFAS-containing products . . . Released at or from the Cordova Facility." The State denied that the request "is consistent with their legal obligations to establish liability on the claims asserted in the People's Complaint." *Id.* at 9.

31.     Taken together, the State's verified discovery responses reveal: (1) the State does not deny that it seeks to recover where MilSpec AFFF is present; (2) the State seeks to recover for mixed contamination, including where non-AFFF and AFFF PFAS have plausibly commingled; (3) the State seeks to recover at numerous sites, including, *without limitation* the Mississippi River, where at least some contamination from the Cordova Facility is allegedly present; (4) the State intends to offer testimony to trace or apportion PFAS among sources; (5) the State no longer concedes that 100% of contamination at a site for which it seeks recovery must be sourced from the Cordova Facility or the State's recovery is barred.

32.    Following further investigation, 3M has become aware of at least one additional source of PFAS contamination from MilSpec AFFF that is plausibly commingled in the Mississippi River with PFAS from the Cordova Facility. MilSpec AFFF use at the Savanna Army Depot, which is on the banks of the Mississippi River approximately 30 miles upstream of the Cordova Facility, plausibly resulted in at least part of the contamination for which Illinois seeks to recover.

33.    The State's verified discovery responses, alongside 3M's plausible allegations that MilSpec AFFF commingled with alleged contamination from the Cordova Facility, necessarily mean that a factfinder will need to apportion PFAS contamination between that stemming from the Cordova Facility and that sourced from AFFF (which would be subject to the government contractor defense).

### THE PROCEDURAL REQUIREMENTS FOR REMOVAL UNDER 28 U.S.C. §§ 1442(a)(1) AND 1446 ARE MET

34.    Venue is proper in this Court pursuant to 28 U.S.C. §§ 93(b) and 1442(a) because the State of Illinois Circuit Court of the Fourteenth Judicial Circuit, Rock Island County, is located within the Central District of Illinois.

35.    Pursuant to 28 U.S.C. § 1446(a), true and correct copies of the Summons and Complaint are attached hereto as Exhibit B. True and correct copies of the documents on file in this case (including process, pleadings, and orders served on 3M) prior to the filing of this notice of removal are attached as Exhibits F & G.

36.    Removal is timely under 28 U.S.C. § 1446(b). A defendant removing a case is required to file a notice of removal within 30 days of service on it by the plaintiff of an initial pleading (28 U.S.C. § 1446(b)(1)) or other paper (*id*., § 1446(b)(3)) that, considering "the four corners" of the document, "informs the reader, to a substantial degree of specificity, that all the

elements of federal jurisdiction are present." *McLaren v. UPS Store, Inc.*, 32 F.4th 232, 236 (3d Cir. 2022) (cleaned up); *Walker v. Trailer Transit, Inc.*, 727 F.3d 819, 824 (7th Cir. 2013) ("The 30–day removal clock does not begin to run until the defendant receives a pleading or other paper that affirmatively and unambiguously reveals that the predicates for removal are present."). Although neither the Complaint nor any other paper served by the State (including the RFA Responses), separately or together in combination, contain the information necessary to inform 3M that all of the elements of federal jurisdiction are present, 3M has nevertheless filed this notice of removal within 30 days of service of the State's RFA Responses that have made clear the State's position that its disclaimer covers only MilSpec AFFF contamination stemming from the Rock Island Arsenal to the extent such contamination commingled with contamination from the Cordova Facility. This Notice of Removal is therefore timely. *See Tooley v. Washington Grp. Inter.*, No. 08-1084, 2009 WL 102926, at *7 (C.D. Ill. Jan. 13, 2009) (notice of removal timely where defendant filed removal "within thirty days of receipt" of the plaintiff's interrogatory responses, "which established" the requisite amount in controversy for diversity jurisdiction); *Oehlman v. Wal-Mart Stores East, LP*, No. 2:06 CV 055, 2006 WL 1043465, at *3 (N.D. Ind. Apr. 19, 2006) (similar).

37.    Pursuant to 28 U.S.C. § 1446(d), 3M is serving a copy of this Notice of Removal upon counsel for the State, and a copy is being filed with the Clerk of the State of Illinois Circuit Court of the Fourteenth Judicial Circuit, Rock Island County.

38.    By filing a Notice of Removal in this matter, 3M does not waive and reserves its right to assert any defenses and/or objections to which it may be entitled.

39.    3M reserves the right to further amend or supplement this Notice of Removal.

40.    If any question arises as to the propriety of the removal of this action, 3M requests the opportunity to present a brief and oral argument in support of removal.

## REMOVAL IS PROPER UNDER THE FEDERAL OFFICER REMOVAL STATUTE, 28 U.S.C. § 1442(a)(1)

41.    Removal here is proper under the federal officer removal statute, 28 U.S.C. § 1442(a)(1), which provides for removal of an action relating to a defendant's acts undertaken at the direction of a federal officer. Removal is appropriate under this provision where the removing defendant establishes that: (a) it is a "person" within the meaning of the statute; (b) it acted under federal authority; (c) its actions taken pursuant to a federal officer's direction have a causal nexus with plaintiff's claims or injuries or are otherwise related to the lawsuit; and (d) it can assert a "colorable" federal defense. *See Baker*, 962 F.3d at 941; *see also Mesa v. California*, 489 U.S. 121, 124–25, 129–31, 133–35 (1989); *see also Moore v. Elec. Boat Co.*, 25 F.4th 30, 34 (1st Cir. 2022); *Cuomo v. Crane Co.*, 771 F.3d 113, 115 (2d Cir. 2014); *Isaacson v. Dow Chem. Co.*, 517 F.3d 129, 135 (2d Cir. 2008).

42.    Removal rights under the federal officer removal statute are much broader than under the general removal statute, 28 U.S.C. § 1441. Suits against defendants acting on behalf of federal officers "may be removed despite the nonfederal cast of the complaint; the federal-question element is met if the defense depends on federal law." *Jefferson County v. Acker*, 527 U.S. 423, 431 (1999). This is because § 1442(a)(1) protects "the government's need to provide a federal forum for its officers and those who are 'acting under' a federal office." *Albrecht v. A.O. Smith Water Prods.*, No. 11 Civ. 5990(BSJ), 2011 WL 5109532, at *3 (S.D.N.Y. Oct. 21, 2011) (citation omitted). This important federal policy "should not be frustrated by a narrow, grudging interpretation of [§] 1442(a)(1)." *Willingham v. Morgan*, 395 U.S. 402, 407 (1969). To the contrary, § 1442 as a whole must be "liberally construe[d]" in favor of removal. *Durham v.*

*Lockheed Martin Corp.*, 445 F.3d 1247, 1252 (9th Cir. 2006) (quoting *Colorado v. Symes*, 286 U.S. 510, 517 (1932)); *Maryland v. 3M Co.*, 130 F.4th 380, 388 (4th Cir. 2025) (noting that "'the ordinary presumption against removal does not apply' to federal officer removal" and that "[g]eneral removal principles are . . . inverted when § 1442(a)(1) is at issue") (*quoting Cnty. Bd. of Arlington Cnty., Virginia v. Express Scripts Pharmacy, Inc.*, 996 F.3d 243, 251 (4th Cir. 2021)).

43.    All requirements for removal under § 1442(a)(1) are satisfied where, as here, the notice of removal alleges that the plaintiff's injuries are—at least in part—caused by or related to MilSpec AFFF. *See, e.g.*, *The City of Irondale v. 3M Company, Inc., et al.*, No. 2:23-cv-01327-AMM, 2025 WL 2419238, at \*6 (N.D. Ala. Aug. 19, 2025) (denying motion to remand and noting that for federal officer removal purposes, removal is proper so long as 3M has "put forth a **plausible** case that MilSpec AFFF is a **potential** source of [the plaintiff's] complained-of injury") (emphasis in original); *Nessel v. Chemguard, Inc.*, No. 1:20-cv-1080, 2021 WL 744683, at \*3 (W.D. Mich. Jan. 6, 2021) (denying motion to remand in PFAS case against AFFF manufacturers because, notwithstanding plaintiffs' assertion "that they do not seek resolution of any claims related to MilSpec AFFF, . . . Plaintiffs cannot decide what defense Defendants might present"); *Ayo v. 3M Co.*, No. 18-CV- 0373(JS)(AYS), 2018 WL 4781145 (E.D.N.Y. Sept. 30, 2018) (denying motion to remand and finding that federal officer removal was proper in a lawsuit against AFFF manufacturers of MilSpec AFFF).

44.    The court overseeing the *In re Aqueous Film-Forming Foams Products Liability Litigation* multi-district litigation ("MDL") has also found on multiple occasions that removal under § 1442 is proper where the notice of removal alleges that the plaintiff's injuries are caused, at least in part, by MilSpec AFFF. *See In re AFFF Prods. Liab. Litig.*, 2019 WL 2807266, at \*2–3 (D.S.C. May 24, 2019) ("MDL Order 1"); Order, *In re AFFF Prods. Liab. Litig.*, MDL No. 2:18-

A40

mn-2873-RMG, ECF No. 320 (D.S.C. Sept. 27, 2019) ("MDL Order 2"), at 3–5; Order, *In re AFFF Prods. Liab. Litig.*, MDL No. 2:18-mn-2873-RMG, ECF No. 325 (D.S.C. Oct. 1, 2019) ("MDL Order 3"), at 3–6.  Given its experience with the claims and defenses in the AFFF litigation, the MDL Court's holdings demonstrate that this case, too, has been properly removed to federal court.[3]

A.    **MilSpec AFFF**

45.    Since the late 1960s/early 1970s, the United States military has used MilSpec AFFF on military bases, airfields, and Navy ships—settings where fuel fires are inevitable and potentially devastating—to train its personnel, put out fires, save lives, and protect property. In fact, the United States Naval Research Laboratory developed AFFF; its researchers were granted the first AFFF patent in 1966.[4] Decades later, the Naval Research Laboratory described the development of AFFF as "one of the most far-reaching benefits to worldwide aviation safety."[5]

46.    The design and manufacture of MilSpec AFFF are governed by rigorous military specifications created and administered by Naval Sea Systems Command, part of the Department of Defense ("DoD"). The applicable specification, Mil-F-24385, was first promulgated in 1969, and has been revised several times since.[6] All MilSpec AFFF products must be "qualified for

---

[3] Following removal, 3M intends to designate this action for transfer to the MDL. Although the Judicial Panel on Multidistrict Litigation previously declined to transfer this action to the MDL, the Panel has since found transfer of cases relating to the Cordova Facility to be appropriate in light of evidence that "AFFF has been used at the Cordova facility for fire suppression since 1969 and that, historically, wastewater containing AFFF was discharged, spilled, or released at the facility." Transfer Order, *In re AFFF*, MDL No. 2873, ECF No. 3420 at 1–2 (J.P.M.L. Apr. 3, 2025).

[4] U.S. Patent No. 3,258,423 (filed Sept. 4, 1963; published June 28, 1966).

[5] U.S. Navy, NRL/MR/1001-06-8951, U.S. Naval Research Lab., *The U.S. Naval Research Laboratory (1923-2005): Fulfilling the Roosevelts' Vision for American Naval Power*, at 37 (June 30, 2006) ("*Fulfilling the Roosevelts' Vision*"), https://permanent.fdlp.gov/gpo125428/roosevelts.pdf.

[6] The 1969 MilSpec and all its revisions and amendments through April 2020 are available at https://tinyurl.com/yxwotjpg.

listing on the applicable Qualified Products List" prior to military procurement.[7] Prior to such listing, a "manufacturer's . . . products are examined, tested, and approved to be in conformance with specification requirements."[8] The MilSpec designates Naval Sea Systems Command as the agency responsible for applying these criteria and determining whether AFFF products satisfy the MilSpec's requirements.[9] After a product is added to the Qualified Products List, "[c]riteria for retention of qualification are applied on a periodic basis to ensure continued integrity of the qualification status."[10] Naval Sea Systems Command "reserves the right to perform any of the [quality assurance] inspections set forth in the specification where such inspections are deemed necessary to ensure supplies and services conform to prescribed requirements."[11]

47.    From its inception until 2019, the MilSpec for AFFF included the express requirement that MilSpec AFFF contain "fluorocarbon surfactants." All fluorocarbon surfactants are PFAS, and that category includes PFOA, PFOS, and their precursors—among the compounds expressly alleged to be at issue in this action.[12] *See, e.g.*, Am. Compl. at p. 1, ¶¶ 43–44, 46–47. The current MilSpec expressly contemplates the presence of PFOA and PFOS (subject to recently

---

[7] MIL-PRF-24385F(4) § 3.1 (2020).

[8] DoD SD-6, Provisions Governing Qualification at 1 (Feb. 2014), https://tinyurl.com/y5asm5bw.

[9] *See, e.g.*, MIL-PRF-24385F(4) at 18 (2020). The cited MilSpec designates Naval Sea Systems Command as the "Preparing Activity." The "Preparing Activity" is responsible for qualification. (*See* DoD SD-6, *supra* n.9, at 3.)

[10] DoD SD-6, *supra* n.9, at 1.

[11] *See, e.g.*, MIL-PRF-24385F(4) § 4.1 (2020).

[12] *See* Mil-F-24385 § 3.2 (1969); MIL-PRF-24385F(2) § 3.2 (2017). In May 2019, the MilSpec was revised to drop the explicit requirement that the surfactants in the product be "fluorocarbon." *See* MIL-PRF-24385F(3) § 3.2 (2019). But under current technology, the only AFFF products capable of meeting the MilSpec's stringent performance requirements—and the only ones listed on the military's Qualified Product List—are those containing fluorocarbon surfactants. Thus, as a practical matter, the MilSpec still requires fluorocarbon surfactants.

imposed limits) in AFFF formulations.[13] Indeed, the current MilSpec recognizes that it is not yet technically feasible for manufacturers to completely eliminate PFOA and PFOS "while still meeting all other military specification requirements."[14]

48.     3M manufactured and sold PFAS-containing MilSpec AFFF to the U.S. military for over three decades pursuant to contracts with the United States. One or more of 3M's AFFF products were on the Navy's Qualified Products List for AFFF from 1970 until 2010 (even though 3M had phased out production of AFFF beginning in 2000).[15] Over time, the U.S. military used MilSpec AFFF manufactured by 3M throughout the United States, including in Illinois.

**B.     MilSpec AFFF Plausibly Contributed to PFAS Contamination Alleged By The State.**

*The State Has Abandoned Its Position That Served As The Basis For Remand*

49.     In its RFA Responses, the State has revealed that it means to narrow the scope of its oral argument concession that it would not seek relief against 3M for mixed PFAS contamination—*i.e.*, from any source other than the Cordova facility.

50.     At oral argument before the Seventh Circuit, the State expressly limited its theory of recovery to locations where all of the alleged PFAS contamination originated only from Cordova. When asked, "You have to prove that, whatever location you're talking about, that all of the damage there arose from Cordova and nothing else?," counsel for the State responded, "That's correct." Exhibit A at 18:8–11.

---

[13] *See* MIL-PRF-24385F(4) § 6.6 & Tables 1, 3 (2020).

[14] MIL-PRF-24385F(4) § 6.6.

[15] *See* MIL-F-24385 QPL/QPD History for Type 3 AFFF (Oct. 24, 2014) & MIL-F-24385 QPL/QPD History for Type 6 AFFF (Oct. 24, 2014) (available at *In re AFFF Prods. Liab. Litig.*, No. 2:18-mn-02873, ECF No. 1969-24 (D.S.C.)).

51.    The State's litigation tactics on this issue, recently revealed in discovery, are directly contrary to what the State represented to the Seventh Circuit to secure the prior remand of this action to state court. The State's positions make plain that 3M has a colorable federal defense and is entitled to a federal forum to litigate it.

52.    In affirming remand of this action, the Seventh Circuit made clear that "if a designated area of the Mississippi River is contaminated with PFAS from both the Cordova Facility and from AFFF, then a factfinder would need to apportion the contamination" and the action would properly proceed in federal court. *Raoul*, 111 F. 4th at 848. However, because the State "clearly and unequivocally conceded at oral argument that it would not seek relief against 3M for mixed PFAS contamination" and "expressly agreed that a factfinder would not need to apportion PFAS contamination between sources," the Seventh Circuit found 3M could not present a colorable government contractor defense. *Id.* at 849.

53.    That is no longer the case. In its RFA Responses, the State walks back its oral argument concession to the Seventh Circuit that it would not seek relief against 3M at any sites where there is mixed PFAS contamination from sources other than Cordova. The State now attempts to limit its oral argument concession to provide only that it will not seek to recover for PFAS from MilSpec AFFF used or stored at the Rock Island Arsenal. Even that narrowed concession will, by the State's admission in its RFA Responses, require the factfinder to decide whether the State has in fact distinguished the source of PFAS in the Mississippi since the State still maintains claims for PFAS contamination in the river. But more fundamentally, this change of tack demonstrates that State does not intend to rule out PFAS contamination from any other source, including MilSpec AFFF from the Savanna Army Depot upstream from the Cordova facility. Because the State no longer concedes that it can only recover where "100% of the

A44

contamination must be sourced from Cordova" alone, 3M will have a colorable federal defense based on plausibly commingled MilSpec AFFF and is entitled to remove the case under the federal officer removal statute to litigate the defense and challenge the State's expert testimony.

### The State's Claims Plausibly Stem From Contamination Caused By MilSpec AFFF

54. As set forth below, the contamination of natural resources alleged by the State was plausibly caused by the use of MilSpec AFFF, including at the Savanna Army Depot and Rock Island Arsenal. Specifically, based on the upstream and downstream releases of MilSpec AFFF into the Mississippi River, the portions of the Mississippi River and the wildlife—for which the State seeks recovery in this case—are plausibly contaminated with PFAS from the use of MilSpec AFFF. The State's claims thus relate to or arise in part from PFAS-containing MilSpec AFFF.

55. The Savanna Army Depot is a U.S. military facility located on the banks of the Mississippi River approximately 30 miles upstream from 3M's Cordova Facility.

56. In February 2021, U.S. Army Corps of Engineers prepared a final site inspection report related to PFAS use and contamination at the Savanna Army Depot.[16] The "primary objective" of the Savanna Report was to "determine the presence or absence of PFOS or PFOA in groundwater" at locations at the Savanna Army Depot. Savanna Report at 1-1, 1-4.

57. The Savanna Report noted a history of fire training activities at the Savanna Army Depot, which included the use of AFFF. The Savanna Report specifically identified the use at the facility of AFFF manufactured by 3M. *Id.* at 1-5, 3-1, 7-1.

---

[16] *See Site Inspection Report for Per- and Polyfluoroalkyl Substances at SVAD-067 – Fire Training Area and SVAD-084 – Scrap Wood Open Burn Area*, U.S. Army Corps of Engineers (February 2021), available at https://aec.army.mil/Portals/115/PFAS/SVDA_PFAS_SI.pdf? ver=jmDmDtuHGo_eZCLK30H4lg%3d%3d ("Savanna Report").

58.     The Savanna Report also explained that, at the fire training area examined, the "primary release mechanism of PFAS to the environment . . . is from the use of AFFF products to extinguish fires during firefighting training activities." *Id.* at 5-3. The report further explained that "[d]uring fire training exercises, contaminants released onto the soil subsequently would have migrated to groundwater." *Id.* And, as shown in Figure 5-2 of the Savanna Report, the predominant groundwater flow direction from the fire training area is towards the Mississippi River. *Id.* at 5-5.

59.     The Savanna Report also determined that at the scrap wood open burn area examined, the "primary release mechanism of PFAS to the environment . . . is from the use of AFFF products to extinguish burning scrap wood fires during firefighting training activities." *Id.* at 6-1. The report further explained that "[d]uring the fire training exercises, contaminants released onto the soil subsequently would have migrated to groundwater." *Id.* And, as shown in Figure 6-2 of the Savanna Report, the predominant groundwater flow direction from the scrap wood open burn area is towards the Mississippi River. *Id.* at 6-3.

60.     The Savanna Report concludes that "groundwater sampling results indicate PFOS/PFOA chemicals are present at levels exceeding" the United States Environmental Protection Agency Lifetime Health Advisory. *Id.* at 7-1.

61.     Because the Savanna Army Depot is a U.S. military facility, any AFFF used, stored, or disposed at the Savanna Army Depot would have been MilSpec AFFF.

62.     Moreover, because the Savanna Army Depot is on the banks of the Mississippi River approximately 30 miles upstream from 3M's Cordova facility, alleged downstream PFAS contamination of natural resources due to releases from the Cordova Facility into the Mississippi River plausibly overlaps with PFAS contamination identified by the U.S. Army that stems from the use, storage, or disposal of MilSpec AFFF at the Savanna Army Depot.

63.      The Rock Island Arsenal is a U.S. military facility located on the banks of the Mississippi River approximately 25 miles downriver from 3M's Cordova facility. The U.S. Army prepared a Preliminary Assessment and Site Inspection of the Rock Island Arsenal to investigate PFAS contamination at that facility, including contamination from PFOS and PFOA.[17]

64.      The Rock Island Report identified multiple areas of potential interest ("AOPIs") where the use, storage, or disposal of PFAS-containing materials had occurred, and determined that elevated levels of PFOS and PFOA existed in the groundwater at many of those areas. Rock Island Report at ES-1 to ES-2. Those included AFFF storage warehouses and fire training areas. *Id.*; *see also id.* at -13–14 (identifying "AFFF Use, Storage, and Disposal Areas").

65.      The Rock Island Report explains that "AFFF-use and storage was identified at nine areas" of potential interest, including firefighting training areas and AFFF storage areas where AFFF is currently stored. *Id.* at 13. The report also identified an additional site, an "Old Landfill," where burn pits "indicate[d] the use of AFFF during fire training exercises." *Id.* at 15. In addition, the report confirmed the use of AFFF during "two occurrences of the RIA Fire Department responding to offsite fires." *Id.*

66.      The Rock Island Report also describes historical evidence that "firefighting foam operations [were] conducted in the Mississippi River" and that the "foam [was] released into the Mississippi River during training exercises." *Id.* at ES-1. The report further explains that "[s]urface water runoff and/or groundwater associated with the AOPIs may discharge to the Mississippi River." *Id.* at 40, 41, 42; *see also id.* at 13 (noting that "seeps located in the Mississippi River" are

---

[17] *See Final Preliminary Assessment and Site Inspection of Per- and Polyfluoroalkyl Substances*, *Rock Island Arsenal, Illinois*, U.S. Army Corps of Engineers (October 2022), available at https://aec.army.mil/Portals/115/PFAS/RIA_PFAS_PASI.pdf?ver=tVBlnHZuHIWi_Qya25i16Q %3d%3d ("Rock Island Report").

"downgradient" from training areas where AFFF was used). The report acknowledges that PFAS "impacts from other sources" may have contributed to PFAS contamination of the Mississippi River from the Rock Island Arsenal. *Id.* at 29, 30.

67.    Because the Rock Island Arsenal is a U.S. military facility, any AFFF used, stored, or disposed at the Rock Island Arsenal would have been MilSpec AFFF.

68.    Moreover, because the Rock Island Arsenal is on the banks of the Mississippi River, 25 miles downriver from 3M's Cordova facility, alleged downstream PFAS contamination of natural resources due to releases from the Cordova Facility into the Mississippi River could plausibly overlap with PFAS contamination identified by the U.S. Army that stems from the use, storage, or disposal of MilSpec AFFF at the Rock Island Arsenal.

69.    The unspecified wildlife and fish for which the State seeks recovery in this case live in or consume water from portions of the Mississippi River near the Savanna Army Depot and the Rock Island Arsenal. Those wildlife and fish can and do freely move upstream and downstream and thus may be plausibly impacted by MilSpec AFFF use at the Savanna Army Depot and the Rock Island Arsenal.

70.    Accordingly, the alleged PFAS contamination in the Mississippi River and other natural resources, fish and wildlife for which the State seeks recovery in this action is plausibly attributable in part to MilSpec AFFF, and the State has attempted to limit its now ineffective disclaimer to contamination caused by MilSpec AFFF from the Rock Island Arsenal (but not the Savanna Army Depot), 3M is entitled to remove this case as a whole pursuant to federal officer jurisdiction.

C.    **All the Requirements of 28 U.S.C. § 1442(a)(1) Are Satisfied.**

71.    In granting the State's motion to remand after 3M filed its first removal, this Court determined that 3M had satisfied every element of the federal officer removal statute except the

"under color of federal authority requirement." *Raoul*, 693 F. Supp. 3d at 956 ("The outcome of Plaintiff's motion to remand thus hinges on the under color of federal authority requirement.") (internal quotations omitted). Because the State has effectively abandoned its disclaimer by stating that a factfinder will be called upon to determine whether any PFAS contamination at a particular location can be attributed to MilSpec AFFF, 3M's NOR now satisfies each element of the federal officer removal statute.

### 1. The "Person" Requirement Is Satisfied.

72.    The first requirement for removal under the federal officer removal statute is satisfied here because 3M (a corporation) meets the definition of "person" under the statute. For purposes of § 1442(a)(1), the term "person" includes corporations. *Papp*, 842 F.3d at 812 (quoting 1 U.S.C. § 1); *accord Isaacson*, 517 F.3d at 135–36.

### 2. The "Acting Under" Requirement Is Satisfied.

73.    The second requirement ("acting under" a federal officer) is satisfied when an entity assists or helps carry out the duties or tasks of a federal officer. *Watson v. Philip Morris Co., Inc.*, 551 U.S. 142, 152 (2007); *Papp*, 842 F.3d at 812.  The phrase "acting under" is to be "liberally construed in favor of the entity seeking removal." *Sawyer v. Foster Wheeler LLC*, 860 F.3d 249, 255 (4th Cir. 2017) (internal quotation marks omitted). "[C]ourts have unhesitatingly treated the 'acting under' requirement as satisfied where a contractor seeks to remove a case involving injuries arising from equipment that it *manufactured for the government*." *Id.*

74.    The requirement of "acting under" a federal officer is met here because the alleged PFAS contamination at issue in this action stems in part from MilSpec AFFF, a vital product provided by 3M that otherwise "the Government would have had to produce itself." *Isaacson*, 517 F.3d at 137. MilSpec AFFF is a mission-critical military and aviation safety product that, without the support of private contractors, the government would have to produce for itself. *See Ayo*, 2018

A49

WL 4781145, at *9 (describing MilSpec AFFF as a "mission-critical" and "life-saving product" used by all branches of the U.S. armed forces and NATO members (internal quotation marks omitted)); *cf. Isaacson*, 517 F.3d at 137. The Naval Research Laboratory states that, "[a]lthough [it] was responsible for the original concepts and formulations, it was necessary to elicit the aid of the chemical industry to synthesize the fluorinated intermediates and agents to achieve improvements in formulations."[18] Accordingly, the military has long depended upon outside contractors like 3M to develop and supply AFFF. *See Nessel*, 2021 WL 744683, at *3 (holding that AFFF manufacturers were "acting under" a federal officer in connection with the manufacture and sale of MilSpec AFFF); *Ayo*, 2018 WL 4781145, at *8–9 (same); *see also* MDL Order 1, 2019 WL 2807266, at *2 (finding that the "acting under" requirement was satisfied because defendant demonstrated that it was manufacturing AFFF under the guidance of the U.S. military); MDL Order 2, at 3–5; MDL Order 3, at 3–6.

75.   In designing, manufacturing, and supplying the MilSpec AFFF at issue, 3M acted under the direction and control of federal officers. Specifically, 3M acted in accordance with detailed specifications, promulgated by Naval Sea Systems Command, that govern AFFF formulation, performance, testing, storage, inspection, packaging, and labeling. Further, MilSpec AFFF products were subject to various tests by the U.S. Navy before and after being approved for use by the military and for inclusion on the Qualified Products List maintained by the DoD.[19] 3M has satisfied the "acting under" requirement. *See, e.g.*, *Nessel*, 2021 WL 744683, at *3; *Ayo*, 2018 WL 4781145, at *8–9.

---

[18] Fulfilling the Roosevelts' Vision, *supra* n. 6, at 37.

[19] *See* DoD, SD-6, *supra* n. 9, at 1.

### 3.    The "Under Color Of Federal Office" Requirement Is Satisfied.

76.    The third requirement, that the defendant's actions were taken "under color of federal office," is satisfied where there is a "nexus" between "the allegations in the complaint and conduct undertaken at the behest of a federal officer." *Moore*, 25 F.4th at 34 n.2 (quoting *R.I. v. Shell Oil Prods. Co., L.L.C.*, 979 F.3d 50, 59 (1st Cir. 2020)). As with the "acting under" requirement, "[t]he hurdle erected by this requirement is quite low." *Isaacson*, 517 F.3d at 137. To meet this requirement, "there need be only *a connection or association* between the act in question and the federal office." *Sawyer*, 860 F.3d at 258 (internal quotation marks omitted).[20]

77.    Here, the State's claims against 3M for alleged PFAS contamination of natural resources and property are for or relate to (at least in part) 3M's design, manufacture, and sale of MilSpec AFFF—which was designed and manufactured according to DoD military specifications and which has been used, stored, and/or released at military facilities (and elsewhere) in Illinois. *See supra* ¶¶ 45–70. As a result, the State's claims against 3M relate to their acts taken under color of federal office. *See Maryland*, 130 F.4th at 391 (nexus element satisfied where 3M "plausibly alleged that PFAS intermingled to the point that it is impossible to identify their source," such that MilSpec AFFF "contributed to at least" part of the contamination); *Ayo*, 2018 WL 4781145, at *9 ("[T]here is evidence of a 'casual connection' between the use of PFCs in AFFF and the design and manufacture of AFFF for the government."); MDL Order 1, 2019 WL 2807266, at *3 (nexus element satisfied where "[Plaintiff]'s claims arise out of use of AFFF products . . . for which the U.S. military imposes MilSpec standards"); MDL Order 2, at 5 (nexus element satisfied where

---

[20] The "acting under" and "under color of" prongs overlap. Both "are satisfied if the actions subject to suit resulted directly from government specifications or direction." *Albrecht*, 2011 WL 5109532, at *5.

AFFF products, "for which the military imposes MilSpec standards," were the alleged cause of plaintiff's injuries); MDL Order 3, at 5–6 (same).

78.    It is immaterial that the State purports to disclaim recovery for alleged contamination stemming from AFFF. Courts "credit Defendants' theory of the case when determining whether [the] causal connection exists." *Isaacson*, 517 F.3d at 137; *see also Raoul*, 111 F.4th at 848 ("If the contamination came from AFFF, then the government contractor defense could apply. This would be true even though the State's complaint expressly excluded 3M from liability for PFAS contamination sourced from AFFF."); *Maryland*, 130 F.4th at 389; *Puerto Rico v. Express Scripts, Inc.*, 119 F.4th 174, 192 (1st Cir. 2024); *Nessel*, 2021 WL 744683, at *3 (noting that "Plaintiffs cannot decide what defense Defendants might present"); Case Management Order No. 36, *In re: Aqueous Film-Forming Foams Prod. Liab. Litig.*, No. 2:18-mn-02873-RMG, ECF No. 7891 (D.S.C. Aug. 22, 2025) (finding efforts "to avoid the MDL and/or federal jurisdiction by denying, disclaiming, or omitting allegations concerning exposure to AFFF" to be "contrary to law" under *Maryland*). In any case, as explained above, the State's RFA Responses have made clear that it does not intend to be bound by the concessions the Seventh Circuit found to be necessary to preclude 3M's assertion of a colorable federal defense. *See supra* ¶¶ 26–33, 49–53.

79.    As averred in this Notice of Removal, the alleged injuries arise at least in part from alleged exposure to MilSpec AFFF. Accordingly, the State's claims are "for or relating to" 3M's actions under color of federal office (28 U.S.C. § 1442(a)(1)), and 3M is entitled to remove this case as a whole pursuant to § 1442(a)(1). *See, e.g.*, *Bennett v. MIS Corp.*, 607 F.3d 1076, 1084 n.6 (6th Cir. 2010) ("[S]ection 1442(a)(1) authorizes removal of the entire case even if only one of the controversies it raises involves a federal officer or agency.").

4.          *The "Colorable Federal Defense" Requirement Is Satisfied.*

80.     The fourth requirement ("colorable federal defense") is satisfied by 3M's assertion of the government contractor defense.

81.     At the removal stage, a defendant need only show that its government contractor defense is colorable—that is, "that the defense was 'legitimate and [could] reasonably be asserted, given the facts presented and the current law.'" *Papp*, 842 F.3d at 815 (alteration in original) (citation omitted). "A defendant 'need not win his case before he can have it removed.'" *Id.* (quoting *Willingham*, 395 U.S. at 407); *see also Isaacson*, 517 F.3d at 139 ("To be 'colorable,' the defense need not be 'clearly sustainable,' as the purpose of the statute is to secure that the validity of the defense will be tried in federal court.") (citation omitted); *O'Connell v. Foster Wheeler Energy Corp.*, 544 F. Supp. 2d 51, 54 (D. Mass. 2008) (upon removal, defendant must raise "colorable federal defense"). At the removal stage, the inquiry "is purely jurisdictional, and neither the parties nor the district courts should be required to engage in fact-intensive motion practice, pre-discovery, to determine the threshold jurisdictional issue." *Cuomo*, 771 F.3d at 116; *see also Kraus v. Alcatel-Lucent*, No. 18-2119, 2018 WL 3585088, at *2 (E.D. Pa. July 25, 2018) ("A court does not 'determine credibility, weigh the quantum of evidence or discredit the source of the defense' at this stage.  Instead, [the court] only determine[s] whether there are sufficient facts alleged to raise a colorable defense.") (internal citation omitted). Moreover, "this inquiry is undertaken whilst viewing the facts in the light most favorable to Defendants." *Hagen v. Benjamin Foster Co.*, 739 F. Supp. 2d 770, 783–84 (E.D. Pa. 2010). "Precisely in those cases where a plaintiff challenges the factual sufficiency of the defendant's defense, the defendant should 'have the opportunity to present [his] version of the facts to a federal, not a state, court.'" *Cuomo*, 771 F.3d at 116 (alteration in original) (citation omitted).

A53

82.     This is particularly true here, where the State avoided federal jurisdiction by taking a position before the Seventh Circuit from which it has since retreated. Not only do the State's RFA Responses indicate that it has substantially narrowed its oral argument concession, but also the State contends it can offer expert evidence to demonstrate whether contamination was caused by MilSpec AFFF. But the Seventh Circuit rejected 3M's government contractor defense solely because "the State expressly agreed that a factfinder would not need to apportion the PFAS contamination." *Raoul*, 111 F.4th at 849. The State has now made it plain that it seeks to recover for mixed AFFF and non-AFFF PFAS contamination, and there will be presentation of disputed evidence and testimony as to the source of contamination at locations for which it seeks to recover. This necessarily gives rise to "difficult causation question[s] that a federal court should be the one to resolve'" and makes 3M's government contractor defense "viabl[e]." *Id.* (cleaned up) (quoting *Baker*, 962 F.3d at 945 n.3).

83.     Under the government contractor defense, the defendant is not liable for the design, manufacture, or warnings of equipment or supplies "when (1) the United States approved reasonably precise specifications; (2) the equipment conformed to those specifications; and (3) the supplier warned the United States about the dangers in the use of the equipment that were known to the supplier but not to the United States." *Boyle*, 487 U.S. at 512.

84.     The requirement of "reasonably precise specifications" can be met by evidence showing either (a) that the government's participation in the design of the product "amount[ed] to more than a rubber stamping," or (b) that the government continued to purchase or use a product after the government became aware that the product contained the alleged defect. *Ramey v. Martin-Baker Aircraft Co. Ltd.*, 874 F.2d 946, 950 (4th Cir. 1989). Naval Sea Systems Command participated in the design of MilSpec AFFF, and its role was not a mere "rubber stamping." It

created (and has updated) detailed specifications governing the product's formulation, performance, testing, storage, inspection, packaging, and labeling.[21] Those specifications are "reasonably precise," including in requiring the use of PFAS.[22] In addition, in the past and continuing to the present, the DoD has purchased and used MilSpec AFFF with awareness of the product's PFAS content and of the alleged risks associated with PFAS in the product. *See Ayo*, 2018 WL 4781145, at *12 ("That the DoD knows of the alleged risks of PFC-based AFFF products but continues to purchase them supports the position that the government approved reasonably precise specifications for the claimed defective design.").

85.    With respect to the second requirement, 3M's products have appeared on the DoD Qualified Products List,[23] which could have happened only if Naval Sea Systems Command had first determined that they conformed to the MilSpec. *See Ayo*, 2018 WL 4781145, at *13 ("There is also colorable evidence . . . that Manufacturing Defendants' AFFF products conformed to the government's reasonably precise specifications."); MDL Order 1, 2019 WL 2807266, at *3 (finding that defendant demonstrated a colorable defense "where it contends that its AFFF products were manufactured according to the U.S. military's MilSpec specifications").

86.    Regarding the third requirement, the U.S. government was sufficiently informed regarding alleged product-related "dangers," *Boyle*, 487 U.S. at 512, to exercise its discretionary

---

[21] *See* Mil-F-24385 (1969) and subsequent revisions and amendments, cited in note 7, *supra*.

[22] As noted earlier, until 2019 the specification expressly required that MilSpec AFFF contain "fluorocarbon surfactants," all of which are members of the PFAS family. Even since that express requirement was removed from the specification, the use of PFAS has been implicitly mandated because PFAS-containing surfactants are the only kind that enable AFFF to meet the performance requirements of the specification.

[23] *See* MIL-F-24385 QPL/QPD History for Type 3 AFFF (Oct. 24, 2014); MIL-F-24385 QPL/QPD History for Type 6 AFFF (Oct. 24, 2014) (both available at *In re AFFF Prods. Liab. Litig.*, No. 2:18-mn-02873, ECF No. 1969-24 (D.S.C.)).

authority in specifying and procuring MilSpec AFFF. The military specifications have long included testing protocols and requirements for toxicity, chemical oxygen, and biological demand. Indeed, it is clear that the United States has long understood that AFFF contains PFAS and may contain or break down into PFOS and/or PFOA; that AFFF constituents can migrate through the soil and potentially reach groundwater; and that it has been reported that this may raise environmental or human health issues.[24] For example, as early as October 1980, a report supported by the U.S. Navy Civil Engineering Laboratory, U.S. Air Force Engineering Service Center, and the U.S. Army Medical Research and Development Command stated that AFFF contained fluorocarbons and that "[a]ll of the constituents resulting from firefighting exercises are considered to have adverse effects environmentally."[25] In June 1991, the Air Force stated that past Air Force fire training activities resulted in "adverse environmental impact," including "soil contamination" and the "potential" for "groundwater contamination."[26] By no later than 2001, DoD was aware of data purportedly showing PFAS compounds in MilSpec AFFF to be "toxic" and "persistent."[27] In 2002, the United States Environmental Protection Agency issued a draft hazard assessment for PFOA, which reviewed in detail, among other data, human epidemiological studies and animal

---

[24] *See, e.g.*, EPA, *Revised Draft Hazard Assessment of Perfluorooctanoic Acid and Its Salts* 1-6 (Nov. 4, 2002).

[25] *See* Edward S. K. Chian et al., *Membrane Treatment of Aqueous Film Forming Foam (AFFF) Wastes for Recovery of Its Active Ingredients* 1 (Oct. 1980), https://apps.dtic.mil/dtic/tr/fulltext/u2/a136612.pdf.

[26] USAF, Engineering Technical Letter ETL 91-4: Site Selection Criteria for Fire Protection Training Areas 2 (June 14, 1991).

[27] EPA Presentation on Activities/Issues on Fluorosurfactants, March 16, 2001 (available at *In re AFFF Prods. Liab. Litig.*, No. 2:18-mn-02873, ECF No. 1971-2 (D.S.C.)).

toxicology studies pertaining to alleged associations between PFOA and cancer.[28] More recently, in a November 2017 report to Congress, the DoD acknowledged the concerns raised by the EPA regarding PFOS and PFOA. Nonetheless, it still described AFFF containing PFOS or PFOA as a "mission critical product [that] saves lives and protects assets by quickly extinguishing petroleum-based fires."[29] Indeed, Naval Sea Systems Command continues to require that MilSpec AFFF contain "surfactants,"[30] and recognizes that PFAS, including PFOS and PFOA, will be present (subject to recently imposed limits for PFOS and PFOA) in AFFF formulations.[31] *See Ayo*, 2018 WL 4781145, at *12 ("That the DoD knows of the alleged risks of PFC-based AFFF products but continues to purchase them supports the position that the government approved reasonably precise specifications for the claimed defective design."); MDL Order 1, 2019 WL 2807266, at *3 ("As to whether [defendant] adequately informed the U.S. military of dangers associated with its AFFF products of which the military was not already aware, [defendant] points to materials such as a November 2017 Department of Defense report to Congress, in which the agency acknowledged the [EPA]'s stated concerns with PFOS/PFOA in drinking water").

87.    At minimum, these facts constitute colorable evidence that Naval Sea Systems Command "made a discretionary determination" regarding the formulation of MilSpec AFFF after weighing the fire-suppression benefits against the alleged risks. *See In re "Agent Orange" Prod. Liab. Litig.*, 517 F.3d 76, 90 (2d Cir. 2008); *see also Albrecht*, 2011 WL 5109532, at *5 ("A

---

[28] *See* EPA, Revised Draft Hazard Assessment, *supra* note 25.

[29] DoD, *Aqueous Film Forming Foam Report to Congress* 1–2 (Oct. 2017) (pub. Nov. 3, 2017), https://tinyurl.com/wshcww4.

[30] MIL-PRF-24385F(4) § 3.2 (2020).

[31] *Id.* § 6.6 & Tables I, III; *see also* David Vergun, *DOD Officials Discuss Fire-Fighting Foam Replacement, Remediation Efforts* (Sept. 16, 2020), https://tinyurl.com/ty5ku8hp.

defendant is not required to warn the government where 'the government knew as much or more than the defendant contractor about the hazards of the product.'") (citation omitted). Where, as here, the government has exercised "discretionary authority over areas of significant federal interest such as military procurement," the government contractor defense applies. *In re "Agent Orange" Prod. Liab. Litig.*, 517 F.3d at 89–90; *see also Ayo*, 2018 WL 4781145, at *13.

88.    3M's use of PFAS in MilSpec AFFF was required by military specifications. By seeking to impose tort liability on 3M for alleged injuries to the State that were caused at least in part by 3M's compliance with military specifications, the State is attempting to use state tort law to attack design choices dictated by the military. The government contractor defense precludes such an attack. *See Boyle*, 487 U.S. at 509.

89.    The MDL Court, based on an extensive record, has found that the government contractor defense asserted by 3M and other AFFF manufacturers presents genuine issues of fact for trial. *See In re Aqueous Film-Forming Foams Prods. Liab. Litig.*, 2022 WL 4291357, at *12, 15 (D.S.C. Sept. 16, 2022). A defense that presents triable issues necessarily is "colorable."

90.    Accordingly, 3M is entitled to remove this action to federal court pursuant to the federal officer removal statute, 28 U.S.C. § 1442(a)(1).

WHEREFORE, 3M hereby removes this action from the State of Illinois Circuit Court of the Fourteenth Judicial Circuit, Rock Island County to this Court.

A58

Dated: October 23, 2025

Respectfully submitted,

*/s/ Daniel L. Ring*
Daniel L. Ring
JENNER & BLOCK LLP
353 N. Clark Street
Chicago, IL 60654
(312) 923-2625
DRing@jenner.com

*Counsel for Defendant 3M Company*

## CERTIFICATE OF SERVICE

I, Daniel L. Ring, hereby certify that on October 23, 2025, a copy of the foregoing was served on counsel for Plaintiff via electronic mail and first class mail at the addresses indicated below.

Stephen J. Sylvester
Ellen F. O'Laughlin Karen Howard
OFFICE OF THE ILLINOIS ATTORNEY GENERAL
Environmental Bureau
69 West Washington Street, Suite 1800
Chicago, IL 60602
stephen.sylvester@ilag.gov
ellen.olaughlin@ilag.gov
karen.howard@ilag.gov

Adam J. Levitt
Daniel Rock Flynn
Amy E. Keller
Diandra Debrosse Zimmerman
Anna Claire Skinner
Elizabeth Carpenter
James Crisafulli
Special Assistant Attorneys General
DICELLO LEVITT LLP
Ten North Dearborn Street, Sixth Floor
Chicago, IL 60602
alevitt@dicellolevitt.com
dflynn@dicellolevitt.com
akeller@dicellolevitt.com
fu@dicellolevitt.com
askinner@dicellolevitt.com
ecarpenter@dicellolevitt.com
jcrisafulli@dicellolevitt.com

Joseph M. Callow, Jr.
Gregory M. Utter
Special Assistant Attorneys General
Callow & Utter, LLC
8044 Montgomery Road, Suite 170
Cincinnati, OH 45236
jcallow@callowandutter.com
gmutter@callowandutter.com

Richard W. Fields Martin Cunniff
Special Assistant Attorneys General
FIELDS HAN & CUNNIFF LLC
1700 K. Street NW, Suite 810
Washington, DC 20006
fields@fhcfirm.com
martincunniff@fhcfirm.com

/s/ *Daniel L. Ring*
Daniel L. Ring
*Counsel for Defendant 3M Company*

tance claim in a motion to reopen before the BIA).

Granted, this backstop is not always available. The 90-day deadline for filing motions to reopen is tight, so sometimes petitioners cannot hire new counsel in time. Added to that is the fact that most noncitizens in removal proceedings do not know they have been ill-served by their counsel until they seek a second opinion much later. In these situations, petitioners have two options: (1) they can persuade the government to agree to reopen their removal proceedings, *see* 8 C.F.R. § 1003.23(b)(4)(iv), or (2) they can argue to the BIA for equitable tolling of the motion to reopen deadline, *see, e.g., Patel v. Gonzales*, 442 F.3d 1011, 1013–14 (7th Cir. 2006). Petitioners did not ask the BIA for equitable tolling of the motion to reopen deadline, so we do not reach this issue.

But given the gravity of the consequences Petitioners face because their counsel was unprepared, this might be a case where the government should consider agreeing to reopen the proceedings in the name of justice. *Castaneda-Suarez*, 993 F.2d at 144 ("[C]ourts have consistently held that counsel at a deportation hearing may be so ineffective as to have impinged upon the fundamental fairness of the hearing in violation of the fifth amendment due process clause.") (cleaned).

## III

We DISMISS Josefina Sedano-Bustos and Junny Sedano-Bustos from this appeal for lack of jurisdiction. Four Petitioners remain: Josefina Bustos-Millan, Grethel Morales-Sedano, Martha Sedano-Bustos, and Oscar Sedano-Bustos. But because the IJ did not abuse his discretion in denying the motion to continue and because Petitioners did not raise their claim for ineffec-

tive assistance of counsel before the BIA, we must DENY their petitions for review.



**PEOPLE of the State of Illinois, EX REL. Kwame RAOUL, Attorney General of the State of Illinois, Plaintiff-Appellee,**

**v.**

**3M COMPANY, Defendant-Appellant.**

**No. 23-3031**

United States Court of Appeals, Seventh Circuit.

Argued May 30, 2024

Decided August 7, 2024

**Background:** State brought action in state court against manufacturing company alleging violations of Illinois Environmental Protection Act, Illinois Fish and Aquatic Life Code, Illinois Wildlife Code, and under several common law theories, arising from alleged contamination of river with perfluoroalkyl and polyfluoroalkyl substances (PFAS) produced by company. After company removed the action under the federal officer removal statute, the United States District Court for the Central District of Illinois, Sara Darrow, Chief Judge, 693 F.Supp.3d 948, granted the State's motion to remand. Company appealed.

**Holdings:** The Court of Appeals, Kirsch, Circuit Judge, held that company did not have a colorable federal defense, precluding removal under federal officer removal statute.

Affirmed.

**1. Removal of Cases ⟜107(9)**

Court of Appeals reviews the propriety of the removal of a state-court action de novo.

**2. Removal of Cases ⟜21**

A defendant seeking removal based on the federal officer removal statute must show the following: (1) it is a person within the meaning of the statute; (2) it is acting under the United States (or its agencies or officers); (3) it has been sued for or relating to any act under color of such office; and (4) it has a colorable federal defense to the plaintiff's claim. 28 U.S.C.A. § 1442(a)(1).

**3. Products Liability ⟜177**

The "federal government contractor defense" immunizes government contractors from state tort law when the government had a hand in a defendant's allegedly defective design.

See publication Words and Phrases for other judicial constructions and definitions.

**4. Removal of Cases ⟜21**

State's concession that it was only seeking recovery from manufacturing company for its purported contamination of river with perfluoroalkyl and polyfluoroalkyl substances (PFAS) produced at company's specific facility, and not for any contamination from downstream military arsenal which used and stored company's aqueous film-forming foam (AFFF) which contained PFAS compounds, precluded company from asserting federal government contractor defense and, thus, company did not have a colorable federal defense, as would support removal under federal officer removal statute; State expressly conceded it would not seek relief for any mixed PFAS contamination, and that factfinder would not need to apportion PFAS contamination between sources. 28 U.S.C.A. § 1442(a)(1).

Appeal from the United States District Court for the Central District of Illinois, No. 4:22-cv-04075-SLD-JEH — **Sara Darrow**, *Chief Judge.*

Leigh J. Jahnig, Attorney, Office of the Attorney General, Civil Appeals Division, Chicago, IL, for Plaintiff-Appellee.

Rich F. Bulger, Michael Anthony Scodro, Gary A. Isaac, Avi Kupfer, Attorneys, Mayer Brown LLP, Chicago, IL, for Defendant-Appellant.

Before St. Eve, Kirsch, and Kolar, Circuit Judges.

Kirsch, Circuit Judge.

3M Company operates manufacturing facilities throughout the United States, including in Cordova, Illinois (the Cordova Facility). At the Cordova Facility, which is located along the banks of the Mississippi River, 3M produces numerous chemical products, some of which contain per- and polyfluoroalkyl substances (PFAS). Twenty-five miles downstream from the Cordova Facility sits the United States Army's Rock Island Arsenal. 3M develops and sells aqueous film-forming foam (AFFF)—which contains certain types of PFAS compounds—to the United States military, some of which is used and stored at the Rock Island Arsenal. (Because this AFFF complies with military specifications, it is said to be "MilSpec" AFFF.) However, 3M does not produce or use MilSpec AFFF at the Cordova Facility.

In March 2022, the State of Illinois sued 3M in Illinois state court, alleging violations of the Illinois Environmental Protection Act, 415 ILCS 5/1–5/58.17, the Illinois Fish and Aquatic Life Code, 515 ILCS 5/1-1–5/50-1, and the Illinois Wildlife Code, 520 ILCS 5/1.1–5/4.4. The State also brought its claims under several common

law theories. The State alleged that PFAS from the Cordova Facility contaminated the Mississippi River. Notably, the State excluded PFAS that contaminated Illinois's environment from any facility other than the Cordova Facility (including PFAS used in AFFF) from this case.

3M removed the action to federal district court, citing the federal officer removal statute, 28 U.S.C. § 1442(a)(1), as its basis for federal jurisdiction. Specifically, 3M argued that it planned to assert the federal government contractor defense because some of the alleged PFAS contamination in the Mississippi River may have come from AFFF that 3M provided to the U.S. military and which was used or stored at the Rock Island Arsenal.

The State moved to remand the case back to Illinois state court. The district court granted the State's motion, finding that the case did not relate to a federal act because the State's complaint expressly excluded PFAS contamination sourced from AFFF and instead sought recovery only for contamination from the Cordova Facility (where AFFF is not produced). 3M appealed.

[1, 2]  We review the propriety of the removal of a state-court action de novo. *Betzner v. Boeing Co.*, 910 F.3d 1010, 1014 (7th Cir. 2018). Under the federal officer removal statute, a defendant may remove a state court action to federal court if the suit is against "any person acting under" a federal officer, and the suit is "for or relating to any act under color of such office." 28 U.S.C. § 1442(a)(1). A defendant seeking removal based on this statute must show the following: (1) it is a person within the meaning of the statute; (2) it is acting under the United States (or its agencies or officers); (3) it has been sued "for or relating to any act under color of such office"; and (4) it has a "colorable federal defense to the plaintiff's claim." *Ruppel v. CBS*

*Corp.*, 701 F.3d 1176, 1180–81 (7th Cir. 2012) (quotation omitted).

[3]  3M cannot satisfy the fourth element. The federal government contractor defense "immunizes government contractors from state tort law when the government had a hand in a defendant's allegedly defective design." *Id.* at 1183 (citing *Boyle v. United Techs. Corp.*, 487 U.S. 500, 511–12, 108 S.Ct. 2510, 101 L.Ed.2d 442 (1988)). We need not delve further into the details of the defense, however, because the State's concessions on appeal have foreclosed 3M's ability to assert it.

[4]  3M's defense presumes that the PFAS contamination the State alleges could either have come from the Cordova Facility or from AFFF out of the U.S. Army's Rock Island Arsenal. If the contamination came from AFFF, then the government contractor defense could apply. This would be true even though the State's complaint expressly excluded 3M from liability for PFAS contamination sourced from AFFF. For instance, if a designated area of the Mississippi River is contaminated with PFAS from both the Cordova Facility and from AFFF, then a factfinder would need to apportion the contamination between that stemming from the Cordova Facility (which would not be subject to the government contractor defense) and that sourced from AFFF (which would potentially be subject to the defense).

Indeed, we have previously noted the viability of the government contractor defense in a similar context. In *Baker v. Atlantic Richfield Co.*, 962 F.3d 937 (7th Cir. 2020), former residents of a housing complex sued nine industrial manufacturing companies, alleging that they polluted the soil in and around the site of the residence with lead and arsenic. *Id.* at 939. The defendants removed the case to feder-

al court under the federal officer removal statute, contending that they partially polluted the soil at the government's direction. *Id.* at 939, 944. The plaintiffs then moved to remand the case to state court, which the district court granted. *Id.* at 940. We reversed. In doing so, we rejected the plaintiffs' argument that their lawsuit disclaimed any contamination arising out of the defendants' work for the government. *Id.* at 945 n.3. Instead, we concluded that the parties' dispute over "whether the [plaintiffs'] injuries ar[o]se from products [the defendants] manufactured for the government . . . is just another example of a difficult causation question that a federal court should be the one to resolve." *Id.*

*Baker* might have supplied 3M with a colorable federal defense. But the State clearly and unequivocally conceded at oral argument that it would not seek relief against 3M for mixed PFAS contamination—in other words, PFAS contamination arising from both the Cordova Facility and from AFFF from the Rock Island Arsenal. Further, the State expressly agreed that a factfinder will not need to apportion the PFAS contamination between sources. Simply put, for the State to recover against 3M for PFAS contamination in a designated area, 100% of that contamination must be sourced from the Cordova Facility. If even a morsel of contamination is not from PFAS produced at the Cordova Facility (such as AFFF out of the Rock Island Arsenal), the State's recovery is barred. Because of this concession, this case falls outside of the scope of *Baker*. 3M cannot present a colorable federal government contractor defense in line with *Baker* because the defense is wholly irrelevant under the State's theory of recovery. In this case, 3M is liable for PFAS contamination only in areas where the contamination is wholly derived from the Cordova Facility, and the government contractor defense does not apply to PFAS sourced

from that facility. Thus, 3M's attempt to remove the case under the federal officer removal statute fails under the fourth element.

AFFIRMED



# IN RE: T-MOBILE CUSTOMER DATA SECURITY BREACH LITIGATION

Veera Daruwalla, Washington Western, 2:23-cv-01118; John G. Cooke, Washington Western, 2:21-cv-01324; Michael March, Washington Western, 2:21-cv-01118; Peter Luna, Washington Western, 2:21-cv-01324; Lavicicia Sturdivant, Washington Western, 2:21-cv-01118; Leotha Scott-Boone, Washington Western, 2:21-cv-01324; Stephanie Espanoza, Washington Western, 2:21-cv-01119; Jack Precour, Washington Western, 2:21-cv-01415; Alex Pygin, Washington Western, 2:21-cv-01119; William Captain Reed, Washington Western, 2:21-cv-01415; Stephen J. Vash, Georgia Northern, 1:21-cv-03384; Cesar Lopez, Washington Western, 2:21-cv-01415; Jonathan Morales, Washington Western, 2:21-cv-01119; Edmund Metzger, New York Eastern, 2:21-cv-04721; Thomasina Enoch, Washington Western, 2:21-cv-01415; Judith Weil, New York Eastern, 2:21-cv-04721; Marshall P. Jones, Jr., Washington Western, 2:21-cv-01415; Zorka Lipovic, New York Eastern, 2:21-cv-04721; Cornelia Clay Fulghum, Washington Western, 2:21-cv-01415; Maria Rapestkaya, New York Eastern, 2:21-cv-04721; Linda Song, Washington

that claims 1, 3, 7, and 10 of the '101 Patent are invalid for lack of written description and as anticipated under § 102 and enters judgment for Abbott with respect to claims 1, 3, 7, and 10 of the '101 Patent. The Court grants Defendants' motion for partial summary judgment of no invalidity on obviousness-type double patenting [127] as to claims 9 and 17 of the '101 Patent and denies it as moot as to the remaining asserted claims. The Court enters judgment for Defendants on Abbott's obviousness-type double patenting defense for claims 9 and 17 of the '101 Patent. The Court grants in part and denies in part Abbott's motion for partial summary judgment of non-infringement and summary judgment of no willfulness [150]. To the extent Defendants establish infringement of claims 9 and 17, they can only recover for those Accused Products that incorporate Accused Manufacturing Steps that took place in the United States after November 2, 2019. The Court enters judgment for Abbott that the rpGO-11CKS, rpGO-9CK, HIV-1 rpCKS41, and rp41 HLH-M antigens do not infringe claims 9 and 17 of the '101 Patent under the doctrine of equivalents.



**People of the State of ILLINOIS, EX REL. Kwame RAOUL, Attorney General of the State of Illinois, Plaintiff,**

v.

**3M COMPANY, Defendant.**

**Case No. 4:22-cv-04075-SLD-JEH**

United States District Court,
C.D. Illinois,
Rock Island Division.

Signed September 21, 2023

**Background:** State brought action in state court against manufacturing compa-

ny alleging negligence, trespass, common law public nuisance, common law prohibition on unjust enrichment, and violations of Illinois Environmental Protection Act, Illinois Fish and Aquatic Life Code, and Illinois Wildlife Code in connection with wastewater contamination by perfluoroalkyl and polyfluoroalkyl substances (PFAS). After company removed action asserting federal officer removal statute as basis for jurisdiction, state moved to remand.

**Holdings:** The District Court, Sara Darrow, Chief Judge, held that:

(1) company was "person," as required for company to seek removal under federal officer removal statute;

(2) company was "acting under" United States in manufacturing aqueous film-forming foams (AFFF) containing PFAS for sale to military;

(3) company plausibly alleged federal government contractor defense for damages related to its manufacture of AFFF, as provided company with colorable federal defense required for company to seek removal; but

(4) any wastewater contamination with PFAS caused by company from facility which was subject of litigation was not done "under color of federal authority," as precluded company from seeking removal; and

(5) award of attorney fees was not warranted following remand.

Motion granted.

**1. Removal of Cases ⬥107(7)**

The party seeking removal bears the burden of proving the grounds for its motion.

**2. Removal of Cases ⬥107(7)**

A defendant need not submit evidence in support of its notice of removal under

the federal officer removal statute; rather, jurisdictional allegations control unless it is legally impossible for them to be true. 28 U.S.C.A. § 1442(a)(1).

**3. Removal of Cases ⬙86(1)**

Courts will review allegations in support of removal under the federal pleading standards, asking whether they are facially plausible.

**4. Removal of Cases ⬙21**

Central purpose of federal officer removal statute is to protect federal government and its operations from potential interference by states through proceedings in state court; because such proceedings may reflect local prejudice against unpopular federal laws or federal officials and may deprive federal officials of federal forum in which to assert federal immunity defenses, it is important for federal forum to be available. 28 U.S.C.A. § 1442(a)(1).

**5. Removal of Cases ⬙21**

The same considerations supporting removal for federal officers under the federal officer removal statute apply to a private person who acts with or for federal officers or agents in executing duties under federal law. 28 U.S.C.A. § 1442(a)(1).

**6. Removal of Cases ⬙21**

For a defendant to remove a case pursuant to the federal officer removal statute, it must show it was a (1) person (2) acting under the United States, its agencies, or its officers (3) that has been sued for or relating to any act under color of such office, and (4) has a colorable federal defense to the plaintiff's claim. 28 U.S.C.A. § 1442(a)(1).

**7. Removal of Cases ⬙21, 25(1)**

The federal officer removal statute operates as an exception to the well-pleaded complaint rule: whereas an action may generally only be removed to federal court under federal question jurisdiction if the federal question appears on the face of the properly pleaded complaint, under the federal officer removal statute, the federal-question element is met if the defense depends on federal law. 28 U.S.C.A. § 1442(a)(1).

**8. Removal of Cases ⬙107(7)**

At the removal stage, a court will credit the removing party's theory of the case, even if both sides have reasonable theories.

**9. Removal of Cases ⬙76.5**

The concern in considering a motion to remove is with who makes the ultimate determination, not what that determination will be.

**10. Removal of Cases ⬙21**

Corporations are persons for purposes of the federal officer removal statute. 28 U.S.C.A. § 1442(a)(1).

**11. Removal of Cases ⬙21**

Manufacturing company was "person," as required for company to seek removal under federal officer removal statute of state's action against it in connection with wastewater contamination by perfluoroalkyl and polyfluoroalkyl substances (PFAS), where company was corporation. 28 U.S.C.A. § 1442(a)(1).

See publication Words and Phrases for other judicial constructions and definitions.

**12. Removal of Cases ⬙21**

Courts consider government contractors to be "acting under" the United States, its agencies, or its officers, as a requirement to seek removal under the federal officer removal statute, when they assist, or help carry out, the duties or tasks of the federal superior, such as helping the government to produce an item that it needs. 28 U.S.C.A. § 1442(a)(1).

**13. Removal of Cases ⬲21**

"Acting under," as a requirement to seek removal under the federal officer removal statute, may include situations in which a defendant works hand-in-hand with the federal government to achieve a task that furthers an end of the federal government or in which the federal government uses a private corporation to achieve an end it would have otherwise used its own agents to complete. 28 U.S.C.A. § 1442(a)(1).

**14. Removal of Cases ⬲21**

Mere compliance with the law—even where compliance is overseen by the government—is not sufficient to meet the "acting under" requirement to seek removal under the federal officer removal statute. 28 U.S.C.A. § 1442(a)(1).

**15. Removal of Cases ⬲21**

Manufacturing company was "acting under" United States in manufacturing aqueous film-forming foams (AFFF) containing perfluoroalkyl and polyfluoroalkyl substances (PFAS) for sale to military, as required for company to seek removal under federal officer removal statute of state's action against it in connection with wastewater contamination by PFAS; AFFF were mission critical military and aviation safety product that, without support of private contractors, government would have had to produce for itself, military had long depended on outside contractors to manufacture and supply AFFF, and in designing, manufacturing, and supplying AFFF, company acted in accordance with detailed specifications governing AFFF formulation, performance, testing, storage, inspection, packaging, and labeling. 28 U.S.C.A. § 1442(a)(1).

**16. Products Liability ⬲177**

The "federal government contractor defense" immunizes government contractors from state tort law when the government had a hand in a defendant's allegedly defective design.

See publication Words and Phrases for other judicial constructions and definitions.

**17. Products Liability ⬲177**

The federal government contractor defense applies where (1) the federal government approved reasonably precise specifications, (2) the manufactured equipment conformed to the government's specifications, and (3) the contractor warned the federal government about the equipment's dangers that were unknown to the government.

**18. Removal of Cases ⬲21**

The defense required for a defendant to seek removal under the federal officer removal statute need only be colorable, not clearly sustainable. 28 U.S.C.A. § 1442(a)(1).

**19. Removal of Cases ⬲21**

Manufacturing company plausibly alleged federal government contractor defense for damages related to its manufacture of aqueous film-forming foams (AFFF) containing perfluoroalkyl and polyfluoroalkyl substances (PFAS) for sale to United States military, as provided company with colorable federal defense required for company to seek removal under federal officer removal statute of state's action against it in connection with wastewater contamination by PFAS; government approved rigorous specifications for manufacture and sale of AFFF, expressly contemplating formulations would contain PFAS, company conformed to government's specifications, and government was aware of dangers of AFFF based on testing protocols and its own reports concerning AFFF's adverse environmental effects. 28 U.S.C.A. § 1442(a)(1).

**20. Removal of Cases ⟸21**

That defendant acted generally under federal directive and would have colorable defense for those actions is not sufficient to remove case under federal officer removal statute; actions under federal directive must relate to claims brought in suit. 28 U.S.C.A. § 1442(a)(1).

**21. Removal of Cases ⟸21**

To satisfy the "under color of federal authority" requirement of the federal officer removal statute, a defendant must plausibly allege that the action is connected or associated with acts under color of federal office. 28 U.S.C.A. § 1442(a)(1).

**22. Removal of Cases ⟸21**

Removing defendant seeking removal under federal officer removal statute need not claim that alleged harm arose entirely from acts done under federal authority; all that is needed is allegation that at least some of alleged harm arose from federal acts. 28 U.S.C.A. § 1442(a)(1).

**23. Removal of Cases ⟸21**

Removing defendant seeking removal under federal officer removal statute need not prove conclusively that connection or association exists between acts done under federal authority and at least some of the alleged harm; provided that allegations are sufficient, whether challenged act was outside scope of defendant's official duties, or whether it was specifically directed by federal government, is question for federal, not state, courts to answer. 28 U.S.C.A. § 1442(a)(1).

**24. Removal of Cases ⟸21**

Any wastewater contamination with perfluoroalkyl and polyfluoroalkyl substances (PFAS) caused by manufacturing company from facility which was subject of litigation was not done "under color of federal authority," as precluded company from seeking removal under federal officer removal statute of state's action against company; state expressly disclaimed claims for PFAS contamination stemming from anywhere other than facility, including downstream military installation where aqueous film-forming foams (AFFF) containing PFAS manufactured by company for military were stored and used, state defined PFAS as non-AFFF PFAS, company did not produce AFFF at facility, and company could not face any liability in action for contamination stemming from AFFF released from installation. 28 U.S.C.A. § 1442(a)(1).

**25. Removal of Cases ⟸107(11)**

Award of attorney fees was not warranted following remand of state's action against manufacturing company in connection with wastewater contamination by perfluoroalkyl and polyfluoroalkyl substances (PFAS), where company had previously successfully removed other actions involving PFAS or aqueous film-forming foams (AFFF) containing PFAS company manufactured for United States military under federal officer removal statute on number of other occasions. 28 U.S.C.A. §§ 1442(a)(1), 1447(c).

**26. Removal of Cases ⟸107(11)**

Courts may award attorney fees upon remand only where removing party lacked objectively reasonable basis for seeking removal; conversely, when objectively reasonable basis exists, fees should be denied. 28 U.S.C.A. § 1447(c).

**27. Removal of Cases ⟸107(11)**

District courts retain discretion to consider whether unusual circumstances in a given case warrant a departure from the general rule that attorney fees should be denied upon remand when a party seeking removal had an objectively reasonable basis for removal. 28 U.S.C.A. § 1447(c).

**28. Removal of Cases ⟸2**

Removal under the federal rule of civil procedure governing removal of civil ac-

tions should be construed narrowly and against removal.  28 U.S.C.A. § 1441.

———

Adam J. Levitt, Amy E. Keller, Daniel Rock Flynn, DiCello Levitt Gutzler LLP, Chicago, IL, Gerald Thomas Karr, Stephen J. Sylvester, Office of the Illinois Attorney General, Chicago, IL, Gregory Michael Utter, Joseph M. Callow, Jr., Callow & Utter, LLC, Cincinnati, OH, for Plaintiff.

Daniel L. Ring, Richard F. Bulger, Mayer Brown LLP, Chicago, IL, for Defendant.

## ORDER

SARA DARROW, CHIEF UNITED STATES DISTRICT JUDGE

Before the Court is Plaintiff People of the State of Illinois, *ex rel.* Kwame Raoul, Attorney General of the State of Illinois's Motion to Remand, ECF No. 3. For the following reasons, the motion is GRANTED.

### BACKGROUND

On March 16, 2022, Plaintiff filed a complaint in Illinois state court against Defendant 3M Company. Compl., ECF No. 1-1 at 5–69. According to the complaint, Defendant is a manufacturing company which operates throughout the United States. *Id.* at 10. Since the 1970s, it has operated a manufacturing facility on the banks of the Mississippi River in Cordova, Illinois (the "Cordova Facility"). *Id.* Defendant produces numerous chemical products at this facility, some of which contain perfluoroalkyl and polyfluoroalkyl substances ("PFAS"). *Id.* at 11–12.

PFAS are toxic chemicals that are harmful to public health, safety, and welfare, as well as to the environment. *Id.* at 3. The United States Environmental Protection Agency ("US EPA") has estab-

lished a lifetime health advisory level for certain PFAS compounds. *Id.* at 12. The Illinois Environmental Protection Agency ("Illinois EPA") has also established health advisories containing health-based guidance levels for several PFAS. *Id.* Defendant "has detected PFAS in wastewater at, from, and around the Cordova Facility at levels injurious to public health and welfare and to the environment." *Id.* These levels are "thousands of times higher" than the levels established by the US EPA and the Illinois EPA. *Id.* at 13. The US EPA has also detected levels of PFAS in wastewater from the Cordova Facility that exceed its and the Illinois EPA's established levels. *Id.*

Plaintiff claims that "[o]n information and belief, [Defendant] manufactured and disposed of PFAS and/or PFAS-containing products at the Cordova Facility in a manner that caused PFAS to be released into Illinois' environment." *Id.* at 12. Explicitly excluded from the definition of PFAS as used in the complaint are "any PFAS that have contaminated Illinois' environment or natural resources from aqueous film-forming foams ("AFFF") containing . . . PFAS compound[s]." *Id.* at 8. Plaintiff alleges that Defendant "negligently operated [the] Cordova Facility such that it allowed the discharge, emission, placement, disposal, leakage, spillage, and/or abandonment of PFAS" and that, despite knowing that PFAS are toxic and pose substantial risks to health and the environment, it "persistently and intentionally hid this information from Illinois and the public." *Id.* at 19. Plaintiff brings claims for violation of the Illinois Environmental Protection Act, 415 ILCS 5/1–5/58.17 (Counts I, II, III, IV, and V); violation of the Illinois Fish and Aquatic Life Code, 515 ILCS 5/1-1–5/50-1, and Wildlife Code, 520 ILCS 5/1.1–5/4.4 (Count VI); negligence (Count VII); trespass (Count VIII); common law public nuisance (Count IX); and common law prohi-

bition on unjust enrichment (Count X). Compl. 38–60. It seeks compensatory damages for the PFAS contamination and the costs of remediation; injunctive relief to address past, present, and future PFAS contamination; and statutory penalties, as well as attorney's fees, costs, and prejudgment interest. *Id.* at 61–63.

On April 21, 2022, Defendant removed this action to the Central District of Illinois. Not. Removal, ECF No. 1. It cites the federal officer removal statute, 28 U.S.C. § 1442(a)(1), as the basis for federal jurisdiction. *Id.* at 3. As the suit "seeks damages for all Illinois natural resources allegedly contaminated with PFAS from the Cordova Facility—including downstream areas of the Mississippi River," Defendant argues that the alleged contamination for which Plaintiff alleges Defendant is responsible "plausibly may encompass and overlap with PFAS contamination" from other sources, specifically, the use, storage, and/or disposal of AFFF ("MilSpec AFFF") by the U.S. Military at the Rock Island Arsenal, twenty-five miles downstream from the Cordova Facility. *Id.* at 2. Defendant states that because it developed and sold MilSpec to the U.S. Military, some of which was stored and used at the Rock Island Arsenal, it intends to assert the federal government contractor defense, entitling it to a federal forum. *Id.* at 2, 8, 14.

Plaintiff now moves to remand this case back to state court, arguing that the federal officer removal statute is not a basis for removal because Plaintiff does not seek to hold Defendant liable for contamination from any MilSpec AFFF released from the Rock Island Arsenal but rather only for PFAS discharged specifically from the Cordova Facility. Mem. Supp. Mot. Remand 1–2, ECF No. 4.

## DISCUSSION

### I. Removal

#### A. Legal Standard

[1] "The federal officer removal statute permits a defendant to remove to federal court a state-court action brought against the 'United States or any agency thereof or any officer (or any person acting under that officer) of the United States or of any agency thereof, sued in an official or individual capacity for any act under color of such office.'" *Watson v. Philip Morris Cos.*, 551 U.S. 142, 145, 127 S.Ct. 2301, 168 L.Ed.2d 42 (2007) (emphasis omitted) (quoting 28 U.S.C. § 1442(a)(1)). A plaintiff may move to remand the case to state court for lack of subject matter jurisdiction at any time before final judgment. 28 U.S.C. § 1447(c). "The party seeking removal bears the burden of proving the grounds for its motion." *Ruppel v. CBS Corp.*, 701 F.3d 1176, 1180 (7th Cir. 2012).

[2, 3] A defendant need not submit evidence in support of its notice of removal under the federal officer removal statute. *Betzner v. Boeing Co.*, 910 F.3d 1010, 1016 (7th Cir. 2018). Rather, "[j]urisdictional allegations control unless it is legally impossible for them to be true." *Id.* at 1014 (alteration in original) (quotation marks omitted). Courts will review "allegations in support of removal under the federal pleading standards, asking whether they are facially plausible." *Baker v. Atl. Richfield Co.*, 962 F.3d 937, 941 (7th Cir. 2020).

#### B. Analysis

[4, 5] The central purpose of the federal officer removal statute is to protect the federal government and its operations from potential interference by the states through proceedings in state court. *Watson*, 551 U.S. at 150, 127 S.Ct. 2301. Because such proceedings "may reflect local prejudice against unpopular federal laws

or federal officials" and may deprive federal officials of a federal forum in which to assert federal immunity defenses, it is important for a federal forum to be available. *Id.* (quotation marks omitted). The same considerations apply to a private person who acts with or for federal officers or agents in executing duties under federal law. *Id.* at 151, 127 S.Ct. 2301.

**[6–9]** For a defendant to remove a case pursuant to the statute, it "must show it was a (1) 'person' (2) 'acting under' the United States, its agencies, or its officers (3) that has been sued 'for or relating to any act under color of such office,' and (4) has a colorable federal defense to the plaintiff's claim." *Ruppel*, 701 F.3d at 1180–81 (quoting 28 U.S.C. § 1442(a)). The statute thus operates as an exception to the well-pleaded complaint rule: whereas an action may generally only be removed to federal court under federal question jurisdiction if "the federal question . . . appear[s] on the face of [the] properly pleaded complaint," under the federal officer removal statute, "the federal-question element is met if the defense depends on federal law." *Jefferson County v. Acker*, 527 U.S. 423, 430–31, 119 S.Ct. 2069, 144 L.Ed.2d 408 (1999). At this stage, the court will credit the removing party's theory of the case, even if both sides "have reasonable theories." *See Baker*, 962 F.3d at 947. The concern is "with who makes the ultimate determination, not what that determination will be." *Id.* (quotation marks omitted). The Supreme Court "has made clear that courts must liberally construe" the statute. *Id.* at 941 (quotation marks omitted); *see also Arizona v. Manypenny*, 451 U.S. 232, 242, 101 S.Ct. 1657, 68 L.Ed.2d 58 (1981) (noting that "the policy favoring removal [under the federal officer removal statute] should not be frustrated by a narrow, grudging interpretation of § 1442(a)(1)" (quotation marks omitted)); *Ruppel*, 701 F.3d at 1180 ("[T]he federal officer removal statute is not narrow or limited." (quotation marks omitted)).

The Court will examine whether Defendant has satisfied each requirement of the statute.

#### i. Person Within Meaning of Statute

**[10, 11]** Corporations are persons for purposes of the federal officer removal statute. *See Ruppel*, 701 F.3d at 1181. Defendant states that it is a corporation, Not. Removal 11; *see also* Compl. 10 (alleging that Defendant is a corporation), so the person requirement is satisfied.

#### ii. Acting Under the United States

**[12–14]** Courts consider government contractors to be "acting under" the United States, its agencies, or its officers when they "assist, or . . . help carry out, the duties or tasks of the federal superior," *Watson*, 551 U.S. at 152, 127 S.Ct. 2301 (emphases omitted), such as "help[ing] the [g]overnment to produce an item that it needs," *Baker*, 962 F.3d at 942 (quotation marks omitted); *see, e.g., Betzner*, 910 F.3d at 1015 (finding that the defendant "plausibly alleged that it acted under federal officers when it contracted to manufacture heavy bomber aircraft for the United States Air Force, and that it acted under the military's detailed and ongoing control"). "Acting under" may include situations in which a defendant "work[s] hand-in-hand with the federal government to achieve a task that furthers an end of the federal government" or in which "the federal government uses a private corporation to achieve an end it would have otherwise used its own agents to complete." *Ruppel*, 701 F.3d at 1181. However, mere compliance with the law—even where compliance is overseen by the government—is not sufficient. *Watson*, 551 U.S. at 152, 127 S.Ct. 2301.

**[15]** In the notice of removal, Defendant alleges that for over three decades, it manufactured MilSpec AFFF for sale to the U.S. military. Not. Removal 8. It notes that "MilSpec AFFF is a mission critical military and aviation safety product that, without the support of private contractors, the government would have to produce for itself" and that "the military has long depended upon outside contractors like [Defendant] to manufacture and supply AFFF." *Id.* at 12. Moreover, it asserts, "[i]n designing, manufacturing and supplying MilSpec AFFF products, [Defendant] acted ... in accordance with detailed specifications, promulgated by Naval Sea Systems Command, that govern AFFF formulation, performance, testing, storage, inspection, packaging, and labeling." *Id.* at 13. Because Defendant has thus plausibly alleged that it assisted the federal government in producing a necessary item under the military's observation and control, a task the government would otherwise have had to use its own agents to complete, it has satisfied the "acting under" requirement of the federal officer removal statute. *See Nessel v. Chemguard, Inc.*, No. 1:20-cv-1080, 2021 WL 744683, at *3 (W.D. Mich. Jan. 6, 2021) (finding that the defendants, private contractors, were "acting under" a federal officer by producing Mil-Spec AFFF because that "is a product that the [g]overnment would have had to create if [the] [d]efendants did not exist").

### iii. Colorable Federal Defense

**[16–18]** A defendant must also allege a "colorable or plausible federal defense." *See Hammer v. U.S. Dep't of Health & Hum. Servs.*, 905 F.3d 517, 528 (7th Cir. 2018) (quotation marks omitted). Defendant has stated it intends to assert the federal government contractor defense as to MilSpec AFFF. *See* Not. Removal 15. This defense "immunizes government contractors from state tort law when the government had a hand in a defendant's allegedly defective design." *Ruppel*, 701 F.3d at 1183. It "applies where (1) the federal government approved reasonably precise specifications, (2) the manufactured equipment conformed to the government's specifications, and (3) the contractor warned the federal government about the equipment's dangers that were unknown to the government." *Betzner*, 910 F.3d at 1016 (citing *Boyle v. United Techs. Corp.*, 487 U.S. 500, 512, 108 S.Ct. 2510, 101 L.Ed.2d 442 (1988)). The defense need only be "colorable," not "clearly sustainable." *Ruppel*, 701 F.3d at 1182 (quotation marks omitted).

**[19]** Defendant states that the U.S. government has approved rigorous specifications for the manufacture and sale of MilSpec AFFF, which were created and administrated by Naval Sea Systems Command, namely, that,

> [a]ll MilSpec AFFF products must be qualified for listing on the applicable Qualified Products List prior to military procurement. Prior to such listing, a manufacturer's products are examined, tested, and approved to be in conformance with specification requirements.... After a product is added to the Qualified Products List, [c]riteria for retention of qualification are applied on a periodic basis to ensure continued integrity of the qualification status.

Not. Removal 7 (third alteration in original) (footnote omitted) (quotation marks omitted). It notes that "the current Mil-Spec expressly contemplates that AFFF formulations will contain [PFAS compounds]." *Id.* at 8. Defendant further alleges that the MilSpec AFFF it manufactured conformed to the government's specifications. *See id.* at 16 ("[Defendant's] products appeared on the DOD Qualified Products List, which could have happened only if Naval Sea Systems Command had first determined that they conformed to the

MilSpec [specifications].""). And it claims that "the government was adequately informed regarding alleged product-related dangers" of MilSpec AFFF through "testing protocols and requirements for toxicity, chemical oxygen, and biological demand." *Id.* at 17 (quotation marks omitted) ("[I]t is clear that the United States has long understood that AFFF contain PFAS and may contain or break down into [PFAS compounds]; that AFFF constituents can migrate through the soil and potentially reach groundwater; and that it has been reported that this may raise environmental or health issues."). Defendant points to government reports from 1980 and 2017 discussing the adverse environmental effects of AFFF to illustrate that the government was aware of the dangers of AFFF. *Id.* at 17–18; *see, e.g., Betzner*, 910 F.3d at 1015–16 (finding that the defendant had adequately alleged the federal government contractor defense where it alleged that "the federal government was independently aware of the potential health hazards related to" the acts alleged in the complaint).

For damages related to MilSpec AFFF, Defendant has plausibly alleged each of the three elements of the federal government contractor defense, showing a colorable federal defense.

### iv. Under Color of Federal Authority

[20, 21]  The outcome of Plaintiff's motion to remand thus hinges on the "under color of federal authority" requirement. That a defendant acted generally under a federal directive and would have a colorable defense for those actions is not sufficient to remove a case; the actions under federal directive must relate to the claims brought in the suit. *See Baker*, 962 F.3d at 943; *see Ruppel*, 701 F.3d at 1181 (noting that the "under color of federal authority" requirement "is distinct from the 'acting under' requirement in the same way a bona fide federal officer could not remove

a trespass suit that occurred while he was taking out the garbage"). To satisfy this requirement, a defendant must plausibly allege that the action is "connected or associated[ ] with acts under color of federal office." *Baker*, 962 F.3d at 943–44 (emphases omitted) (quotation marks omitted) (noting that this requirement is more inclusive than the previous requirement that there be a "causal connection" between the suit and acts done under governmental authority).

[22, 23]  A removing defendant need not claim that the alleged harm arose entirely from acts done under federal authority; all that is needed is an allegation that "at least some of the [alleged harm] arose from the federal acts." *Id.* at 945; *see also id.* ("[R]emoval need not be justified as to all claims asserted in the plaintiffs' complaint; rather, the defense need only apply to one claim to remove the case." (quotation marks omitted)). Nor must the defendant prove conclusively that such a connection or association exists; provided that the allegations are sufficient, "whether the challenged act was outside the scope of [the] [d]efendants' official duties, or whether it was specifically directed by the federal [g]overnment, is [a question] for the federal—not state—courts to answer." *Id.* (quotation marks omitted); *see Acker*, 527 U.S. at 432, 119 S.Ct. 2069 (finding that "demanding an airtight case on the merits in order to show the required . . . connection" would "defeat the purpose of the removal statute").

[24]  In the complaint, Plaintiff seeks to recover for PFAS contamination to Illinois' environment and natural resources, including to the Mississippi River, caused by Defendant. *See* Compl. 1, 38–45, 51–54, 57–58. Defendant now alleges that this suit is connected to the MilSpec AFFF it manufactured for the U.S. military and which was stored at the Rock Island Arsenal—

despite Plaintiff's explicit exemption of AFFF from the suit, *id.* at 8—because the alleged contamination to the Mississippi River for which Plaintiff is seeking damages "plausibly may encompass and overlap with PFAS contamination from the use, storage, and discharge of MilSpec AFFF at the Rock Island Arsenal." Not. Removal 2. Thus, Defendant argues, this suit is connected or associated with its actions as a federal contractor. Plaintiff counters that the supposed release of MilSpec AFFF from the Rock Island Arsenal "has nothing to do with a single allegation" in its complaint, as it "seek[s] relief exclusively" for non-AFFF PFAS contamination from Defendant's Cordova Facility. Mem. Supp. Mot. Remand 1–2 ("This case only concerns [Defendant's] release of pollutants from a specific ... facility ....").

"[C]ourts have consistently granted motions to remand where the plaintiff expressly disclaimed the claims upon which federal officer removal was based." *Reinbold v. Advanced Auto Parts, Inc.*, Case No. 18-CV-605-SMY-DGW, 2018 WL 3036026, at *2 (S.D. Ill. June 19, 2018) (collecting cases finding remand appropriate because the plaintiff expressly disclaimed claims for asbestos exposure from military or other federal government locations). By renouncing all claims stemming from a contractor's work for the federal government, it no longer becomes necessary to assert the federal government contractor defense. Plaintiff only seeks relief for PFAS contamination from the Cordova Facility, not for PFAS contamination from other locations. *See* Compl. 1. It expressly defines PFAS as non-AFFF PFAS, *id.* at 8, and Defendant does not assert in its notice of removal that it produced MilSpec AFFF at the Cordova Facility. *See* Mem. Supp. Mot. Remand 3 ("[Defendant] does not contend that it produced or used MilSpec AFFF at its Cordova Facility." (emphasis omitted)). This indicates that Plaintiff has expressly disclaimed claims for

PFAS contamination stemming from anywhere other than the Cordova Facility—including the Rock Island Arsenal—and Defendant cannot be held liable for PFAS contamination from anywhere other than the Cordova Facility.

Defendant points to *Nessel* in support of its argument that it is entitled to raise "the production of MilSpec AFFF as a defense or an alternate theory' of causation" and then assert the federal government contractor defense as to contamination resulting from MilSpec AFFF. *See* Not. Removal 2 (quoting *Nessel*, 2021 WL 744683, at *3). The complaint in *Nessel* was brought to remedy contamination from commercially available AFFF only; a separate case against the same defendants involved MilSpec AFFF. *Nessel*, 2021 WL 744683, at *1. The defendants removed the suit to federal court, arguing that the injuries from commercially available AFFF and MilSpec were "indivisible," and so they intended to assert the federal government contractor defense. *Id.* The court found that removal was proper because the plaintiffs had failed to show that the injuries from the two sources would be "distinguishable" and that "[i]t [wa]s entirely possible that [the] [p]laintiffs' injuries occurred from actions taken while [the] [d]efendants were acting under color of federal office: namely, MilSpec AFFF." *Id.* at *3. It disregarded the plaintiffs' argument that they did not seek resolution of any claims related to MilSpec AFFF because they could not "decide what defense [the] [d]efendants might present." *Id.* The court elaborated:

> Consider, for example, a tort case: a plaintiff can allege that a defendant and only that defendant caused his injury, but a plaintiff cannot prevent a defendant from presenting an alternate theory of causation. Thus, while [the] [p]laintiffs attempt to surgically divide their complaints between [c]ommercial and

MilSpec AFFF, they cannot prevent [the] [d]efendants from raising the production of MilSpec AFFF as a defense or an alternate theory, particularly when [the] [p]laintiffs admit that [the] [d]efendants produced MilSpec AFFF and that PFAS from AFFF spread contamination throughout the state.

*Id.* (emphases omitted).

This Court does not disagree that Defendant could point to PFAS contamination from the use and storage of MilSpec AFFF at the Rock Island Arsenal as an alternate source of the contamination that is the basis of this suit. But even without asserting the federal government contractor defense as to that source of contamination, Defendant cannot be held liable for contamination from the Rock Island Arsenal. In other words, once Defendant shows that a certain portion of the contamination stemmed from MilSpec AFFF released from the Rock Island Arsenal, that contamination is eliminated from the case, whether or not that MilSpec AFFF was produced according to rigorous military specifications and the government was warned of any dangers of which it was unaware. *See supra* Section I(B)(iii); *see also New Hampshire v. 3M Co.*, Civil No. 22-cv-145-LM, 665 F. Supp. 3d 215, 227 (D.N.H. Mar. 29, 2023) (finding that the court lacked removal jurisdiction under the federal officer removal statute in a suit brought for PFAS contamination where the plaintiff had "consistently disclaimed any recovery for contamination resulting from [the defendant's] production of AFFF" because the disclaimer eliminated the connection between the claims and the defendant's production of MilSpec AFFF for the U.S. military). Likewise, Defendant could point to another private company releasing PFAS into the Mississippi River from another facility as an alternate source of the contamination and be released from liability for that contamination, regardless

of that company's status as a federal contractor.

Permitting Defendant to remove this suit under the federal officer removal statute when the federal government contractor defense is irrelevant to the eventual resolution of the case and any PFAS it produced as a military contractor is explicitly excluded from this suit would defeat the purpose of the statute. It is thus impossible for Defendant to be held liable for damages stemming from its actions under federal authority, and so the requisite connection or association is missing. Because the "under color of federal authority" requirement has not been met, federal jurisdiction is not proper. Plaintiff's motion to remand this case to state court is granted.

## II. Attorney's Fees

**[25–27]** In the event that the Court granted its motion to remand, Plaintiff requests that Defendant be ordered to pay the attorney's fees Plaintiff incurred as a result of the removal. Mem. Supp. Mot. Remand 16. 28 U.S.C. § 1447(c) permits an award of attorney's fees upon remand. The Supreme Court has held that there is no strong presumption in favor of a fee award. *Martin v. Franklin Cap. Corp.*, 546 U.S. 132, 137, 126 S.Ct. 704, 163 L.Ed.2d 547 (2005). "[C]ourts may award attorney's fees under § 1447(c) only where the removing party lacked an objectively reasonable basis for seeking removal." *Id.* at 141, 126 S.Ct. 704. "Conversely, when an objectively reasonable basis exists, fees should be denied." *Id.* "[D]istrict courts retain discretion to consider whether unusual circumstances warrant a departure from the rule in a given case." *Id.*

**[28]** The Court declines to use its discretion to order an award of fees in Plaintiff's favor. Unlike removal under 28 U.S.C. § 1441, which "should be construed narrowly and against removal," *People of*

*State of Ill. v. Kerr-McGee Chem. Corp.*, 677 F.2d 571, 576 (7th Cir. 1982), the Supreme Court has made clear that "the policy favoring removal [under § 1442(a)(1)] should not be frustrated by a narrow, grudging interpretation of" the statute, *Manypenny*, 451 U.S. at 242, 101 S.Ct. 1657 (quotation marks omitted). Moreover, it appears that Defendant has successfully removed cases involving PFAS and/or AFFF under the federal officer removal statute on a number of occasions. *See, e.g.*, Not. Removal 6 (collecting cases); Mem. Supp. Mot. Remand 1–2 n.1 (same). Plaintiff's request for attorney's fees is therefore denied.

## CONCLUSION

For the foregoing reasons, Plaintiff People of the State of Illinois, *ex rel.* Kwame Raoul, Attorney General of the State of Illinois's Motion to Remand, ECF No. 3, is GRANTED. This suit is remanded back to the Circuit Court of the Fourteenth Judicial Circuit, Rock Island County.



**Dolores KALLAS, et al., Plaintiffs,**

v.

**Chasen THOMPSON, et al., Defendants**

**Donna Tirva, etc., et al., Plaintiffs,**

v.

**Hilton Spencerport Express, Inc., et al., Defendants.**

**3:22CV838-PPS/MGG**

**Consolidated with: 3:23CV483-PPS/MGG**

United States District Court, N.D. Indiana, South Bend Division.

Signed September 19, 2023

**Background:** Motorist's estate and family members brought action in state court against defendants including trucking company, trucking company's owner, logistics broker who contracted for truck with trucking company, and truck driver arising from fatal collision between motorist's vehicle and truck. Case was removed, and it was consolidated with another case that arose from same collision.

**Holdings:** On its own motion, the District Court, Philip P. Simon, J., held that:

(1) trucking company and its owner failed to satisfy burden of establishing that requirements for diversity jurisdiction were met;

(2) removal statute precluding removal "if any of the parties in interest properly joined and served as defendants" are citizens of forum state does not operate to permit removal on basis of diversity even where the parties are not all diverse so long as the removing defendant has out-of-forum citizenship and files the removal before any non-diverse defendant has been served; and

(3) preemption under the Federal Aviation Administration Authorization Act (FAAA) is express preemption, which falls short of creating federal question jurisdiction.

Consolidation vacated; remanded.

**1. Federal Civil Procedure ⧦678**

A party may plead citizenship facts upon information and belief if the information is outside of its control.

**2. Federal Courts ⧦2477**

Party seeking to invoke federal jurisdiction based on diversity bears the burden of demonstrating that the requirements for diversity are met. 28 U.S.C.A. § 1332(a).

**3. Removal of Cases ⧦107(7)**

In order to bear its burden of demonstrating federal jurisdiction, the party removing a case on diversity grounds must address the citizenship of each of the par-

E-FILED
Thursday, 23 October, 2025  05:18:15 PM
Clerk, U.S. District Court, ILCD

# EXHIBIT A

IN THE CIRCUIT COURT
FOR THE SEVENTH JUDICIAL CIRCUIT


THE PEOPLE OF THE STATE OF ILLINOIS,

        Plaintiff,

vs.

3M COMPANY,

        Defendant.
_____


AUDIO RECORDING

FILE NAME: Dab.23-3031.23-3031_05_30_2024

DATE TAKEN:    5/30/2024


Transcribed By:  Kurstin Strange, AAERT #2539

May 30, 2024

```
1   APPEARANCES

2

3           On behalf of The People of the State of Illinois:
              BY: LEIGH J. JAHNIG, ESQUIRE
4             APPEARED IN PERSON

5

6           On behalf of 3M Company:
              BY: MICHAEL ANTHONY SCODRO, ESQUIRE
7             APPEARED IN PERSON

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

A79

May 30, 2024

1                                    INDEX

2
                                                                      PAGE
3        RECORDING                                                    3
         CERTIFICATE OF TRANSCRIPTIONIST                              23
4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

A80

May 30, 2024

```
1          THE COURT:  Case for oral argument is Appeal No.
2   23-3031, People of the State of Illinois v. 3M Company.
3   Whenever you're ready, Mr. Scodro.  Good morning.
4          MR. SCODRO:  Good morning.  Thank you, Your Honor.
5   May it please the Court, Counsel.  Michael Scodro on behalf of
6   the defendant, Appellant 3M.  This court's decision in Baker is
7   controlling, and requires reversal of the remand order below.
8          Indeed, at this point, the State says it would
9   subtract out damages caused by AFFF PFAS in calculating damages
10  when chemically identical AFFF PFAS and Cordova PFAS is
11  commingled, but that's exactly what the plaintiffs tried to do
12  in Baker, where this court correctly recognized that a federal
13  court must perform those allocations.
14         But in any event --
15         THE COURT:  Counsel, wasn't Baker different?  In
16  Baker, they were talking about the -- the -- the freon, backing
17  out freon, but there wasn't an -- an acknowledgment that that
18  meant that they'd back out exposure to lead and arsenic.
19         Here, we're not even necessarily talking about
20  exposure paths.  We're not talking about something where only
21  part of it was disclaimed.  We're talking about fixed sites and
22  environmental claims.
23         MR. SCODRO:  But Your Honor, in -- in Baker, as in
24  this case, the freon was a source of the chemicals that were
25  being challenged.  Just as here, AFFF houses precisely the same
```

A81

1  PFAS chemical, identical to the PFAS being talked about in the

2  Cordova facility.  So the sources -- just as in that case, the

3  sources of the self-same chemical are different.  And the

4  question is which court ought to do that apportionment.

5         And as this court correctly recognized in Baker, and

6  you contrast it with the decision below in Baker, which, by the

7  way, relies on a case like Kelleher, precisely the same

8  authority being relied upon by the state in this case.

9         It's clear that this court was rejecting the idea

10  adopted by the District Court in Baker, that that apportionment

11  is not part and parcel of the defense.  It isn't something that

12  ought to be in front of a federal court.

13         And I do want to add, Your Honor, that while we're

14  talking about apportionment of damages and parts of the briefs

15  are devoted to that, there's another argument at issue here too,

16  which I think is logically prior, and that is, looking at the

17  complaint, the complaint also seeks significant injunctive

18  relief.  Monitoring, remediation, air and water.  Investigation.

19  Public information.

20         There's no suggestion as to how one could go about

21  allocating injunctive relief in this case, consistent with, as

22  we point out in our brief, Page 218 in the record, A-218 and the

23  -- and the footnote on that page, which shows that, in the trial

24  court, even as to damages, putting aside injunctive relief,

25  there was a stated effort on the part of the state to collect

1  for an entire site or resource if some of the contamination

2  there -- some of the PFAS originated from the armory.

3       So you really have two levels.  The first is,

4  is apportionment even going to be possible?  Certainly not as to

5  the injunctive relief, and that was, again, not the position of

6  the state below, even as to damages.  But even if you could,

7  then we get to Baker.

8       And Baker tells us that those complex apportionment

9  decisions are for the courts to make, and it did so with good

10 reason.  Just prior to that, in Baker, the Baker decision

11 recognizes that, with the 2011 amendment, relate to is now added

12 to for, and that Congress was intending to broaden the scope of

13 cases that would be brought into federal court where there was a

14 potential for a federal officer argument to be raised, as it --

15 as it is here.

16      And clearly -- to put it in very simple terms,

17 clearly, the question of whether and to what extent a particular

18 site is contaminated by or contains AFFF that is mil-spec from

19 an armory, clearly that question relates to the production of

20 mil-spec or the use of mil-spec at the armory.  It seems

21 self-evident.

22      THE COURT:  Mr. Scodro, is 3M the only company that

23 manufactures this mil-spec AFFF, or do other companies

24 manufacture it?

25      MR. SCODRO:  So in the -- the PFAS that's used in the

May 30, 2024

1    -- these products, and so there -- there's -- there are multiple

2    layers here.  And in some of the cases around the country, Your

3    Honor, there are other defendants in play.

4           So PFAS is produced, or was produced, by multiple

5    companies, and there were also multiple sources of AFFF.  Now,

6    certainly 3M -- yes?

7           THE COURT:  I'm sorry.  Certainly, 3M -- you're one of

8    the producers, but not the sole --

9           MR. SCODRO:  Not the sole producer, but we --

10          THE COURT:  So I didn't see anything here alleging

11   that the mil-spec AFFF that was used at the Rock Island Arsenal

12   was actually produced by 3M.

13          MR. SCODRO:  So, Your Honor, in our notice of removal,

14   treated as a pleading here, we certainly take on the

15   responsibility for having been the producer of mil-spec at the

16   armory.  And --

17          THE COURT:  I don't want to waste your argument

18   time --

19          MR. SCODRO:  No, of course.

20          THE COURT:  Maybe on rebuttal, you could come back and

21   just identify where that is that it's clear that 3M is the

22   producer, alleging that it's the producer of the chemical at

23   issue here.

24          MR. SCODRO:  Of the chemical at issue.  Sure.  And I

25   -- and I mean to be precise.  A producer.  I'm not suggesting we

A84

May 30, 2024

1  took on --

2      THE COURT:  You clearly have stated that you were a

3  producer of mil-spec AFFF, but I didn't see where you were --

4  alleged that you were a producer of the mil-spec AFFF used at

5  the Rock Island Arsenal.

6      MR. SCODRO:  Okay.  Well, then certainly -- that is

7  certainly our position, Your Honor, and --

8      THE COURT:  Okay.

9      MR. SCODRO:  -- I can represent that.  I will come

10  back with -- yeah.  That's -- that's -- that's --

11      THE COURT:  Because, obviously, if you're not the

12  producer of it --

13      MR. SCODRO:  Sure.

14      THE COURT:  -- all of your arguments go away.

15      MR. SCODRO:  Right.  No, we have certainly -- and --

16  and it is certainly within the -- the -- yes, I'll --

17      THE COURT:  Okay.

18      MR. SCODRO:  I'll identify that.

19      THE COURT:  Thank you.

20      MR. SCODRO:  But certainly within the -- the pleading,

21  it certainly has been our intent that that is the plausible

22  allegation in the -- in the notice of removal.

23      THE COURT:  So if you prevail here, is every lawsuit

24  involving the PFAS anywhere down river of the Rock Island

25  Arsenal removal against 3M removable to federal court?

May 30, 2024

1        MR. SCODRO:  If the claim is -- if there is a

2   plausible argument that -- and that is the -- the standard.

3   There -- there -- there's a plausible allegation, and here we

4   support it with, you know, the -- the military's own -- Army

5   Corps' own report attached to our notice of removal.

6        If there's an allegation that -- that we -- that --

7   that mil-spec AFFF has commingled and that it's going to require

8   this aggregation -- and again, here, as to the injunctive relief

9   claims, I don't even know how you'd start that.  But even as to

10  the damages claim, where they're claiming that we can

11  disaggregate, that would, under Baker, require a federal court

12  to do that disaggregation.

13       Now, I should note that, of course, they have the

14  opportunity, in responding to a -- a notice of removal to -- to

15  argue and to even -- and some -- some plaintiffs have done so --

16  to provide evidence to the contrary that that is not a plausible

17  allegation.

18       So for example, an isolated -- I'm going to make this

19  up.  An isolated pond for which there is no, you know, possible

20  claim, no plausible argument within Twombly and Iqbal.  The

21  applicable standard, no plausible argument of cocontamination.

22  Under those circumstances, then I think the Court would be well

23  within its rights to conclude that that was not plausibly

24  alleged in the notice of removal.  No disaggregation required

25  under those circumstances.  So yes.

A86

May 30, 2024

1        So again, I -- and I know I'm -- I'm about to encroach
2   on rebuttal time, but I -- I do just want to close the opening
3   by saying, we really have two levels here.  Again, one, it seems
4   quite clear, as their own notice of remand -- motion to remand
5   made clear, 218 is the most obvious place.

6        The -- the -- there will be instances, perhaps on the
7   damages side, certainly on the injunctive relief side, where we
8   will have to be spending money to remediate or otherwise, under
9   their view, account for mil-spec AFFF.  And even if all of that
10  were apportionable, if we ignore the injunctive claims and we
11  look solely at damages, even if one could disaggregate in the
12  manner suggested, that's precisely what Baker requires to happen
13  in a federal court.

14        THE COURT:  Thank you.  Ms. Jahnig, good morning.

15        MS. JAHNIG:  Good morning, Your Honor.  And may it
16  please the Court.  Assistant Attorney General Leigh Jahnig for
17  the Appellee, the State of Illinois.

18        3M failed to plausibly allege both the third and the
19  fourth prong of federal officer removal for essentially the same
20  reason, and that is that this case does not present any federal
21  issue.

22        THE COURT:  So let me ask you about that.  Does that
23  mean that the State of Illinois, at trial, will concede that if
24  the toxins were commingled, there is no liability to 3M?  None?
25  Zero?

A87

May 30, 2024

1          MS. JAHNIG:  If there's any particular place where the

2    State cannot prove that contamination came from Cordova, then

3    yes, the State --

4          THE COURT:  No, I asked about commingling.  You got to

5    answer my question.  I asked about commingling.  If the toxins

6    are commingled, does that mean that Illinois loses?  Is that

7    what you're going to tell the jury --

8          MS. JAHNIG:  Yes.

9          THE COURT:  -- in the opening statement?

10          MS. JAHNIG:  Yes, Your Honor, because --

11          THE COURT:  There's no apportionment whatsoever?

12          MS. JAHNIG:  Yes.  And -- and -- and I think -- I'm

13    sorry.  I think I was just -- I think those things mean the same

14    thing.  3M kind of keeps talking about commingling, but that's

15    really just another way of saying that we will not have proved

16    that contamination came from Cordova, right, if the source of

17    the contamination --

18          THE COURT:  Well, no -- no, not really.  And I think

19    your brief dances around this issue a little bit.  I think

20    there's a difference between saying that if there is

21    commingling, 3M wins.  It could be five percent from one

22    facility and 95 percent from another facility.  There is no

23    apportionment.

24          As long as that five -- five percent came from

25    Facility A, 3M wins.  Nobody will apportion the amount of the --

A88

1    of the amount of contaminant that came from Facility B.  Is that

2    your position?

3            MS. JAHNIG:  Yes, Your Honor.  And because I think

4    that, you know, part of 3M's argument is really talking about,

5    you know, commingling at a site.  But the -- you know, the --

6    the --

7            THE COURT:  I think it's talking about commingling at

8    multiple sites or --

9            MS. JAHNIG:  Yes, and --

10           THE COURT:  -- commingling in the river.  And I think

11   what -- what -- I -- I think they would be happy -- I mean, I

12   think with that concession, they would be happy.  I think.  But

13   I don't -- I didn't get that from the brief, that that's the

14   concession that you're making.

15           MS. JAHNIG:  Well, our position is, you know, perhaps

16   there's -- perhaps there's some part of the environment where

17   everything is all mixed up.  It's all commingled, and we can't

18   prove that contamination came from Cordova.  There might be

19   another part of the environment, maybe not in the river, but on

20   the banks of the river, something like that, where we can prove

21   that it came from Cordova.

22           And in that instance, the State would recover and it

23   wouldn't implicate any (indiscernible) issue --

24           THE COURT:  You have to prove that 100 percent of the

25   contamination came from Cordova, right?  That you -- you concede

May 30, 2024

1  that?

2          MS. JAHNIG:  Yes.  I -- I -- I -- and I think 3M is

3  kind of trying to say, well, we're just seeking to recover for

4  contamination all in one place.

5          THE COURT:  No.  I -- I -- I -- I think 3M's argument

6  is different.  I think 3M is saying -- and I -- and I -- I read

7  this in your brief a little bit.  I think 3M is saying that the

8  State kind of wants to have it both ways.

9          The State wants to be able to make an argument in the

10 State court that there's commingling of these toxins, that some

11 came from Cordova but not all.  And then the State court will

12 have to apportion what amount came from Cordova and what amount

13 came from other facilities.

14         But I think it's different if, in opening statements,

15 you know, the State of Illinois says if 3M -- if -- if -- if --

16 I guess, if the State can't establish that all of the toxins

17 came from another facility.  In other words, if -- if -- if the

18 -- if the State fails in its burden to establish that 100

19 percent of the toxins came from a different facility, 3M wins.

20 Full stop.

21         MS. JAHNIG:  So our position is -- is still that we're

22 talking about a -- a -- a -- an area that's not, you know, sort

23 of a -- a tiny place.  So we might be able to prove that all of

24 the contamination came from Cordova in one place, which case we

25 -- we would recover.  And in another place, we couldn't prove

A90

1  that, and then we would not recover.  That's our --

2          THE COURT:  Yeah, I got it.  I mean, that -- that --

3  that's a big concession.

4          MS. JAHNIG:  And -- and I -- and I -- and I think, you

5  know, that's -- we've sort of -- 3M kind of takes -- makes this

6  argument that we've been changing our position here, but I think

7  we're just trying to say in as many ways as possible that this

8  case is about, is contamination come from Cordova or did it come

9  from something else?

10          THE COURT:  And --

11          MS. JAHNIG:  It came from -- I'm sorry.

12          THE COURT:  Go ahead.  But -- but that totally

13  distinguishes Baker, because there's no -- I mean, it seems like

14  these are two ships crossing in the night, at least the

15  arguments, because what you're saying is Baker is totally

16  irrelevant because there is no apportionment necessary in this

17  case, period.

18          MS. JAHNIG:  That's exactly right.  In Baker, there

19  was -- you know, the plaintiffs were seeking to recover for

20  contamination at -- you know, from one super fund (phonetic)

21  site, and then they were trying to carve out, you know, a piece

22  that was due to federal activities.

23          Here, what we're saying is we want to recover for

24  contamination from Cordova.  That's it.  So --

25          THE COURT:  So I had the --

May 30, 2024

1    MS. JAHNIG:  -- there's nothing really to carve out.

2    THE COURT:  I had the same question as Judge Kirsten

3    (phonetic), and I just want to ask it a little bit differently

4    to make sure I understand the State's position.

5    So if 3M comes in, if you're talking about the water

6    or the bank or any portion, and they show that there is AFFF in

7    there, or I don't even think they have to show mil-spec AFFF.

8    If they show that there's AFFF that caused the -- that's

9    contaminated there, you will not seek to recover damages from

10   that location, whether it's water, the bank, etcetera, because

11   you've excluded that from what you're seeking?

12   MS. JAHNIG:  Yes.  That -- and that's what the

13   complaint says.  The complaint says, we're seeking to recover

14   for contamination that came from Cordova.  So --

15   THE COURT:  And then the next question is, you would

16   not ask the Court or the jury at that point to say, well, sure,

17   there might be some AFFF in there, but they've only proven that

18   goes to ten percent of the contamination.  Cordova caused the

19   other 90 percent, and therefore, we can recover that 90 percent;

20   is that correct?  You were not going to make an argument like

21   that?

22   MS. JAHNIG:  That's right.  I mean, I -- and, you

23   know, and -- and maybe I'm -- maybe there was some confusion in

24   the briefing.  I mean, again, we're talking about an area that's

25   -- you know, there could be contamination over here from Cordova

A92

```
1    and not from over here.  So we'd say to the jury, well, give us
2    recovery from -- for this part and not that part.
3            THE COURT:  We just want to make clear --
4            MS. JAHNIG:  We talk about --
5            THE COURT:  -- that the -- your argument about Cordova
6    is not going to require any finder of fact to do any kind of
7    apportionment about what may or may not have come from 3M or
8    AFFF.  And it sounds like you were agreeing you're not going to
9    argue that?
10           MS. JAHNIG:  That's right.
11           THE COURT:  Okay.
12           MS. JAHNIG:  Right.  And -- and -- and importantly,
13   this -- this argument is the same, whether, you know, the
14   something else that is not Cordova that caused any given
15   contamination.  It doesn't matter whether that is mil-spec AFFF,
16   whether 3M made it, or whether it's a completely different
17   chemical -- excuse me, chemical.
18           If it's not from Cordova, then the State will not
19   recover.  That's why the State brought this case specifically
20   about this one facility, where we have a lot of information
21   about, you know, 3M and its manufacturing there.  And so wanting
22   to, you know, get this one case moving as opposed to, you know,
23   these other cases about PFAS and AFFF, where we have to do a lot
24   more apportionment and factfinding questions.
25           THE COURT:  And counsel, you started that sentence
```

 1  with, if it's not for -- from Cordova, we're not going to

 2  recover.  I just -- I just want to retread this once more.  What

 3  you're really saying is, if it's not all from Cordova, you're

 4  not going to recover; is that accurate?

 5          MS. JAHNIG:  I -- I mean, I guess, again, this sort of

 6  comes down to, like, what are we talking about?  You know, on a

 7  site, if -- if -- if over here, at this part of the bank of the

 8  river, we can say that's all from Cordova, then we would

 9  recover.

10          If over here, we say, you know, the -- it -- it cannot

11  be -- we can't prove that it came from Cordova, then we don't

12  recover.  I mean, when we're talking about all, I -- I don't

13  think it's -- it -- it is not the State's position that.

14          THE COURT:  It's location-specific.

15          MS. JAHNIG:  Yes.

16          THE COURT:  In each location, you have to prove it all

17  came from Cordova.

18          MS. JAHNIG:  Right.  And at this point, early in the

19  case, we can't say, you know, what those locations are.  That's

20  all -- so that -- that's why I -- you know, I don't want to say,

21  oh, if it -- it can -- if it can be -- if we can't prove it in

22  one location, we're precluded from recovering in any other

23  location.

24          THE COURT:  I think it's --

25          MS. JAHNIG:  That is not the State's position.

A94

May 30, 2024

1          THE COURT:  Where you put the all.  I mean, we're
2    putting the focus of all on the --
3          MS. JAHNIG:  Any -- any particular location.
4          THE COURT:  And -- or the all on -- it all has to be
5    Cordova, that part of the contamination cannot be the AFFF at
6    any location?
7          MS. JAHNIG:  I'm sorry.  I'm --
8          THE COURT:  The -- all -- you have to prove that,
9    whatever location you're talking about, that all of the damage
10   there arose from the Cordova and nothing else?
11         MS. JAHNIG:  That's correct.
12         THE COURT:  Okay.
13         MS. JAHNIG:  And that is -- that is what -- that is
14   what our complaint has alleged.  That's what we argued in our
15   brief in support of remand.  We said this case is about
16   contamination that was caused by Cordova, so what we have to
17   prove in order to recover is that contamination was caused by
18   Cordova.
19         Maybe it's -- maybe it's the whole area that we think
20   is contaminated by Cordova.  Maybe it's just one piece of it.
21   Maybe it's none of it.  We can't say at this point.  But
22   regardless of whether -- you know, regardless of the answer to
23   that question, if it's not from Cordova, then the State won't
24   recover, and we don't get into any questions of federal defenses
25   over even what that -- what that thing that is not Cordova is.

May 30, 2024

1    It doesn't even matter.

2            And, you know, I -- we made this argument many times

3    in the District Court.  It's the same argument that we're making

4    here.  And sort of -- there's been no change in position, and

5    that's plain from the face of the complaint.

6            THE COURT:  It seems that you were alleging your

7    allegations here in order to avoid the MDL.  Is -- should that

8    concern us at all?

9            MS. JAHNIG:  No, because this is not -- you know, this

10   case is not -- it's very different from the cases that were

11   presented, you know, that were brought into the MDL.  This is a

12   case about a specific manufacturing facility where we have a lot

13   of information about, you know, what's being dumped into the

14   river, what chemicals there are, how elevated the levels are,

15   and the fact that 3M is the one that manages it.

16           As opposed to the MDL, which has a lot of questions

17   just about -- you know, there's -- there's many defendants,

18   even, in that case about, you know, where the PFAS got, into

19   what drinking water?  Who made it?  What was the source?  That's

20   a lot of -- you know, and so we just didn't want this case to

21   get bogged down into all of those factfinding questions.

22           And that's another reason why this doesn't present the

23   claims or the -- excuse me, the sort of artful pleading issues

24   in Baker.

25           THE COURT:  Okay.  Thank you.

A96

May 30, 2024

1          MS. JAHNIG:  Unless the --

2          THE COURT:  Mr. Scodro?

3          MR. SCODRO:  Thank you, Your Honor.  To first address

4  Your Honor's question, on Page A-33, which is Page 14 of the

5  removal papers, we say, the State claims -- the State's claims

6  for PFAS contamination of natural resources downstream from the

7  Cordova facility -- facility plausibly arise, in part, from 3M's

8  production and sale of AFFF manufacture according to military

9  specifications established by the Department of Defense.

10          Such mil-spec AFFF was then used, stored, and disposed

11  by the U.S. military installations in the State of Illinois,

12  including at least the Rock Island Arsenal.

13          So from there, Your Honor, we would say we --

14          THE COURT:  Okay.

15          MR. SCODRO:  -- have certainly plausibly alleged that

16  we are the manufacturer.

17          THE COURT:  Thank you for answering that.

18          MR. SCODRO:  I -- I would like to address the -- the

19  point just made and the characterization.  So a -- just a couple

20  of quick points.

21          First, there has been a change.  As we point out in

22  A-218, the argument was actually made in -- in their remand

23  papers saying that there -- it is not an argument that 3M should

24  be excused from liability for damages caused by the U.S. Army's

25  discharge of mil-spec AFFF, and then a footnote discussing joint

A97

May 30, 2024

1   and several liability.

2          As the briefs, I think, acknowledge, that isn't the

3   precisely correct term, but the notion was that there would have

4   been liability assigned more broadly and --

5          THE COURT:  Not anymore.

6          MR. SCODRO:  Well, and -- and so I'll just --

7          THE COURT:  You -- you had to get what you wanted

8   there.

9          MR. SCODRO:  I'll just end with -- by saying, Your

10  Honor, during the -- during the exchange, there was a discussion

11  of this part and that part, your -- the -- the term location was

12  used, and then the reference to just one piece.

13         And I -- I -- I guess I would just say that, if Baker

14  is talking about the need for a complex factual determination,

15  the sort of small piece allocation, it's unclear at what micro

16  level that's occurring is, itself, precisely what Baker is

17  talking about, in talking about the need for those kinds of

18  allocations to occur in federal court.

19         So I -- I don't see a distinction, although obviously

20  if -- and -- and, you know, the same would go for -- and I

21  realize I'm over my time.

22         THE COURT:  Go ahead.  You can finish answering.

23  Finish.

24         MR. SCODRO:  Thank you, Your Honor.  Thank you, Your

25  Honor.  Same would go for the remedial measures.  It's hard to

A98

May 30, 2024

1 imagine that the remedial measures, including cleaning

2 groundwater, for example, or the other types that are talked

3 about, even air remediation, how that could occur on the kind of

4 micro place location level we're talking about.

5          And again, I just think all of that suggests that --

6 that that's exactly the concern that Baker had in mind in

7 discussing complex factual determination, something they have

8 said in their brief a couple of times correctly, would require.

9          THE COURT:  Okay.  Thank you, Mr. Scodro.

10          MR. SCODRO:  Thank you, Your Honor.

11          THE COURT:  The Court will take the case under

12 advisement.  Thanks to both counsel.  The final --

13

14

15

16

17

18

19

20

21

22

23

24

25

A99

May 30, 2024

CERTIFICATE OF TRANSCRIBER

1

2

3

4      I, Kurstin Strange, AAERT #2539, do hereby certify that I

5  was authorized to transcribe the foregoing recorded proceeding;

6  and that the transcript is a true and accurate transcription, to

7  the best of my ability, taken while listening to the provided

8  recording.

9

10      I FURTHER CERTIFY that I am not of counsel or attorney

11  for either/or any of the parties to said proceedings, nor in any

12  way interested in the events of this cause, and that I am not

13  related to any of the parties thereto.

14

15

16      Dated this 21st day of October, 2025.

17

18

19      _____

20      Kurstin Strange, AAERT #2539

21

22

23

24

25

A100

May 30, 2024

**1**

**100**
  12:24 13:18

**2**

**2011**
  6:11
**218**
  5:22 10:5
**23-3031**
  4:2

**3**

**3M**
  4:2,6 6:22
  7:6,7,12,21
  8:25 10:18,
  24 11:14,21,
  25 13:2,6,7,
  15,19 14:5
  15:5 16:7,
  16,21
**3m's**
  12:4 13:5

**9**

**90**
  15:19
**95**
  11:22

**A**

**A-218**
  5:22
**account**
  10:9
**acknowledgment**
  4:17

**activities**
  14:22
**add**
  5:13
**added**
  6:11
**adopted**
  5:10
**AFFF**
  4:9,10,25
  6:18,23 7:5,
  11 8:3,4 9:7
  10:9 15:6,7,
  8,17 16:8,
  15,23
**aggregation**
  9:8
**agreeing**
  16:8
**ahead**
  14:12
**air**
  5:18
**allegation**
  8:22 9:3,6,
  17
**allege**
  10:18
**alleged**
  8:4 9:24
**alleging**
  7:10,22
**allocating**
  5:21
**allocations**
  4:13
**amendment**
  6:11
**amount**
  11:25 12:1
  13:12
**Appeal**
  4:1
**Appellant**
  4:6
**Appellee**
  10:17

**applicable**
  9:21
**apportion**
  11:25 13:12
**apportionable**
  10:10
**apportionment**
  5:4,10,14
  6:4,8 11:11,
  23 14:16
  16:7,24
**area**
  13:22 15:24
**argue**
  9:15 16:9
**argument**
  4:1 5:15
  6:14 7:17
  9:2,20,21
  12:4 13:5,9
  14:6 15:20
  16:5,13
**arguments**
  8:14 14:15
**armory**
  6:2,19,20
  7:16
**Army**
  9:4
**Arsenal**
  7:11 8:5,25
**arsenic**
  4:18
**Assistant**
  10:16
**attached**
  9:5
**Attorney**
  10:16
**authority**
  5:8

**B**

**back**
  4:18 7:20
  8:10

**backing**
  4:16
**Baker**
  4:6,12,15,
  16,23 5:5,6,
  10 6:7,8,10
  9:11 10:12
  14:13,15,18
**bank**
  15:6,10
**banks**
  12:20
**behalf**
  4:5
**big**
  14:3
**bit**
  11:19 13:7
  15:3
**briefing**
  15:24
**briefs**
  5:14
**broaden**
  6:12
**brought**
  6:13 16:19
**burden**
  13:18

**C**

**calculating**
  4:9
**carve**
  14:21 15:1
**case**
  4:1,24 5:2,
  7,8,21 10:20
  13:24 14:8,
  17 16:19,22
**cases**
  6:13 7:2
  16:23
**caused**
  4:9 15:8,18
  16:14

A101

May 30, 2024

challenged
    4:25
changing
    14:6
chemical
    5:1,3 7:22,
    24 16:17
chemically
    4:10
chemicals
    4:24
circumstances
    9:22,25
claim
    9:1,10,20
claiming
    9:10
claims
    4:22 9:9
    10:10
clear
    5:9 7:21
    10:4,5 16:3
close
    10:2
cocontaminati
on
    9:21
collect
    5:25
commingled
    4:11 9:7
    10:24 11:6
    12:17
commingling
    11:4,5,14,21
    12:5,7,10
    13:10
companies
    6:23 7:5
company
    4:2 6:22
complaint
    5:17 15:13
completely
    16:16

complex
    6:8
concede
    10:23 12:25
concession
    12:12,14
    14:3
conclude
    9:23
confusion
    15:23
Congress
    6:12
consistent
    5:21
contaminant
    12:1
contaminated
    6:18 15:9
contamination
    6:1 11:2,16,
    17 12:18,25
    13:4,24
    14:8,20,24
    15:14,18,25
    16:15
contrary
    9:16
contrast
    5:6
controlling
    4:7
Cordova
    4:10 5:2
    11:2,16
    12:18,21,25
    13:11,12,24
    14:8,24
    15:14,18,25
    16:5,14,18
Corps'
    9:5
correct
    15:20
correctly
    4:12 5:5

counsel
    4:5,15 16:25
country
    7:2
court
    4:1,5,12,13,
    15 5:4,5,9,
    10,12,24
    6:13,22 7:7,
    10,17,20
    8:2,8,11,14,
    17,19,23,25
    9:11,22
    10:13,14,16,
    22 11:4,9,
    11,18 12:7,
    10,24 13:5,
    10,11 14:2,
    10,12,25
    15:2,15,16
    16:3,5,11,25
court's
    4:6
courts
    6:9
crossing
    14:14

**D**

damages
    4:9 5:14,24
    6:6 9:10
    10:7,11 15:9
dances
    11:19
decision
    4:6 5:6 6:10
decisions
    6:9
defendant
    4:6
defendants
    7:3
defense
    5:11

devoted
    5:15
difference
    11:20
differently
    15:3
disaggregate
    9:11 10:11
disaggregatio
n
    9:12,24
disclaimed
    4:21
distinguishes
    14:13
District
    5:10
due
    14:22

**E**

effort
    5:25
encroach
    10:1
entire
    6:1
environment
    12:16,19
environmental
    4:22
essentially
    10:19
establish
    13:16,18
etcetera
    15:10
event
    4:14
evidence
    9:16
excluded
    15:11
excuse
    16:17

A102

**exposure**
4:18,20
**extent**
6:17

---

**F**

**facilities**
13:13
**facility**
5:2 11:22,25
12:1 13:17,
19 16:20
**fact**
16:6
**factfinding**
16:24
**failed**
10:18
**fails**
13:18
**federal**
4:12 5:12
6:13,14 8:25
9:11 10:13,
19,20 14:22
**finder**
16:6
**fixed**
4:21
**footnote**
5:23
**fourth**
10:19
**freon**
4:16,17,24
**front**
5:12
**Full**
13:20
**fund**
14:20

---

**G**

**General**

**give**
10:16
**give**
16:1
**good**
4:3,4 6:9
10:14,15
**guess**
13:16

---

**H**

**happen**
10:12
**happy**
12:11,12
**Honor**
4:4,23 5:13
7:3,13 8:7
10:15 11:10
12:3
**houses**
4:25

---

**I**

**idea**
5:9
**identical**
4:10 5:1
**identify**
7:21 8:18
**ignore**
10:10
**Illinois**
4:2 10:17,23
11:6 13:15
**implicate**
12:23
**importantly**
16:12
**indiscernible**
12:23
**information**
5:19 16:20
**injunctive**
5:17,21,24

**6:5 9:8**
10:7,10
**instance**
12:22
**instances**
10:6
**intending**
6:12
**intent**
8:21
**Investigation**
5:18
**involving**
8:24
**Iqbal**
9:20
**irrelevant**
14:16
**Island**
7:11 8:5,24
**isolated**
9:18,19
**issue**
5:15 7:23,24
10:21 11:19
12:23

---

**J**

**Jahnig**
10:14,15,16
11:1,8,10,12
12:3,9,15
13:2,21
14:4,11,18
15:1,12,22
16:4,10,12
**Judge**
15:2
**jury**
11:7 15:16
16:1

---

**K**

**Kelleher**

**5:7**
**kind**
11:14 13:3,8
14:5 16:6
**Kirsten**
15:2

---

**L**

**lawsuit**
8:23
**layers**
7:2
**lead**
4:18
**Leigh**
10:16
**levels**
6:3 10:3
**liability**
10:24
**location**
15:10
**logically**
5:16
**long**
11:24
**loses**
11:6
**lot**
16:20,23

---

**M**

**made**
10:5 16:16
**make**
6:9 9:18
13:9 15:4,20
16:3
**makes**
14:5
**making**
12:14
**manner**
10:12

May 30, 2024

manufacture
6:24
manufactures
6:23
manufacturing
16:21
matter
16:15
meant
4:18
Michael
4:5
mil-spec
6:18,20,23
7:11,15 8:3,
4 9:7 10:9
15:7 16:15
military's
9:4
mixed
12:17
money
10:8
Monitoring
5:18
morning
4:3,4 10:14,
15
motion
10:4
moving
16:22
multiple
7:1,4,5 12:8

N

necessarily
4:19
night
14:14
note
9:13
notice
7:13 8:22
9:5,14,24

10:4

O

obvious
10:5
officer
6:14 10:19
opening
10:2 11:9
13:14
opportunity
9:14
opposed
16:22
oral
4:1
order
4:7
originated
6:2

P

parcel
5:11
part
4:21 5:11,25
12:4,16,19
16:2
parts
5:14
paths
4:20
People
4:2
percent
11:21,22,24
12:24 13:19
15:18,19
perform
4:13
period
14:17
PFAS
4:9,10 5:1

6:2,25 7:4
8:24 16:23
phonetic
14:20 15:3
piece
14:21
place
10:5 11:1
13:4,23,24,
25
plaintiffs
4:11 9:15
14:19
plausible
8:21 9:2,3,
16,20,21
plausibly
9:23 10:18
play
7:3
pleading
7:14 8:20
point
4:8 5:22
15:16
pond
9:19
portion
15:6
position
6:5 8:7
12:2,15
13:21 14:6
15:4
potential
6:14
precise
7:25
precisely
4:25 5:7
10:12
present
10:20
prevail
8:23
prior
5:16 6:10

produced
7:4,12
producer
7:9,15,22,25
8:3,4,12
producers
7:8
production
6:19
products
7:1
prong
10:19
prove
11:2 12:18,
20,24 13:23,
25
proved
11:15
proven
15:17
provide
9:16
Public
5:19
put
6:16
putting
5:24

Q

question
5:4 6:17,19
11:5 15:2,15
questions
16:24

R

raised
6:14
read
13:6
ready
4:3

A104

May 30, 2024

reason
  6:10 10:20
rebuttal
  7:20 10:2
recognized
  4:12 5:5
recognizes
  6:11
record
  5:22
recover
  12:22 13:3,
  25 14:1,19,
  23 15:9,13,
  19 16:19
recovery
  16:2
rejecting
  5:9
relate
  6:11
relates
  6:19
relied
  5:8
relief
  5:18,21,24
  6:5 9:8 10:7
relies
  5:7
remand
  4:7 10:4
remediate
  10:8
remediation
  5:18
removable
  8:25
removal
  7:13 8:22,25
  9:5,14,24
  10:19
report
  9:5
represent
  8:9

require
  9:7,11 16:6
required
  9:24
requires
  4:7 10:12
resource
  6:1
responding
  9:14
responsibilit
y
  7:15
reversal
  4:7
rights
  9:23
river
  8:24 12:10,
  19,20
Rock
  7:11 8:5,24

———————

S

Scodro
  4:3,4,5,23
  6:22,25 7:9,
  13,19,24
  8:6,9,13,15,
  18,20 9:1
scope
  6:12
seek
  15:9
seeking
  13:3 14:19
  15:11,13
seeks
  5:17
self-evident
  6:21
self-same
  5:3
sentence
  16:25

ships
  14:14
show
  15:6,7,8
shows
  5:23
side
  10:7
significant
  5:17
simple
  6:16
site
  6:1,18 12:5
  14:21
sites
  4:21 12:8
sole
  7:8,9
solely
  10:11
sort
  13:22 14:5
sounds
  16:8
source
  4:24 11:16
sources
  5:2,3 7:5
specifically
  16:19
spending
  10:8
standard
  9:2,21
start
  9:9
started
  16:25
state
  4:2,8 5:8,25
  6:6 10:17,23
  11:2,3 12:22
  13:8,9,10,
  11,15,16,18
  16:18,19

State's
  15:4
stated
  5:25 8:2
statement
  11:9
statements
  13:14
stop
  13:20
subtract
  4:9
suggested
  10:12
suggesting
  7:25
suggestion
  5:20
super
  14:20
support
  9:4

———————

T

takes
  14:5
talk
  16:4
talked
  5:1
talking
  4:16,19,20,
  21 5:14
  11:14 12:4,7
  13:22 15:5,
  24
tells
  6:8
ten
  15:18
terms
  6:16
thing
  11:14

A105

May 30, 2024

**things**
  11:13
**time**
  7:18 10:2
**tiny**
  13:23
**totally**
  14:12,15
**toxins**
  10:24 11:5
  13:10,16,19
**treated**
  7:14
**trial**
  5:23 10:23
**Twombly**
  9:20

---

**U**

**understand**
  15:4

---

**V**

**view**
  10:9

---

**W**

**wanting**
  16:21
**waste**
  7:17
**water**
  5:18 15:5,10
**ways**
  13:8 14:7
**whatsoever**
  11:11
**wins**
  11:21,25
  13:19
**words**
  13:17

A106

E-FILED
Thursday, 23 October, 2025  05:18:16 PM
Clerk, U.S. District Court, ILCD

# EXHIBIT C

FILED
4/7/2025 2:03 PM
TAMMY WEIKERT, CIRCUIT CLERK
ROCK ISLAND COUNTY, IL

## IN THE CIRCUIT COURT OF THE FOURTEENTH JUDICIAL CIRCUIT
## ROCK ISLAND COUNTY, ILLINOIS

| | |
|---|---|
| PEOPLE OF THE STATE OF ILLINOIS, *ex rel.* KWAME RAOUL, Attorney General of the State of Illinois,<br><br>            Plaintiff,<br><br>    v.<br><br>3M Company, a Delaware Corporation,<br><br>            Defendant. | Case No. 2022 LA 16 |

### <u>FIRST AMENDED COMPLAINT</u>

Plaintiff, People of the State of Illinois, *ex rel.* Kwame Raoul, Attorney General of the State of Illinois ("Illinois" or the "State"), seek to hold Defendant 3M Company ("3M" or "Defendant") liable for its operation of, and related negligent conduct at, its Cordova facility in Rock Island County, Illinois ("Cordova Facility") and its discharge, emission, placement, disposal, leakage, spillage, and/or abandonment of perfluoroalkyl and polyfluoroalkyl substances ("PFAS") from the Cordova Facility.

Illinois brings this civil action to: (1) hold 3M liable for monetary damages for the cost of identifying, monitoring, and remediating contamination caused by the release of PFAS from 3M's Cordova Facility and all damages to the State's environment and its natural resources because of the resulting contamination; (2) obtain injunctive relief requiring 3M to take action to prevent ongoing contamination and to remediate the areas contaminated and restore resources injured or impacted by PFAS released from the Cordova Facility; (3) recover civil penalties for violations of Illinois statutes and regulations resulting from the PFAS contamination described herein; and (4) obtain any other equitable relief as appropriate.

A108

For its Complaint, Illinois pleads as follows:

## INTRODUCTION AND NATURE OF THE ACTION

1.      Illinois, with a population of approximately 12.67 million people, is the sixth-largest state, by population, in the United States.

2.      Nearly the entirety of Illinois' western boundary is the Mississippi River, with the few exceptions being where the Mississippi River has changed course over time.

3.      The Mississippi River watershed is the fourth largest in the world, with an area of approximately 1.2 million square miles.

4.      Illinois has established itself as a leader in protecting the environment and in identifying, monitoring, and addressing contamination caused by PFAS in Illinois.

5.      The Illinois Environmental Protection Agency ("Illinois EPA") is an administrative agency of the State of Illinois, created pursuant to Section 4 of the Act, 415 ILCS 5/4 (2020), and charged, *inter alia*, with the duty of enforcing the Act.  The Illinois EPA is further charged with the duty to abate violations of the National Pollutant Discharge Elimination System ("NPDES") permit program under Section 402(b)(7) of the Federal Clean Water Act ("CWA"), 33 U.S.C. § 1342(b)(7).

6.      The Illinois Department of Natural Resources ("IDNR") is an administrative agency of the State of Illinois, created by Section 1-5 of the Illinois Department of Natural Resources Act, 20 ILCS 801/1-5 (2020), and charged, *inter alia*, with the duty of enforcing the Fish and Aquatic Life Code ("Fish Code"), 515 ILCS 5/5-5 (2020), and the Wildlife Code, 520 ILCS 5/1-10 (2020) ("Wildlife Code").

7.      The Illinois EPA and IDNR are the State of Illinois Natural Resource Trustees.

8.      PFAS are a group of synthetic chemicals that do not occur naturally in the

environment and have been in use since the 1940s.[1]

9.    PFAS are toxic, human-made chemicals that are harmful to the public health, safety, and welfare, and to the environment.

10.    For purposes of this Complaint, "PFAS" shall include, but not be limited to, the following compounds:

| Acronym | PFAS Analyte Name | Chemical Abstract Services Registry Number ("CASRN") | Formula |
|---|---|---|---|
| Perfluoroalkyl Carboxylic Acids ("PFCAs") | | | |
| PFTeDA | Perfluorotetradecanoic acid | 376-06-7 | $C_{14}HF_{27}O_2$ |
| | Perfluorotetradecanoate | 365971-87-5 | $C_{14}F_{27}O_2^-$ |
| PFTrDA | Perfluorotridecanoic acid | 72629-94-8 | $C_{13}HF_{25}O_2$ |
| | Perfluorotridecanoate | 862374-87-6 | $C_{13}F_{25}O_2^-$ |
| PFDoA | Perfluorododecanoic acid | 307-55-1 | $C_{12}HF_{23}O_2$ |
| | Perfluorododecanoate | 171978-95-3 | $C_{12}F_{23}O_2^-$ |
| PFUnA | Perfluoroundecanoic acid | 2058-94-8 | $C_{11}HF_{21}O_2$ |
| | Perfluoroundecanoate | 196859-54-8 | $C_{11}F_{21}O_2^-$ |

---

[1] *EPA's Per- and Polyfluoroalkyl Substances (PFAS) Action Plan*, U.S. EPA (Feb. 2019) at 1, https://www.epa.gov/sites/default/files/2019-02/documents/pfas_action_plan_021319_508compliant_1.pdf; *PFAS Strategic Roadmap: EPA's Commitment to Action 2021-2024*, U.S. EPA (Oct. 2021) at 5, https://www.epa.gov/system/files/documents/2021-10/pfas-roadmap_final-508.pdf; *An Overview of Perfluoroalkyl and Polyfluoroalkyl Substances and Interim Guidance*, CENTERS FOR DISEASE CONTROL AND PREVENTION (May 7, 2018) at 1, https://stacks.cdc.gov/view/cdc/77114.

| | | | |
|---|---|---|---|
| PFDA | Perfluorodecanoic acid | 335-76-2 | $C_{10}HF_{19}O_2$ |
| | Perfluorodecanoate | 73829-36-4 | $C_{10}F_{19}O_2^-$ |
| PFNA | Perfluorononanoic acid | 375-95-1 | $C_9HF_{17}O_2$ |
| | Perfluorononanoate | 72007-68-2 | $C_9F_{17}O_2^-$ |
| PFOA | Perfluorooctanoic acid | 335-67-1 | $C_8HF_{15}O_2$ |
| | Perfluorooctanoate | 45285-51-6 | $C_8F_{15}O_2^-$ |
| PFHpA | Perfluoroheptanoic acid | 375-85-9 | $C_7HF_{13}O_2$ |
| | Perfluoroheptanoate | 120885-29-2 | $C_7F_{13}O_2^-$ |
| PFHxA | Perfluorohexanoic acid | 307-24-4 | $C_6HF_{11}O_2$ |
| | Perfluorohexanoate | 92612-52-7 | $C_6F_{11}O_2^-$ |
| PFPeA | Perfluoropentanoic acid | 2706-90-3 | $C_5HF_9O_2$ |
| | Perfluoropentanoate | 45167-47-3 | $C_5F_9O_2^-$ |
| PFBA | Perfluorobutanoic acid | 375-22-4 | $C_4HF_7O_2$ |
| | Perfluorobutanoate | 45048-62-2 | $C_4F_7O_2^-$ |
| PFPrA | Perfluoropropionic acid | 422-64-0 | $C_3HF_5O_2$ |
| | Perfluoropropionate | 44864-55-3 | $C_3F_5O_2^-$ |
| TFA | Trifluoroacetic acid | 76-05-1 | $C_2HF_3O_2$ |
| | Trifluoroacetate | 14477-72-6 | $C_2F_3O_2^-$ |
| Perfluoroalkyl Sulfonic Acids ("PFSAs") | | | |
| PFOS (B,L) | Perfluorooctanesulfonic acid | 1763-23-1 | $C_8F_{17}SO_3H$ |
| | Perfluorooctanesulfonate | 45298-90-6 | $C_8F_{17}SO_3^-$ |
| PFHpS | Perfluoroheptanesulfonic acid | 375-92-8 | $C_7F_{15}SO_3H$ |
| | Perfluoroheptanesulfonate | 146689-46-5 | $C_7F_{15}SO_3^-$ |

| PFHxS (B,L) | Perfluorohexanesulfonic acid | 355-46-4 | $C_6F_{13}SO_3H$ |
|---|---|---|---|
| | Perfluorohexanesulfonate | 108427-53-8 | $C_6F_{13}SO_3^-$ |
| PFPeS | Perfluropropanesulfonic acid | 2706-91-4 | $C_5HF_{11}O_3S$ |
| | Perfluropropanesulfonate | 175905-36-9 | $C_5F_{11}O_3S^-$ |
| PFBS | Perfluorobutanesulfonic acid | 375-73-5 | $C_4F_9SO_3H$ |
| | Perfluorobutanesulfonate | 45187-15-3 | $C_4F_9SO_3^-$ |
| PFPrS | Perfluoropropanesulfonic acid | 423-41-6 | $C_3HF_7O_3S$ |
| | Perfluoropropanesulfonate | 110676-15-8 | $C_3F_7O_3S^-$ |
| PFES | Perfluoroethanesulfonic acid | 354-88-1 | $C_4F_9O_4SH$ |
| | Perfluoroethanesulfonate | 108410-37-3 | $C_4F_9O_4S^-$ |
| TFMS | Trifluoromethanesulfonic acid | 1493-13-6 | $CF_3SO_3H$ |
| | Trifluoromethanesulfonate | 37181-39-8 | $CF_3SO_3^-$ |
| Fluorotelomer sulfonic acids | | | |
| 4:2 FTS | 4:2 Fluorotelomer sulfonic acid | 757124-72-4 | $C_6H_5F_9O_3S$ |
| | 4:2 Fluorotelomer sulfonate | 414911-30-1 | $C_6H_4F_9O_3S^-$ |
| 6:2 FTS | 6:2 Flurotelomer sulfonic acid | 82711-15-7 | $C_8H_5F_{13}O_3S$ |
| | 6:2 Flurotelomer sulfonate | 425670-75-3 | $C_8H_4F_{13}O_3S^-$ |
| 8:2 FTS | 8:2 Flurotelomer sulfonic acid | 39108-34-4 | $C_{10}H_5F_{17}O_3S$ |
| | 8:2 Flurotelomer sulfonate | 39108-34-4 | $C_{10}H_4F_{17}O_3S^-$ |
| 10:2 FTS | 10:2 Flurotelomer sulfonic acid | 120226-60-0 | $C_{12}H_5F_{21}O_3S$ |
| | 10:2 Fluorotelomer sulfonate | -- | $C_{12}H_4F_{21}O_3S^-$ |

| Perfluoroalkane Sulfonamides ("FASAs") | | | |
|---|---|---|---|
| PFBSA | Perfluorobutanesulfonamide | 1910057-70-3 | $C_6H_3F_9NO_4S$ |
| FBSA | | | |
| PFOSA | Perfluorooctanesulfonamide | 754-91-6 | $C_8H_2F_{17}NO_2S$ |
| FOSA | | | |
| FBSAA | Perfluorobutane sulfonamide acetic acid | 347872-22-4 | $C_6H_4F_9NO_4S$ |
| NEtFOSAA | N-ethyl perfluorooctanesulfonamidoacetic acid | 2991-50-6 | $C_{10}H_6F_{17}NO_2S$ |
| NMeFOSAA | N-methyl perfluorooctanesulfonamidoacetic acid | 2355-31-9 | $C_{11}H_6F_{17}NO_4S$ |
| EtFOSE | 2-(N-ethylperfluoro-1-octanesulfonamido)- ethanol | 1691-99-2 | $C_{12}H_{10}F_{17}NO_3S$ |
| MeFOSE | 2-(N-methylperfluoro-1-octanesulfonamido)- ethanol | 24448-09-7 | $C_{11}H_8F_{17}NO_3S$ |
| FBSEE diol | Nonafluoro-N,N-bis(2-hydroxyethyl)butane-1- sulfonamide | 34455-00-0 | $C_8H_{10}F_9NO_4S$ |
| HFBSE alcohol | Nonafluoro-N-(2-hydroxyethyl)butane-1-sulfonamide | 34454-99-4 | $C_6H_6F_9NO_3S$ |
| FBSE | | | |
| HQ-115 | Bis(trifluoromethylsulfonyl)amine | 82113-65-3 | $C_2F_6NO_4S_2H$ |
| PBSA | Perfluorobutane-N-(3-(dimethylamino)propyl)-1-sulfonamide sulfonamido amine | 68555-77-1 | $C_9H_{13}F_9N_2O_2S$ |
| PBSA-C1 | 3-{[3-Dimethylamino)propyl](nonafluorobutane-1-sulfonyl)amino}propanoic acid | 172616-04-5 | $C_{12}H_{17}F_9O_4N_2S$ |

| Per- and Polyfluoroalkyl Ether Carboxylic Acids | | | |
|---|---|---|---|
| HFPO-DA (GenX acid) | 2,3,3,3-tetrafluoro-2-(heptafluoropropoxy)propanoic acid | 13252-13-6 | $C_6HF_{11}O_3$ |
| | 2,3,3,3-tetrafluoro-2-(heptafluoropropoxy)propanate | -- | $C_6F_{11}O_3^-$ |
| DONA (ADONA acid) | 4,8-dioxa-3h-perfluorononanoic acid | 1919005-14-4 | $C_{10}H_{11}N_4NaO_5S$ |
| | 4,8-dioxa-3h-perfluorononanoate | -- | $C_{10}H_{10}N_4NaO_5S^-$ |
| PFECA A | Butanoic acid, 2,2,3,3,4,4-hexafluoro-4-(trifluoromethoxy)- | 863090-89-5 | $C_5HF_9O_3$ |
| | 2,2,3,3,4,4-hexafluoro-4-(trifluoromethoxy)-butanoate | -- | $C_5F_9O_3^-$ |
| PFECA B | Acetic Acid, 2,2-difluoro-2-[1,1,2,2-tetrafluoro-2-(trifluoromethoxy)ethoxy]- | 151772-58-6 | $C_5HF_9O_4$ |
| | 2,2-difluoro-2-[1,1,2,2- tetrafluoro-2-(trifluoromethoxy)ethoxy]-acetate | -- | $C_5F_9O_4^-$ |
| PFECA F (PMPA) | Perfluoro(4-methoxybutanoic acid) | 863090-89-5 | $C_5HF_9O_3$ |
| | Perfluoro(4-methoxybutanoate) | -- | $C_5F_9O_3^-$ |
| PFECA G | Butanoic acid, 2,2,3,3,4,4-hexafluoro-4-[1,2,2,2-tetrafluoro-1-(trifluoromethyl)ethoxy]- | 801212-59-9 | $C_7HF_{13}O_3$ |
| | 2,2,3,3,4,4-hexafluoro-4- [1,2,2,2-tetrafluoro-1- (trifluoromethyl)ethoxy]-butanoate | -- | $C_7F_{13}O_3^-$ |
| PFEESA | Perfluoro(2-ethoxyethane)sulfonic acid | 113507-82-7 | $C_4HF_9O_4S$ |
| | Perfluoro(2-ethoxyethane)sulfonate | -- | $C_4F_9O_4S^-$ |
| PFESA BP 1 | Perfluoro-3,6-dioxa-4-methyl-7-octene-1-sulfonic acid | 29311-67-9 | $C_7HF_{13}O_5S$ |

| | Perfluoro-3,6-dioxa-4-methyl-7-octene-1-sulfonate | -- | $C_7F_{13}O_5S^-$ |
|---|---|---|---|
| | F-53B | | |
| 11Cl-PF3OUdS | 11-chloroeicosafluoro-3-oxaundecane-1-sulfonic acid | 763051-92-9 | $C_{10}HF_{20}ClSO_4$ |
| 9Cl-PF3ONS | 9-chlorohexadecafluoro-3-oxanone-1-sulfonic acid | 756426-58-1 | $C_8HF_{16}ClSO_4$ |
| | Miscellaneous | | |
| Bisphenol AF | 4,4'-(Hexafluoroisopropylidene) diphenol | 1478-61-1 | $C_{15}H_{10}F_6O_2$ |
| PFBSi | Perfluorobutanesulfinic Acid | 34642-43-8 | $C_4HF_9O_2S$ |

This definition also includes any other PFAS that have been, or which are being, discharged, emitted, placed, disposed of, leaked, spilled, and/or abandoned from the Cordova Facility, even if not listed above.

11.     PFAS, as defined in this Complaint, do _not_ include any PFAS that have contaminated Illinois' environment or natural resources from aqueous film-forming foams ("AFFF") containing PFOA, PFOS, or any other PFAS compound.

12.     3M has discharged, emitted, placed, disposed of, leaked, spilled, and/or abandoned PFAS and PFAS-containing products at and from its Cordova Facility in such a manner that caused releases of PFAS into the environment at concentrations which are injurious to public health and welfare and to the environment, which cause or tend to cause pollution in the State of Illinois, and which damage to the State's natural resources.

13.     Article XI of the Illinois Constitution, Ill. Const. Article XI, Section 2, provides that, "[e]ach person has the right to a healthful environment.  Each person may enforce this right against any party, governmental or private, through appropriate legal proceedings subject to

A115

reasonable limitation and regulation as the General Assembly may provide by law."

14.    As outlined below, Illinois brings this action against 3M pursuant to the Illinois Environmental Protection Act ("the Act") 415 ILCS 5/1, *et seq.* (2020); the Illinois Department of Natural Resources Act ("DNR Act") 20 ILCS 801/1, *et seq.* (2020); and Illinois' laws of negligence, trespass, public nuisance, and unjust enrichment.

15.    This Complaint is brought on behalf of the PEOPLE OF THE STATE OF ILLINOIS, *ex rel.* KWAME RAOUL, the Attorney General of the State of Illinois, on his own motion, pursuant to the terms and provisions of Sections 42(d) and (e) of the Act, 415 ILCS 5/42(d) and (e) (2020).

## PARTIES

### *Plaintiff*

16.    Plaintiff is the People of the State of Illinois, *ex rel.* Kwame Raoul, Attorney General of the State of Illinois ("Illinois" or the "State").

17.    The State maintains its principal offices at 500 South Second Street, Springfield, Illinois 62701 and at 100 West Randolph Street, Chicago, Illinois 60601.

18.    The Attorney General is the chief legal officer of the State of Illinois, having the powers and duties prescribed by law, Ill. Const. Article V, Section 15.  The Attorney General has statutory and common law authority to appear on behalf of the People of the State of Illinois in any cause or matter in all cases in which the State or the people of the State are interested.  *See, e.g.*, 15 ILCS 205/4 (2020); *People ex rel. Scott v. Briceland*, 65 Ill. 2d 485, 494 (1976).

19.    The "Attorney General has an obligation to represent the interests of the People so as to ensure a healthful environment for all the citizens of the State." *People v. NL Indus.*, 152 Ill. 2d 82, 103 (1992), *opinion modified on denial of reh'g* (Nov. 30, 1992).

20.    The Attorney General is explicitly authorized to commence a civil action in the

name of the People of the State of Illinois to recover penalties provided for in the Act, and to seek "an injunction, prohibitory or mandatory, to restrain violations of this Act, any rule or regulation adopted under this Act, any permit or term or condition of a permit, or any Board order, or to require such other actions as may be necessary to address violations of this Act, any rule or regulation adopted under this Act, any permit or term or condition of a permit, or any Board order." 415 ILCS 5/42(d) and (e) (2020).

### *Defendant*

21.    Defendant 3M Company is a Delaware corporation with its principal place of business at 3M Center, St. Paul, Minnesota 55144.

22.    3M may be served with process through its registered agent, Illinois Corporation Service C, 801 Adlai Stevenson Drive, Springfield, IL 62703.

23.    3M conducts business throughout the United States, including in the State of Illinois.

24.    3M operates a manufacturing facility along the banks of the Mississippi River at its Cordova, Illinois Facility.

25.    The Cordova Facility began operations in 1970.

26.    3M discharged, emitted, placed, disposed of, leaked, spilled, and/or abandoned PFAS and/or PFAS-containing products in the State of Illinois at, from, or around the Cordova Facility and was responsible for activities causing the release of PFAS into the environment at, from, or around the Cordova Facility.

27.    This conduct has caused past and ongoing injury to Illinois' natural resources, environment, and public health and welfare.

28.    To the extent any act or omission of 3M is alleged in this Complaint, the officers, directors, agents, employees, or representatives of 3M committed or authorized each such act or

omission, or failed to adequately supervise or properly control or direct their employees while engaged in the management, direction, operation, or control of the affairs of 3M, and did so while acting within the scope of their duties, employment, or agency.

29.    All references to 3M in this Complaint include any predecessors, successors, parents, subsidiaries, affiliates, and divisions of 3M.

## JURISDICTION AND VENUE

30.    This Court has jurisdiction over the subject matter of this action pursuant to Article VI, Section 9 of the Illinois Constitution, Ill. Const. Article VI, Section 9.

31.    Jurisdiction is proper pursuant to 735 ILCS 5/2-209 (2020), because 3M, at all relevant times: (i) transacted business in Illinois, (ii) committed tortious actions within Illinois; and (iii) owned, used, or possessed real estate within the state of Illinois. *See* 735 ILCS 5/2-209.

32.    Venue is proper pursuant to 735 ILCS 5/2-101(1) and (2) (2020), because the Cordova Facility is located in Rock Island County, Illinois and because the causes of action stated herein arose out of underlying activities that occurred at the Cordova Facility located in Rock Island County, Illinois.

33.    3M's connections with the State of Illinois are consistent with the requirements of the Due Process Clause of the Fourteenth Amendment given that 3M has purposefully availed itself of the privilege of conducting activities in Illinois, the causes of action arise from 3M's activities in Illinois, and 3M's activities are so substantially connected to Illinois to make the exercise of jurisdiction over 3M reasonable.

## THE CORDOVA FACILITY

34.    From approximately 1970 to the present, 3M has owned and operated the Cordova Facility.

35.    At its Cordova Facility, 3M manufactures numerous chemical products, including

A118

adhesives, resins, fluorochemicals, and other specialty chemicals.

36.     The Cordova Facility is located on the banks of the Mississippi River.  The Cordova Facility is situated on roughly 740 acres, with approximately 1.2 miles of river frontage on the Mississippi River.

37.     3M produced and used several different PFAS analytes at the Cordova Facility that had the potential to be discharged, emitted, placed, disposed of, leaked, spilled, and/or abandoned at, from, or around the Cordova Facility.

38.     On information and belief, 3M manufactured and disposed of PFAS and/or PFAS-containing products at the Cordova Facility in a manner that caused PFAS to be released into Illinois' environment.

39.     The United States Environmental Protection Agency ("US EPA") has established a combined lifetime health advisory level for PFOA and PFOS of 70 parts per trillion ("ppt") ("EPA Health Advisory Level").

40.     As further alleged herein, the Illinois EPA has established health advisories containing health-based guidance levels for several PFAS ("Health Advisory Levels").

41.     As set forth more fully in the factual allegations below, 3M has detected PFAS on and around the Cordova Facility at levels injurious to public health and welfare and to the environment.

42.     As set forth more fully in the factual allegations below, 3M has detected PFAS in wastewater at, from, and around the Cordova Facility at levels injurious to public health and welfare and to the environment.

43.     For example, in June 2020, at one groundwater monitoring well located in the Cordova Facility's manufacturing area, 3M detected PFOA at 5570 ppt and PFOS at 80,800 ppt.

44.     These levels are injurious to public health and welfare and to the environment and are thousands of times higher than the EPA Health Advisory Level and the Illinois EPA's current Health Advisory Levels.

45.     US EPA has also recently detected levels of PFAS in wastewater from the Cordova Facility at levels exceeding Illinois EPA's current Health Advisory Levels and the EPA Health Advisory Level.

46.     For example, in December 2019, US EPA detected PFOS levels of 19,600 ppt and PFOA levels of 605 ppt in wastewater that would eventually be discharged from the Cordova Facility directly into the Mississippi River.

47.     These levels are injurious to public health and welfare and to the environment and are hundreds of times above both the US EPA Health Advisory Level and the Illinois EPA's current Health Advisory Levels.

48.     The PFAS described in the preceding paragraphs emanated from the Cordova Facility, and Illinois now seeks to: (a) hold 3M liable for monetary damages for the cost of identifying, monitoring, and remediating contamination caused by the release of PFAS from 3M's Cordova Facility and all damages to the State's environment and its natural resources because of the resulting contamination; (b) obtain injunctive relief requiring 3M to take action to prevent ongoing contamination and to remediate the areas contaminated and restore resources injured or impacted by PFAS released from the Cordova Facility; (c) recover civil penalties for violations of Illinois statutes and regulations resulting from the PFAS contamination described herein; and (d) obtain any other equitable relief as appropriate.

**FACTUAL ALLEGATIONS**

**I.    PFAS are toxic and pose substantial health and environmental risks.**

49.    PFAS are a family of chemical compounds containing strong carbon-fluorine bonds.[2]

50.    PFAS have been used for decades in a wide array of consumer and industrial products.[3]

51.    Among thousands of other uses, PFAS may be used to keep food from sticking to cookware, to make sofas and carpets resistant to stains, to make clothes and mattresses more waterproof, and to make some food packaging resistant to grease absorption.[4]

52.    Because PFAS help reduce friction, they are also used in a variety of other industries, including aerospace, automotive, building and construction, and electronics[5]

53.    PFAS are human-made, synthetic chemicals that do not exist naturally in the environment[6]

54.    Known pathways for PFAS to enter the environment include releases to air, land, surface water, and groundwater from industrial processes and facilities and from disposal by industrial processes and facilities.[7]

55.    PFAS are known as "forever" chemicals, because they are extremely persistent in

---

[2] *EPA's Per- and Polyfluoroalkyl Substances (PFAS) Action Plan*, *supra* n. 1 at 9.

[3] *Id.* at 1; *see also PFAS Strategic Roadmap*, *supra* n. 1 at 5.

[4] *See Per- and Polyfluoroalkyl Substances (PFAS)*, U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES (Aug. 3, 2021), https://ntp.niehs.nih.gov/whatwestudy/topics/pfas/index.html?utm_source=direct&utm_medium=prod&utm_campaign=ntpgolinks&utm_term=pfas.

[5] *An Overview of Perfluoroalkyl and Polyfluoroalkyl Substances and Interim Guidance*, *supra* n. 1 at 1.

[6] *See, e.g.*, *EPA's Per- and Polyfluoroalkyl Substances (PFAS) Action Plan*, *supra* n. 1 at 1; *see also PFAS Strategic Roadmap*, *supra* n. 1 at 6.

[7] *See Per- and Polyfluoroalkyl Substances (PFAS)*, ILLINOIS ENVIRONMENTAL PROTECTION AGENCY https://www2.illinois.gov/epa/topics/water-quality/pfas/Pages/default.aspx (last visited Mar. 12, 2022).

the environment and resistant to typical environmental degradation processes.[8]

56.     The persistence of PFAS and their resistance to biodegradation leads to their accumulation in the environment.[9]

57.     PFAS behave differently depending on their makeup, but generally absorb poorly and tend to be mobile in soil and groundwater systems.

58.     This combination of properties has been observed to enable PFAS to readily migrate in soil, groundwater, and surface water.[10]

59.     The pernicious characteristics of PFAS mean that once these chemicals are released into the environment, they tend to migrate into and can cause extensive contamination and injury to natural resources and property under the jurisdiction of the State.[11]

60.     Humans are exposed to PFAS through ingestion of drinking water and contaminated food, inhalation, dermal contact, and other pathways.[12]

61.     PFAS bioaccumulate in the human body and can bio-magnify in animals, particularly fish and "top of the food chain" mammals.[13]

---

[8] *See* Keith Matheny, *Internal Documents Show 3M Hid PFAS Dangers for Decades*, DETROIT FREE PRESS (May 9, 2019), https://www.freep.com/story/news/local/michigan/2019/05/09/3-m-lawsuit-pfas-water-contamination-michigan/3291156002/.

[9] *See* EPA's *Per- and Polyfluoroalkyl Substances (PFAS) Action Plan*, *supra* n. 1 at 9.

[10] John A. Simon, *Editor's perspective – Per- and polyfluorinated substances pose substantial challenges to remediation practitioners*, 28 THE JOURNAL OF ENVIRONMENTAL CLEANUP COSTS, TECHNOLOGIES, AND TECHNIQUES 3, 3-7 (2018), https://onlinelibrary.wiley.com/doi/full/10.1002/rem.21547.

[11] *See generally id.*

[12] *See An Overview of Perfluoroalkyl and Polyfluoroalkyl Substances and Interim Guidance*, *supra* n. 1 at 1.

[13] *See, e.g.*, Christopher Wanjek, *Breast-Fed Babies Show Buildup of Potentially Harmful Chemical*, FOX NEWS (Oct. 16, 2015, 7:13 PM EDT), https://www.foxnews.com/health/breast-fed-babies-show-buildup-of-potentially-harmful-chemical.

62.     PFAS can even be found in the blood of human infants.[14]

63.     Breast milk appears to be a source of PFAS exposure.[15]

64.     Chronic exposure to PFAS at low doses can result in adverse health effects for humans as well as animals.[16]

65.     Exposure to PFAS is correlated with a wide array of harmful and serious health effects in humans and animals, including but not limited to:

      (a) Liver damage,

      (b) Altered cholesterol levels,

      (c) Pregnancy-induced hypertension and/or preeclampsia,

      (d) Thyroid disease,

      (e) Modulation of the immune system,

      (f) Decreased fertility, and

      (g) Decrease in birth weight.[17]

66.     PFAS contamination is a serious threat to human health and State natural resources and property.

67.     Pursuant to 35 Ill. Adm. Code 620.605, the Illinois EPA shall issue a Health Advisory when there is a confirmed detection in a community water supply well of a chemical substance for which no numeric groundwater standard exists. The guidance levels contained in a Health Advisory represent concentrations in drinking water at which no adverse health effects are

---

[14] *See Toxicological Profile for Perfluoroalkyls*, U.S. DEP'T OF HEALTH AND HUMAN SERVICES, AGENCY FOR TOXIC SUBSTANCES AND DISEASE REGISTRY (May 2021), https://www.atsdr.cdc.gov/toxprofiles/tp200.pdf.

[15] *Id*.

[16] *Id.*

[17] *See id.*

expected to occur. A Health Advisory can be issued in the absence of standards under Section 620.410, groundwater quality standards, and when "the chemical substance is toxic or harmful to human health."

68.     The Illinois EPA must consider the guidance level established in a Health Advisory when (1) establishing "groundwater cleanup or action levels whenever there is a release or substantial threat of a release of… [a] hazardous substance or pesticide… or [o]ther contaminant that represents a significant hazard to public health or the environment;" (2) determining "whether the community water supply is taking its raw water from a site or source consistent with the [applicable] siting and source water requirements;" and (3) developing Illinois Pollution Control Board ("IPCB") "rulemaking proposals for new or revised numerical standards."[18]

69.     On January 28, 2021, the Illinois EPA announced Health Advisory Levels for PFBS, PFHxS, PFHxA, and PFOA.[19] On April 16, 2021, the Illinois EPA announced a new Health Advisory Level for PFOS and a revised limit for PFBS because the US EPA updated its Provisional Peer-Reviewed Toxicity Value for PFBS.[20] On July 27, 2021, the Illinois EPA announced a new Health Advisory Level for PFNA.

70.     The current Illinois EPA Health Advisory Levels are listed below.

---

[18] 35 Ill. Admin. Code Section 620.601.

[19] *See Illinois EPA Issues Health Advisories for Per- and Polyfluoroalkyl Substances (PFAS_ in Accordance with Illinois Groundwater Regulations*, ILLINOIS ENVIRONMENTAL PROTECTION AGENCY, https://www.illinois.gov/news/press-release.22728.html (last visited Mar. 13, 2022).

[20] *See Illinois Issues Health Advisory for Perfluorooctanesulfonic Acid (PFOS) and an Updated Health Advisory for Perfluorobutanesulfonic Acid (PFBS)*, ILLINOIS ENVIRONMENTAL PROTECTION AGENCY (Apr. 16, 2021), https://www2.illinois.gov/Pages/news-item.aspx?ReleaseID=23151.

| Specific PFAS | Health Advisory Level in Nanograms/Liter (ppt) | Chemical Abstract Services Registry Number (CASRN) |
|---|---|---|
| PFOA | 2 | 335-67-1 |
| PFHxA | 560,000 | 307-24-4 |
| PFOS | 14 | 1763-23-1 |
| PFHxS | 140 | 355-46-4 |
| PFBS | 2,100 | 375-73-5 |
| PFNA | 21 | 375-95-1 |

71.     On May 12, 2021, the Illinois EPA announced in a Pre-Filing Public Comment Period that it was proposing draft language to update its groundwater quality standards in 35 Ill. Adm. Code 620 for five PFAS – PFBS, PFHxS, PFOA, PFNA, and PFOS.

72.     On December 8, 2021, the Illinois EPA filed with the Illinois Pollution Control Board a Motion for Acceptance requesting that the Illinois Pollution Control Board accept the proposed groundwater quality standards for six PFAS – PFBS, PFHxS, PFOA, PFNA, PFOS, and HFPO-DA.[21] The proposed standards are listed below:

| Specific PFAS | Proposed Class I and Class II Groundwater Quality Standard in Nanograms/Liter (ppt) | Chemical Abstract Services Registry Number (CASRN) |
|---|---|---|
| PFOA | 2 | 335-67-1 |
| PFNA | 12 | 375-95-1 |

[21] *See 620 Groundwater Quality*, ILLINOIS ENVIRONMENTAL PROTECTION AGENCY, https://www2.illinois.gov/epa/about-us/rules-regs/water/Pages/620-Groundwater-Quality.aspx (last visited Mar. 12, 2022).

| | | |
|---|---|---|
| PFOS | 7.7 | 1763-23-1 |
| PFHxS | 77 | 355-46-4 |
| PFBS | 1,200 | 375-73-5 |
| HFPO-DA | 12 | 13252-13-6 |

73.    Because PFAS are persistent in the environment, unless PFAS are actively cleaned up from contaminated natural resources and property under the jurisdiction of the State, these chemicals will remain within the State and continue to contaminate natural resources and property under the jurisdiction of the State indefinitely.

## II.    3M manufactured and used PFAS at the Cordova Facility with full knowledge of PFAS health and environmental risks, which 3M intentionally hid from the public and the State.

74.    3M negligently operated its Cordova Facility such that it allowed the discharge, emission, placement, disposal, leakage, spillage, and/or abandonment of PFAS from the Cordova Facility in such a way as to cause harm to the State's environment and natural resources.

75.    3M has known for decades that PFAS are toxic and pose substantial health and environmental risks.

76.    Notwithstanding that knowledge, 3M persistently and intentionally hid this information from Illinois and the public.

77.    As early as the 1950s, 3M's internal animal studies found that PFAS are "toxic," and this finding was confirmed in further studies throughout the late 1970s and 1980s.[22]

78.    By the 1960s, 3M knew that perfluorochemicals, a subgroup of PFAS, are stable

---

[22] Lori Swanson, *Former Attorney General of Minnesota Testimony Before the Committee on Oversight and Reform, Subcommittee on Environment, United States House of Representatives* (Sept. 10, 2019), at 3-4, https://www.congress.gov/116/meeting/house/109902/witnesses/HHRG-116-GO28-Wstate-SwansonL-20190910.pdf (hereinafter referred to as "Swanson Testimony").

and persist in the environment and do not degrade.[23]

79.    3M conducted studies in the 1970s that confirmed that PFOS is toxic to a variety of aquatic wildlife, including various fish species and aquatic invertebrates.[24]

80.    In 1975, Dr. Warren Guy and Dr. Donald Taves, two independent scientists, found PFAS in human blood banks across the country and contacted 3M to inform them that they thought 3M chemicals might be to blame and to inquire whether fluorocarbon carboxylic acids were present in items in use by the public, like Scotchgard.[25]

81.    A 3M memorandum documenting the call noted that 3M "plead ignorance" and refused to identify the chemicals in Scotchgard.[26]

82.    3M conducted its own study like the study performed by Drs. Guy and Taves and confirmed that PFAS were present in human blood.[27]

83.    3M conducted multiple studies throughout 1975 and 1976 that confirmed the presence of PFAS in blood of the workers who handled PFAS at levels between 50 to 1000 times higher than "normal" levels.[28]

84.    Despite this, in 1976, 3M lawyers urged 3M not to disclose that the "true identity" of the chemical in the blood was PFOS.[29]

85.    By the late 1980s, 3M employees were questioning 3M's advertisement that PFAS chemicals were biodegradable.

---

[23] *Swanson Testimony*, at 3.

[24] *Swanson Testimony*, at Exhibit K.

[25] *Swanson Testimony*, at Exhibit D.

[26] *Id.*

[27] *Swanson Testimony*, at Exhibit E.

[28] *Id.*

[29] *Swanson Testimony*, at Exhibit F.

86.     In a December 1988 email, a 3M employee sent an email to other 3M employees stating "I don't think it is in 3M's long-term interest to perpetuate the myth that these fluorochemical surfactants are biodegradable.  It is probable that this misconception will eventually be discovered, and when that happens, 3M will likely be embarrassed, and we and our customers may be fined and forced to immediately withdraw products from the market."[30]

87.     By 1993, 3M was aware that there was some evidence that lactating goats transferred PFAS to their kids in milk and it was likely that a similar phenomenon would occur in humans.[31]

88.     In 1997, 3M provided DuPont with a Material Safety Data Sheet for FC-118 Fluorad Brand Fluorochemical Surfactant, which included a warning that stated: "CANCER: WARNING: Contains a chemical which can cause cancer. (3825-26-1) (1983 and 1993 studies conducted jointly by 3M and DuPont)."[32]

89.     3825-26-1 is the Chemical Abstract Services Registry Number ("CASRN") for Pentadecafluorooctanoic acid ammonium salt, which is a chemical form of PFOA.

90.     In 1998, a 3M scientist, Dr. Richard Purdy conducted a risk assessment of potential adverse effects on marine mammals from PFOS in the food chain and informed 3M of his findings that there was a significant risk of harm of food chain transfer, and that "the levels we are seeing in eagles and other biota is likely to climb each year."[33]

91.     Despite all of this knowledge, 3M continued to manufacture and dispose of PFAS

---

[30] *Swanson Testimony*, at Exhibit H.

[31] *Swanson Testimony*, at 5.

[32] *Swanson Testimony*, at Exhibit A.

[33] Richard E. Purdy, *Email to Georjean Adams re: Risk to the environment due to the presence of PFOS* (Dec. 3, 1998, 11:53 AM), https://static.ewg.org/reports/2019/pfa-timeline/1998_Food-Chain.pdf.

at multiple facilities, including the Cordova Facility.

92.    More troubling, 3M actively engaged in a campaign to promote perfluorochemicals as safe to manufacture and use and to distort scientific evidence concerning potential harms associated with perfluorochemicals.

93.    3M hired Dr. John P. Giesy, a professor and academic journal editor, to review several studies of chemicals before they were published and paid him a considerable amount of money in exchange for his services.[34]

94.    Dr. Giesy would share manuscripts of potentially harmful studies with 3M before they were published and advised 3M to "keep 'bad' papers out of the literature otherwise in litigation situations they can be a large obstacle to refute."[35]

95.    Dr. Giesy informed 3M that he made sure his timesheets were written in a way so that "there was no paper trail to 3M."[36]

96.    In 1999, the 3M scientist who conducted the study about movement of PFAS through the food chain, Dr. Richard Purdy, was so outraged by 3M's actions related to PFAS that he resigned in protest and copied US EPA on his resignation letter stating that he could "no longer participate" in a 3M process that put "markets, legal defensibility and image over environmental safety."[37]

97.    Dr. Purdy further stated in his letter that "Perfluorooctanesulfonate is the most insidious pollutant since PCB.  It is probably more damaging than PCB because it does not

---

[34] *Swanson Testimony*, at 6.

[35] *Swanson Testimony*, at Exhibit I.

[36] *Id.*

[37] *Swanson Testimony,* at Exhibit B.

degrade."[38]

98.    Dr. Purdy further stated in his letter that "3M continues to make and sell these chemicals though the company knows of an ecological risk assessment I did that indicates there is a better than 100% probability that perfluorooctanesulfonate is biomagnifying in the food chain and harming sea mammals . . . 3M told those of us working on the fluorochemical project not to write down our thoughts or have email discussions on issues because of how our speculations could be viewed in a legal discovery process."

99.    3M has earned extraordinary profits from its PFAS manufacturing business.

100.    In 2000, when 3M agreed to stop making forms of PFAS under pressure from the US EPA, it was making almost $500,000,000 per year from these types of products.[39]

101.    In 2006, EPA fined 3M $1.5 million for its withholding of studies about the toxicity of PFAS that were required to be reported under the Toxic Substances Control Act.[40]

102.    Despite its explicit knowledge of the dangers of PFAS, 3M deliberately and intentionally concealed the dangers of PFAS from governmental entities, including the State of Illinois and its agencies, and the public at large to protect profits and avoid public responsibility for injuries and damage caused by their toxic products.

103.    To this day, 3M continues to actively deny the adverse effects on the environment and human health caused by PFAS contamination, stating on its company webpage that "[t]he weight of scientific evidence from decades of research does not show that PFOS or PFOA causes

---

[38] *Id.*

[39] *Swanson Testimony*, at 2.

[40] *Id.* at 5.

harm in people at current or past levels."[41]

104.    3M's negligent, intentional, and reckless actions have contaminated property and natural resources under the jurisdiction of the State at and around the Cordova Facility, harmed property and natural resources under the jurisdiction of the State at and around the Cordova Facility, and placed Illinois residents at risk.

### III.    PFAS contamination at the Cordova Facility.

105.    At all relevant times, 3M manufactured PFAS at the Cordova Facility, discharged PFAS-containing waste directly into the Mississippi River, disposed of PFAS-containing sludge from its wastewater treatment plant ("WWTP"), emitted airborne PFAS, and spilled and leaked PFAS from containers, piping systems, tanks, and the wastewater treatment process, all of which resulted in significant contamination of surface waters, groundwater, drinking water, wetlands, soil, sediment, and air at and around the Cordova Facility.

106.    3M's operations that have resulted in the discharge of PFAS and PFAS-containing waste into the surrounding surface waters, groundwater, drinking water, wetlands, soil, sediment, and air at and around the Cordova Facility continue to this day.

107.    3M discharges untreated, non-contact cooling water that is contaminated with PFAS into the Mississippi River.

108.    Stormwater contaminated with PFAS from the Cordova Facility migrates into groundwater and also flows into the Mississippi River.

109.    June 2020 sample results for Monitoring Well 3-94, which is a 3M groundwater monitoring well located in the Cordova Facility's manufacturing area, indicated that PFAS levels

---

[41] *See 3M's Commitment to PFAS Stewardship*, 3M, https://www.3m.com/3M/en_US/pfas-stewardship-us/health-science/ (last visited Mar. 13, 2022).

were significantly higher than the Illinois EPA's current Health Advisory Levels and proposed groundwater quality standards.[42]

| Specific PFAS | June 2020 Sample Result in Nanograms/Liter (ppt) | Proposed Groundwater Quality Standard in Nanograms/Liter (ppt) | Health Advisory Level in Nanograms/Liter (ppt) |
|---|---|---|---|
| PFOA | 5,570 | 2 | 2 |
| PFOS | 80,800 | 7.7 | 14 |
| PFBS | 353,000 | 1200 | 2100 |

110.    The June 2020 sample results for Monitoring Well 3-81, which is another 3M groundwater monitoring well located in the Cordova Facility's former sludge incorporation area, indicated that PFAS levels were significantly higher than the Illinois EPA's current Health Advisory Levels and proposed groundwater quality standards.

| Specific PFAS | June 2020 Sample Result in Nanograms/Liter (ppt) | Proposed Groundwater Quality Standard in Nanograms/Liter (ppt) | Health Advisory Level in Nanograms/Liter (ppt) |
|---|---|---|---|
| PFOA | 6,650 | 2 | 2 |
| PFOS | 62,800 | 7.7 | 14 |

111.    3M's wastewater discharge sampling also demonstrates that levels of PFAS in its wastewater are injurious to public health and welfare and to the environment.

112.    For example, in 2020, PFOA, PFOS, and PFNA were found at elevated levels in

---

[42] 3M's annual monitoring result reports only include groundwater sampling results for the following PFAS compounds: PFBA, PFOA, PFBS, PFHxS, PFOS, and PFNA.

wastewater from Outfall 001, an outfall with an average discharge of 8.1 million gallons per day of wastewater.

| Specific PFAS | Sample Result in Nanograms/Liter (ppt) |
|---|---|
| PFOA | 583 |
| PFOS | 17,300 |
| PFNA | 946 |

113.    In addition to the sampling performed onsite at the Cordova Facility, 3M also completes annual sampling of residential wells located close to the Cordova Facility.

114.    3M has detected significant levels of PFAS in groundwater in nearby areas around the Cordova Facility.

115.    3M has detected concentrations of PFBA at nearly every residential well sampled during every year that sampling has occurred.

116.    The detection methods that 3M historically used for PFOA, PFBS, PFHxS, and PFOS were *not* USEPA approved methods and were *not* sufficiently precise and low enough to determine if the water tested from each residential well had detections above the Illinois EPA's current Health Advisory Levels and proposed groundwater quality standards.

117.    For example, the laboratory's detection limits used up until the 2020 sampling were 0.0240 ppb for PFOA and 0.0232 ppb for PFOS, which convert to 24 ppt and 23.2 ppt, respectively.

118.    The Illinois EPA Health Advisory Level for PFOA is 2 ppt, and the Illinois EPA Health Advisory Level for PFOS is 14 ppt.

119.    Similarly, the Illinois EPA's proposed groundwater standards for PFOA and PFOS are 2 ppt and 7.7 ppt, respectively.

120. It was not until 2020 that the laboratory 3M retained to analyze the residential well results used a sufficiently sensitive detection limit to compare the results to the Illinois EPA's current Health Advisory Levels and proposed groundwater standards.

121. The 2020 residential well results show that multiple residential wells had sample results that exceeded the Illinois EPA's current Health Advisory Levels and proposed groundwater standards.

122. For example, the PFOA results in Residential Wells 23321 and 22610 were 5.1 ppt and 10 ppt, respectively, which exceeds the Illinois EPA's current Health Advisory Level and proposed groundwater objective of 2.0 ppt.

123. On December 28, 2012, the Illinois EPA issued NPDES Permit No. IL0003140 ("NPDES Permit"), which required quarterly monitoring of fourteen PFAS, including: Perfluorobutanoic Acid ("PFBA"); Perfluoroundecanoic Acid ("PFUnA"); Perfluoropentanoic Acid ("PFPeA"); Perfluorododecanoic Acid ("PFDoA"); Perfluorohexanoic Acid ("PFHxA"); Perfluorotridecanoic Acid ("PFTrDA"); Perfluoroheptanoic Acid ("PFHpA"); Perfluorobutanesulfonate ("PFBS"); Perfluorotanoic Acid ("PFOA"); Perfluorohexanesulfonate ("PFHeS"); Perfluorononanoic Acid ("PFNA"); Perfluorooctanesulfonate ("PFOS"); Perfluorodecanoic Acid ("PFDA"); and Perfluorooctanesulfonamide ("PFBSA").

124. 3M informed US EPA in November 2019, and the Illinois EPA in January 2020, that 3M "had not fully characterized its PFAS discharge in its NPDES Permit for the Cordova Facility."[43] 3M has indicated the need to include additional PFAS analytes in the NPDES monitoring program since it did not include PFAS identified from a 2015 analysis in its NPDES

---

[43] *3M SEC Form 10-Q for the Quarterly Period that ended March 31, 2020*, 3M, https://s24.q4cdn.com/834031268/files/doc_financials/2020/q1/Q1-2020-10-Q.pdf (last visited Mar. 13, 2022).

monitoring.

125.    In an earnings conference call in January 2020, Mike Roman, 3M's Chairman and Chief Executive Officer, noted that 3M had discovered a PFAS discharge issue at its Cordova facility.[44]

126.    In December 2019, US EPA conducted a Clean Water Act and Resource Conservation and Recovery Act inspection of the Cordova Facility.

127.    As part of this inspection, US EPA took water and wastewater samples from several different locations at the Cordova Facility and tested the samples for 36 target PFAS analytes.

128.    The results from US EPA's December 2019 sampling demonstrate that multiple PFAS analytes were detected at levels injurious to public health and welfare and to the environment and at orders of magnitude above the Illinois EPA's current Health Advisory Levels and proposed groundwater standards and the US EPA Health Advisory Level.

129.    US EPA's inspection report notes that the samples "show the discharge of elevated concentrations of several PFAS to the Mississippi River and the discharge of several PFAS that are not listed in 3M Cordova's NPDES Permit and, therefore, not monitored for in the discharge."

130.    For example, US EPA collected samples from the production wellfield water, which is used for process water purposes and as once-through non-contact cooling water, and then discharged as untreated non-contact cooling water to the Mississippi River via Outfall 001 at an average flow of 8.1 million gallons per day.  The samples contained elevated levels of PFOA, PFOS, PFHxS, and PFNA.

---

[44] Sylvia Carignan, *3M Hit with $214 Million in PFAS Litigation Costs in Three Months*; BLOOMBERG LAW (Jan. 28, 2020),  https://news.bloomberglaw.com/environment-and-energy/3m-hit-with-214-million-in-pfas-litigation-costs-in-three-months.

| Specific PFAS | Sample Result in Nanograms/Liter (ppt) |
|---|---|
| PFOA | 907 |
| PFOS | 24,400 |
| PFHxS | 1,610 |
| PFNA | 1,210 |

131.    US EPA also collected samples from impounded wastewater and stormwater at Outfall 004 and outlet/outfall B.  US EPA noted in its inspection report that "[w]hile the following results are of impounded wastewater/stormwater and not of actual discharge events, the elevated concentrations of PFAS in the impounded wastewater/stormwater provide an indication of PFAS levels in stormwater runoff from two facility drainage areas, that could be released and discharged to the Mississippi River or percolate into the groundwater."  The samples contained elevated levels of PFOA, PFOS, PFHxS, and PFNA.

| Specific PFAS | Sample Result in Nanograms/Liter (Outfall 004, Outlet/Outfall B) (ppt) |
|---|---|
| PFOA | 84.5 and 136 |
| PFOS | 4,830 and 5,120 |
| PFHxS | 138 and 224 |
| PFNA | 59.1 and 13.1 |

132.    US EPA also collected three samples during the inspection from Outfall 001, which discharges into the Mississippi River at an average flow of 8.1 million gallons per day.  All three samples resulted in PFAS levels orders of magnitude above the US EPA Health Advisory Level

and the Illinois EPA's current Health Advisory Levels for multiple PFAS compounds. The samples contained elevated levels of PFOA, PFOS, PFHxS, and PFNA.

| Specific PFAS | Sample Result in Nanograms/Liter (ppt) |
|---|---|
| PFOA | 605 |
| PFOS | 19,600 |
| PFHxS | 1,070 |
| PFNA | 684 |

133.    Finally, US EPA also collected samples of the treated process wastewater at Outfall A01 at the Cordova Facility from four different locations. As noted in EPA's Inspection Report, "[f]ollowing the discharge of treated wastewater from outfall A01, no further treatment of the wastewater occurs, only the mixing of wastewater with facility non-contact cooling water and the subsequent discharge to the Mississippi River." The samples contained elevated levels of PFOA, PFOS, PFHxS, and PFNA.

| Specific PFAS | Sample Result in Nanograms/Liter (ppt) |
|---|---|
| PFOA | 829 |
| PFOS | 11,600 |
| PFHxS | 2,260 |
| PFNA | 864 |

134.    US EPA's inspection report also notes that 3M has discharged PFAS into the Mississippi River from outfalls that were not listed in the Cordova Facility's NPDES Permit.

A137

135.    3M's own sampling results confirm EPA's inspection findings that 3M continues to discharge elevated levels of PFAS into the Mississippi River.

136.    3M's Discharge Monitoring Report for the fourth quarter of 2021 demonstrates that 3M continues to discharge elevated PFAS levels into the Mississippi River to this day.

137.    The chart below includes 3M's quarterly average and quarterly maximum sampling results for PFOA, PFOS, PFNA, and PFHxS for the fourth quarter of 2021:

| Specific PFAS | Quarterly Average in Nanograms/Liter (ppt) | Quarterly Maximum in Nanograms/Liter (ppt) |
|---|---|---|
| PFOA | 221 | 232 |
| PFOS | 4,480 | 4,680 |
| PFNA | 179 | 182 |
| PFHxS | 460 | 482 |

138.    On September 23, 2021, the Illinois EPA disapproved 3M's 2020 Annual Per- and Polyfluoroalkyl Substances (PFAS) Monitoring Report for the 3M Cordova, IL Facility, June 2021.

139.    In its disapproval letter, the Illinois EPA referenced the residential well sample results that were above the Illinois EPA's current Health Advisory Levels and proposed groundwater quality objectives.

140.    The Illinois EPA also referenced the following statement made by 3M in Section 5.5 of 3M's 2020 Report:

> Accordingly, based on the extensive characterization of Site conditions that has been, and continues to be conducted, and the fact that no exposure pathways of concern have been identified, the establishment of a Groundwater Management Zone ("GMZ") as approved by the Illinois EPA, is confirmed as an effective and appropriate remedial action.

141.    In response to this statement, the Illinois EPA stated in its disapproval letter that

"the establishment of a GMZ is not considered a remedial action" and "[a] GMZ is part of the Remedial Action Plan (RAP) and works in concurrence with approved remedial actions."  The Illinois EPA stated that to continue the GMZ, "a Remedial Action Plan (RAP) proposing a remedy to address the soil and groundwater contamination identified in the site investigation is required, pursuant to 35 Ill. Adm. Code 740.530."

142.    At the time of the filing of this Complaint, 3M has not officially submitted a plan that satisfies the Site Remediation Program requirements.

143.    3M's operations at the Cordova Facility have resulted in PFAS migrating and continuing to migrate into the environment, including, but not limited to, surface water, groundwater, drinking water, wetlands, soils, sediments, air, fish, and wildlife at and around the Cordova Facility in a manner that has caused or tended to cause pollution in the State of Illinois.

144.    The extent of 3M's contamination has not been fully identified, and the State reasonably anticipates further testing will reveal additional surface water, groundwater, drinking water, wetland, soil, sediment, air, fish, and wildlife contamination at and around the Cordova Facility due to 3M's historical and current operations.

IV.    **State natural resource and property damage.**

145.    PFAS contamination at and around the Cordova Facility has injured the State's natural resources and/or adversely impacted its beneficial public trust uses including those for drinking water, recreation, fishing, agriculture, and other uses.

146.    PFAS contamination at and around the Cordova Facility has substantially damaged the intrinsic value of these State natural resources.

147.    Illinois and its residents have been deprived of the full use, enjoyment, and benefit of the State's public trust resources, and the intrinsic value of such State natural resources, and have been substantially harmed by PFAS contamination, as identified above.

148.    The State's natural resources and property at and around the Cordova Facility will continue to be harmed and injured for the foreseeable future by the ongoing release and/or spread of PFAS, as identified above.

149.    3M's acts and/or omissions have caused and/or contributed to cause PFAS contamination, as identified above.

150.    Each of the State's natural resources is precious, limited, and invaluable, as described in more detail below.

**Groundwater.**

151.    The State's public policy for groundwater is set forth in Section 2 of the Illinois Groundwater Protection Act.

(a)    The General Assembly finds that:

(i) a large portion of Illinois' citizens rely on groundwater for personal consumption, and industries use a significant amount of groundwater;

(ii) *contamination of Illinois groundwater will adversely impact the health and welfare of its citizens and adversely impact the economic viability of the State*;

(iii) contamination of Illinois' groundwater is occurring;

(iv) *protection of groundwater is a necessity for future economic development in this State*.

(b)    Therefore, it is the *policy of the State of Illinois to restore, protect, and enhance the groundwaters of the State, as a natural and public resource*. The State recognizes the essential and pervasive role of groundwater in the social and economic well-being of the people of Illinois, and its vital importance to the general health, safety, and welfare. It is further recognized as consistent with this policy that the groundwater resources of the State be utilized for beneficial and legitimate purposes; *that waste and degradation of the resources be prevented*; and *that the underground water resource be managed to allow for maximum benefit of the people of the State of Illinois*.

415 ILCS 55/2 (2020) (Emphasis added).

152.    Groundwater resources can be exposed to PFAS contamination in several ways, including when infiltrating precipitation transports surface contaminants from soils through the unsaturated zone and into shallow groundwater.

153.    3M has contaminated and injured the State's groundwater at and around the Cordova Facility with PFAS and PFAS-containing waste.

154.    3M has contaminated and injured groundwater sources and residential wells in locations at and around the Cordova Facility with PFAS and PFAS-containing waste.

155.    Ongoing additional testing continues to reveal further PFAS contamination and injury of groundwater at and around the Cordova Facility.  It is virtually certain that additional testing will reveal further PFAS contamination of, and injury to, groundwater.

**Surface waters.**

156.    Section 11 of the Act, 415 ILCS 5/11 (2020), provides, in pertinent part, as follows:

§ 11. (a) The General Assembly finds:

(1) that pollution of the waters of this State constitutes a menace to public health and welfare, creates public nuisances, is harmful to wildlife, fish, and aquatic life, impairs domestic, agricultural, industrial, recreational, and other legitimate beneficial uses of water, depresses property values, and offends the senses;

*            *            *

(c) The provisions of this Act authorizing implementation of the regulations pursuant to an NPDES program shall not be construed to limit, affect, impair, or diminish the authority, duties and responsibilities of the Board, Agency, Department or any other governmental agency or officer, or of any unit of local government, to regulate and control pollution of any kind, to restore, to protect or to enhance the quality of the environment, or to achieve all other purposes, or to enforce provisions, set forth in this Act or other State law or regulation.

157.    Surface waters are precious, limited, and invaluable State natural resources that are used for drinking water, irrigation, recreation such as swimming and fishing, and ecological and other important purposes.

A141

158.    State natural resources, including surface waters, are vital to the health, safety, and welfare of Illinois residents, and to the State's economy and ecology.

159.    Surface water, such as lakes, rivers, and wetlands, can receive groundwater inflow and recharge groundwater. The movement of water between groundwater and surface-water systems leads to the mixing of their water qualities.

160.    3M has contaminated and injured the State's surface water at and around the Cordova Facility with PFAS and PFAS-containing waste.

161.    Ongoing additional testing continues to reveal further PFAS contamination and injury of surface waters at and around the Cordova Facility.  It is virtually certain that additional testing will reveal further PFAS contamination of, and injury to, surface waters.

**Wetlands.**

162.    Wetlands are highly productive, biologically diverse, precious, limited, and invaluable State natural resources that enhance water quality, control erosion, maintain stream flows, sequester carbon, and provide a home to at least one third of all threatened and endangered species, playing an important role in ecological health, drinking water, irrigation, agriculture, and other purposes.

163.    State natural resources, including wetlands, are vital to the health, safety, and welfare of Illinois residents, and to the State's economy and ecology.

164.    Multiple areas in and near the Cordova Facility are listed on the National Wetlands Inventory.

165.    Wetlands can receive groundwater inflow and recharge groundwater. The movement of water between groundwater and surface-water systems such as wetlands can lead to the mixing of their water qualities.

A142

166.    Ongoing additional testing continues to reveal further PFAS contamination. It is virtually certain that additional testing will reveal PFAS contamination of, and injury to, wetlands at and around the Cordova Facility.

**Wildlife, aquatic life, soils, and sediment.**

167.    Wildlife, aquatic life, soil, and sediments are precious, limited, and invaluable State natural resources.

168.    3M has contaminated and injured the State's wildlife, aquatic life, soil, and sediments at and around the Cordova Facility.

169.    Agriculture is one of Illinois' largest industries, contributing billions of dollars annually to Illinois' economy.

170.    Illinois' wildlife and aquatic life are used for food and recreational purposes and provide a significant economic benefit to the State, including through tourism and recreation.

171.    Injuries to wildlife and aquatic life affect not only individual wildlife and aquatic life, but also the entire ecosystem of which they are a part.

172.    Ongoing additional testing continues to reveal further PFAS contamination and injury of agricultural operations, wildlife, aquatic life, soils, and sediment at and around the Cordova Facility.  It is virtually certain that additional testing will reveal further PFAS contamination of, and injury to, soils, sediments, wildlife, and aquatic life.

## V.    The PFAS contamination caused by 3M must be remediated.

173.    The State seeks, in part, to: (a) hold 3M liable for monetary damages for the cost of identifying, monitoring, and remediating contamination caused by the release of PFAS from 3M's Cordova Facility and all damages to the State's environment and its natural resources because of the resulting contamination; and (b) obtain injunctive relief requiring 3M to take action

to prevent ongoing contamination and to remediate the areas contaminated and restore resources injured or impacted by PFAS released from the Cordova Facility.

174. Illinois' environment and natural resources are currently, and may in the future be, detrimentally affected by 3M's PFAS pollution and PFAS contamination at, from, and around the Cordova Facility, as described herein.

175. Proven and preliminary remedial techniques exist for cleaning up PFAS in environmental media and successfully treating drinking water.

176. Absent use of remediation and treatment methods, PFAS contamination will continue to spread through the natural resources and property under the jurisdiction of the State. Although PFAS are persistent in the environment, PFAS can be successfully remediated or successfully treated, and impacts to natural resources can be compensated, but at significant expense.

177. PFAS contamination levels in State natural resources at and around the Cordova Facility, including surface water, groundwater, and wetlands, typically fluctuate (*i.e.*, increase and decrease) over time as PFAS moves through water and by other factors that impact hydrology, such as changes in seasonal precipitation levels. Because PFAS levels can fluctuate at a single PFAS contamination site over time, the only way to be certain that PFAS no longer exist in State natural resources, such as surface water, groundwater, and wetlands, is to remediate or treat the PFAS.

178. The presence and migration of PFAS in State natural resources and property at and around the Cordova Facility, absent large-scale and costly remediation and/or treatment, will continue indefinitely and will continue to indefinitely threaten such natural resources and property.

179.    Because of the injury PFAS have caused and are causing to the environment and natural resources under the jurisdiction of the State at and around the Cordova Facility, 3M must remediate PFAS contamination and restore these natural resources, and the State is entitled to compensation for interim and permanent losses to its natural resources, as well as any costs it incurs in restoring its natural resources.

180.    The State reserves its right to amend this Complaint as additional evidence of PFAS contamination comes to light including, but not limited to, PFAS contamination of wildlife, aquatic life, waters, soils, sediments, and other State natural resources arising from/related to 3M's actions and omissions in its ownership and operation of the Cordova Facility.

## CLAIMS ALLEGED

### COUNT I
### WATER POLLUTION UNDER SECTION 12(a)
### OF THE ILLINOIS ENVIRONMENTAL PROTECTION ACT

181.    The State repeats, realleges, and incorporates by reference each allegation contained in Paragraphs 1-180, above, as though fully set forth herein.

182.    Section 12(a) of the Act, 415 ILCS 5/12(a) (2020), provides that, "[n]o person shall: (a) cause or threaten or allow the discharge of any contaminants into the environment in any State so as to cause or tend to cause water pollution in Illinois, either alone or in combination with matter from other sources, or so as to violate regulations or standards adopted by the Pollution Control Board under this Act."

183.    Section 11 of the Act, 415 ILCS 5/11 (2020), provides, in pertinent part, as follows:

§ 11. (a) The General Assembly finds:

(1) that pollution of the waters of this State constitutes a menace to public health and welfare, creates public nuisances, is harmful to wildlife, fish, and aquatic life, impairs domestic, agricultural, industrial, recreational, and other legitimate beneficial uses of water, depresses property values, and offends the senses;

*                *                *

(c) The provisions of this Act authorizing implementation of the regulations pursuant to an NPDES program shall not be construed to limit, affect, impair, or diminish the authority, duties and responsibilities of the Board, Agency, Department or any other governmental agency or officer, or of any unit of local government, to regulate and control pollution of any kind, to restore, to protect or to enhance the quality of the environment, or to achieve all other purposes, or to enforce provisions, set forth in this Act or other State law or regulation.

184.    Section 3.315 of the Act, 415 ILCS 5/3.315 (2020), provides that a "person" is "any individual, partnership, co-partnership, firm, company, limited liability company, corporation, association, joint stock company, trust, estate, political subdivision, state agency, or any other legal entity, or their legal representative, agent or assigns."

185.    Defendant, 3M is a corporation, and therefore is a "person" as that term is defined in Section 3.315 of the Act, 415 ILCS 5/3.315 (2020).

186.    Section 3.165 of the Act, 415 ILCS 5/3.165 (2020), broadly defines "contaminant" as "any solid, liquid, or gaseous matter, any odor, or any form of energy, from whatever source."

187.    PFAS compounds constitute "contaminants" as that term is defined in Section 3.165 of the Act, 415 ILCS 5/3.165 (2020).

188.    Section 3.545 of Act, 415 ILCS 5/3.545 (2020), broadly defines "water pollution" as "such alteration of the physical, thermal, chemical, biological or radioactive properties of any waters of the State, or such discharge of any contaminant into any waters of the State, as will or is likely to create a nuisance or render such waters harmful or detrimental or injurious to public health, safety or welfare, or to domestic, commercial, industrial, agricultural, recreational, or other legitimate uses, or to livestock, wild animals, birds, fish, or other aquatic life."

A146

189.    Section 3.550 of the Act, 415 ILCS 5/3.550 (2020), defines "waters" as "all accumulations of water, surface and underground, natural, and artificial, public and private, or parts thereof, which are wholly or partially within, flow through, or border upon this State."

190.    The Mississippi River and other surface waters, groundwater, and wetlands at and around the Cordova Facility constitute "waters" as that term is defined in Section 3.550 of the Act, 415 ILCS 5/3.550 (2020).

191.    The threatened and actual discharge of PFAS-containing wastewater, stormwater, and wastewater sludge and other direct and indirect discharges of PFAS and PFAS-containing substances from the Cordova Facility into the Mississippi River and other surface waters, groundwater, and wetlands at and around the Cordova Facility tends to cause a nuisance, because such discharges negatively impact commercial and recreational uses of the Mississippi River and render (or are likely to render) the Mississippi River, other surface waters, groundwater, and wetlands at and around the Cordova Facility harmful, detrimental, or injurious to public health, safety or welfare, or to domestic, commercial, industrial, agricultural, recreational, or other legitimate uses, or to livestock, wild animals, birds, fish, or other aquatic life, thereby causing or tending to cause water pollution, as that term is defined in Section 3.545 of the Act, 415 ILCS 5/3.545 (2020).

192.    By threatening, causing, or allowing the discharge of PFAS-containing wastewater, stormwater, and wastewater sludge and other direct and indirect discharges of PFAS and PFAS-containing substances from the Cordova Facility into the Mississippi River and other surface waters, groundwater, drinking water, and wetlands at and around the Cordova Facility, so as to cause or tend to cause water pollution, 3M violated Section 12(a) of the Act, 415 ILCS 5/12(a) (2020).

193.    Violations of the pertinent environmental statutes will continue until and unless this Court grants equitable relief in the form of an immediate and, after trial, permanent injunction.

WHEREFORE, Plaintiff, PEOPLE OF THE STATE OF ILLINOIS, respectfully requests that this Court enter an Order:

(a)  Finding that 3M violated Section 12(a) of the Act, 415 ILCS 5/12(a) (2020);

(b) Enjoining 3M from committing any further violations of Section 12(a) of the Act, 415 ILCS 5/12(a) (2020);

(c) Ordering that 3M take immediate, necessary action to correct its violations of Section 12(a) of the Act, 415 ILCS 5/12(a) (2020), which would include, without limitation, the investigation and remediation of all PFAS contamination at and around the Cordova Facility;

(d) Assessing a civil penalty of Fifty Thousand Dollars ($50,000.00) against 3M for each of its violations of the Act and pertinent regulations, and an additional civil penalty of Ten Thousand Dollars ($10,000.00) for each day of violation;

(e)  Ordering 3M, pursuant to 415 ILCS 5/42(f) (2020) to pay all costs, including oversight, sampling, and clean-up costs, and attorney, expert witness, and consultant fees expended by Plaintiff in its pursuit of this action; and

(f)  granting such other and further relief as this Court deems appropriate and just.

## COUNT II
## CREATING A WATER POLLUTION HAZARD UNDER SECTION 12(d) OF THE ILLINOIS ENVIRONMENTAL PROTECTION ACT

194.    The State repeats, realleges, and incorporates by reference each allegation contained in Paragraphs 1-180, above, as though fully set forth herein.

195.    Section 12(d) of the Act, 415 ILCS 5/12(d) (2020), provides as follows: "No person shall: (d) deposit any contaminants upon the land in such place and manner so as to create a water pollution hazard."

A148

196.    Section 11 of the Act, 415 ILCS 5/11 (2020), provides, in pertinent part, as follows:

§ 11. (a) The General Assembly finds:

(1) that pollution of the waters of this State constitutes a menace to public health and welfare, creates public nuisances, is harmful to wildlife, fish, and aquatic life, impairs domestic, agricultural, industrial, recreational, and other legitimate beneficial uses of water, depresses property values, and offends the senses;

          *                    *                    *

(c) The provisions of this Act authorizing implementation of the regulations pursuant to an NPDES program shall not be construed to limit, affect, impair, or diminish the authority, duties and responsibilities of the Board, Agency, Department or any other governmental agency or officer, or of any unit of local government, to regulate and control pollution of any kind, to restore, to protect or to enhance the quality of the environment, or to achieve all other purposes, or to enforce provisions, set forth in this Act or other State law or regulation.

197.    By depositing PFAS and PFAS-containing waste on the land through sludge disposal and land application, and through suspected leaks and spills of PFAS through the manufacturing process, each a "contaminant" defined by Section 3.165 of the Act, 415 ILCS 5/3.165 (2020), in a place and manner that the contaminants could be carried by storm water or other conveyance into surface waters, including but not limited to the Mississippi River, and/or into the groundwater, 3M created a water pollution hazard at and around the Cordova Facility and thereby violated Section 12(d) of the Act, 415 ILCS 5/12(d) (2020).

198.    Violations of the pertinent environmental statutes will continue until and unless this Court grants equitable relief in the form of an immediate and, after trial, permanent injunction.

WHEREFORE, Plaintiff, PEOPLE OF THE STATE OF ILLINOIS, respectfully requests that this Court enter an Order:

(a) Finding that 3M violated Section 12(d) of the Act, 415 ILCS 5/12(d) (2020);

(b) Enjoining 3M from any further violations of Section 12(d) of the Act, 415 ILCS 5/12(d) (2020);

A149

(c) Ordering that 3M take immediate, necessary action to correct the violation of Section 12(d) of the Act, 415 ILCS 5/12(d) (2020), which would include, without limitation, the investigation and remediation of all PFAS contamination at and around the Cordova Facility;

(d) Assessing a civil penalty of Fifty Thousand Dollars ($50,000.00) against 3M for each violation of the Act and pertinent regulations, and an additional civil penalty of Ten Thousand Dollars ($10,000.00) for each day of violation;

(e) Ordering 3M, pursuant to 415 ILCS 5/42(f) (2020) to pay all costs, including oversight, sampling, and clean-up costs, and attorney, expert witness, and consultant fees expended by the Plaintiff in its pursuit of this action; and

(f) Granting such other relief as this Court deems appropriate and just.

<u>**COUNT III**</u>
**DISCHARGING WITHOUT AN NPDES PERMIT IN VIOLATION OF SECTION 12(f) OF THE ILLINOIS ENVIRONMENTAL PROTECTION ACT**

199.     The State repeats, realleges, and incorporates by reference each allegation contained in Paragraphs 1-180, above, as though fully set forth herein.

200.     Section 12(f) of the Act, 415 ILCS 5/12(f) (2020), provides in pertinent part, as follows:

> No person shall:  (f) Cause, threaten or allow the discharge of any contaminant into the waters of the State, as defined herein, including but not limited to, waters to any sewage works, or into any well or from any point source within the State, without an NPDES permit for point source discharges issued by the Agency under Section 39(b) of this Act, or in violation of any term or condition imposed by such permit, or in violation of any NPDES permit filing requirement established under Section 39(b), or in violation of any regulations adopted by the Board or of any order adopted by the Board with respect to the NPDES program.

201.     Section 309.102(a) of the IPCB Regulations, 35 Ill. Adm. Code 309.102(a), provides as follows: "Except as in compliance with the provisions of the Act, Board regulations, and the CWA, and the provisions and conditions of the NPDES permit issued to the discharger,

the discharge of any contaminant or pollutant by any person into the waters of the State from a point source or into a well shall be unlawful."

202.    By discharging PFAS that were not included in the Cordova Facility's NPDES Permit into the Mississippi River from the Outfalls listed in its NPDES Permit, 3M violated Section 309.102(a) of the IPCB Regulations, 35 Ill. Adm. Code 309.102(a).

203.    By threatening or allowing the discharge of any contaminant into the Mississippi River from point sources not authorized in the Cordova Facility's NPDES Permit, 3M further violated Section 309.102(a) of the IPCB Regulations, 35 Ill. Adm. Code 309.102(a).

204.    By violating Section 309.102(a) of the IPCB Regulations, 35 Ill. Adm. Code 309.102(a), 3M thereby violated Section 12(f) of the Act, 415 ILCS 5/12(f) (2020).

205.    Violations of the pertinent environmental statutes will continue until and unless this Court grants equitable relief in the form of an immediate and, after trial, permanent injunction.

WHEREFORE, Plaintiff, PEOPLE OF THE STATE OF ILLINOIS, respectfully requests that this Court enter an Order:

(a) Finding that 3M violated Section 5/12(f) of the Act, 415 ILCS 5/12(f) (2020), and Section 309.102(a) of the IPCB Regulations, 35 Ill. Adm. Code 309.102(a);

(b) Enjoining 3M from any further violations of Section 5/12(f) of the Act, 415 ILCS 5/12(f) (2020), and Section 309.102(a) of the IPCB Regulations, 35 Ill. Adm. Code 309.102(a);

(c) Ordering that 3M take immediate, necessary action to correct its violations of Section 5/12(f) of the Act, 415 ILCS 5/12(f) (2020), and Section 309.102(a) of the IPCB Regulations, 35 Ill. Adm. Code 309.102(a), which would include, without limitation, the investigation and remediation of all PFAS contamination at and around the Cordova Facility;

A151

(d) Assessing a civil penalty of Ten Thousand Dollars ($10,000.00) against 3M for each of its violations of the Act and pertinent regulations, and an additional civil penalty of Ten Thousand Dollars ($10,000.00) for each day of violation;

(e) Ordering 3M, pursuant to 415 ILCS 5/42(f) (2020) to pay all costs, including oversight, sampling, and clean-up costs, and attorney, expert witness, and consultant fees expended by Plaintiff in its pursuit of this action; and

(f) Granting such other and further relief as this Court deems appropriate and just.

<u>**COUNT IV**</u>
**LIABILITY UNDER 415 ILCS 5/22.2(f)**

206.    The State repeats, realleges, and incorporates by reference each allegation contained in Paragraphs 1-180, above, as though fully set forth herein.

207.    Section 22.2(f) of the Act, 415 ILCS 5/22.2(f) (2020), provides that certain parties "shall be liable for all costs of removal or remedial action incurred by the State of Illinois or any unit of local government as a result of a release or substantial threat of a release of a hazardous substance or pesticide."

208.    One party that can be held liable is "the owner and operator of a facility or vessel from which there is a release or a substantial threat of a release of a hazardous substance or pesticide."  415 ILCS 5/22.2(f)(1) (2020).

209.    "Remove" or "removal" is defined in 415 ILCS 5/3.405 (2020) as:

the cleanup or removal of released hazardous substances from the environment, actions as may be necessary taken in the event of the threat of release of hazardous substances into the environment, actions as may be necessary to monitor, assess, and evaluate the release or threat of release of hazardous substances, the disposal of removed material, or the taking of other actions as may be necessary to prevent, minimize, or mitigate damage to the public health or welfare or the environment, that may otherwise result from a release or threat of release. The term includes, in addition, without being limited to, security fencing or other measures to limit access, provision of alternative water supplies, temporary evacuation and housing

A152

of threatened individuals, and any emergency assistance that may be provided under the Illinois Emergency Management Agency Act or any other law.

210.    "Remedial action" is defined in 415 ILCS 5/3.400 (2020) as:

those actions consistent with permanent remedy taken instead of or in addition to removal actions in the event of a release or threatened release of a hazardous substance into the environment, to prevent or minimize the release of hazardous substances so that they do not migrate to cause substantial danger to present or future public health and welfare or the environment. The term includes, but is not limited to, such actions at the location of the release as storage, confinement, perimeter protection using dikes, trenches, or ditches, clay cover, neutralization, cleanup of released hazardous substances or contaminated materials, recycling or reuse, diversion destruction, segregation of reactive wastes, dredging or excavations, repair or replacement of leaking containers, collection of leachate and runoff, onsite treatment or incineration, provision of alternative water supplies, and any monitoring reasonably required to assure that such actions protect the public health and welfare and the environment. The term includes the costs of permanent relocation of residents and businesses and community facilities where the Governor and the Director determine that, alone or in combination with other measures, such relocation is more cost-effective than and environmentally preferable to the transportation, storage, treatment, destruction, or secure disposition offsite of hazardous substances, or may otherwise be necessary to protect the public health or welfare. The term includes offsite transport of hazardous substances, or the storage, treatment, destruction, or secure disposition offsite of such hazardous substances or contaminated materials.

211.    "Release" is defined broadly as "any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, or disposing into the environment . . ." 415 ILCS 5/3.395 (2020).

212.    "Hazardous substance", as defined in 415 ILCS 5/3.215 (2020), includes hazardous wastes.

213.    "Hazardous waste" is defined broadly in 415 ILCS 5/3.220 (2020).

214.    The definition includes "a waste, or combination of wastes, which because of its quantity, concentration, or physical, chemical, or infectious characteristics may cause or significantly contribute to an increase in mortality or an increase in serious, irreversible, or incapacitating reversible, illness."

215.    PFAS are hazardous wastes, as that term is broadly defined in 415 ILCS 5/3.220 (2020).

216.    Because PFAS is a "hazardous waste", as that term is defined in 415 ILCS 5/3.220 (2020), it is also a "hazardous substance", as that term is defined in 415 ILCS 5/3.215 (2020).

217.    The leaking, emitting, discharging, escaping, leaching, dumping and disposal of PFAS into the environment, a hazardous substance, constitute a "release" as that term is defined in 415 ILCS 5/3.395 (2020).

218.    The Illinois EPA has established Health Advisory Levels for six PFAS compounds.

219.    As a result of the groundwater sampling conducted by 3M, US EPA, and the Illinois EPA, the State has discovered PFAS at the Cordova Facility, which has or is likely to require "removal" as that term is defined in 415 ILCS 5/3.405 (2020), and "remedial action" as that term is defined in 415 ILCS 5/3.400 (2020), at and around the Cordova Facility.

220.    The levels of PFAS impacting surface water, groundwater, drinking water, wetlands, soils, and sediments at and around the Cordova Facility exceed the Illinois EPA's current Health Advisory Levels and proposed groundwater quality standards.

221.    Considering PFAS' chemical characteristics, fate in the environment, dose-response, toxicity, and adverse impacts on natural resources, the concentrations and quantities of PFAS in surface water, groundwater, drinking water, wetlands, soil, and sediments at and around the Cordova Facility may cause or significantly contribute to an increase in mortality or an increase in serious, irreversible, or incapacitating reversible, illness and pose an unacceptable risk of substantial danger to present or future public health or welfare or the environment.

222.    As a result of releases and substantial threats of a release of a hazardous substance, the State has incurred and is continuing to incur removal and remedial costs at and around the Cordova Facility, including investigation, monitoring, and enforcement costs.

WHEREFORE, Plaintiff, PEOPLE OF THE STATE OF ILLINOIS, respectfully requests that this Court enter an Order:

(a) Finding that 3M violated Section 22.2(f) of the Act, 415 ILCS 5/22.2(f) (2020);

(b) Ordering 3M to compensate the State for all past and future natural resource damages, loss-of use damages, response activity costs, costs of investigation, costs of testing and monitoring, costs of providing water from an alternate source, costs of installing and maintaining an early warning system to detect PFAS contamination before it reaches wells, costs of remediating PFAS and other hazardous substances from natural resources at and around the Cordova Facility including groundwater, surface waters, soils, sediments, and other natural resources, costs of remediating PFAS and hazardous substance contamination at and around the Cordova Facility, any other costs or other expenditures incurred to address PFAS contamination and injury at and around the Cordova Facility, and interest on the damages according to law;

(c) Ordering 3M to pay all applicable civil fines; and

(d) Granting such other and further relief as this Court deems appropriate and just.

*COUNT V*[45]
*AIR POLLUTION UNDER SECTION 9(a)*
*OF THE ILLINOIS ENVIRONMENTAL PROTECTION ACT*[46]

223.     *The State repeats, realleges, and incorporates by reference each allegation contained in Paragraphs 1-180, above, as though fully set forth herein.*

224.     *Section 9(a) of the Act, 415 ILCS 5/9(a) (2020), provides as follows:*

*No person shall:*

*a.     Cause or threaten or allow the discharge or emission of any contaminant into the environment in any State so as to cause or tend to cause air pollution in Illinois, either alone or in combination with contaminants from other sources, or so as to violate regulations or standards adopted by the Board under this Act;*

225.     *Section 201.141 of the Illinois Pollution Control Board ("Board") Air Pollution Regulations, 35 Ill. Adm. Code 201.141 provides as follows:*

*No person shall cause or threaten or allow the discharge or emission of any contaminant into the environment in any State so as, either alone or in combination with contaminants from other sources, to cause or tend to cause air pollution in Illinois, or so as to violate the provisions of this Chapter, or so as to prevent the attainment or maintenance of any applicable ambient air quality standard.*

226.     *Section 3.165 of the Act, 415 ILCS 5/3.165 (2020), contains the following definition:*

*"CONTAMINANT" is any solid, liquid, or gaseous matter, any odor or any form of energy, from whatever source.*

227.     *PFAS compounds are each a "contaminant" as the term is defined Section 3.165 of the Act, 415 ILCS 5/3.165 (2020).*

---

[45] On March 21, 2025, the Court partially granted 3M's Motion to Dismiss, dismissing Counts V and X of the People's Complaint.  The People replead Counts V and X only for the purpose of preserving these claims on appeal and have identified them in underlined italics.

[46] For purposes of clarity, the People have retained the same numbering for its First Amended Complaint as its original Complaint.

228.    *Section 3.115 of the Act, 415 ILCS 5/3.115 (2020), provides the following definition:*

*"Air pollution" is the presence in the atmosphere of one or more contaminants in sufficient quantities and of such characteristics and duration as to be injurious to human, plant, or animal life, to health, or to property, or to unreasonably interfere with the enjoyment of life or property.*

229.    *The production of PFAS results in air emissions from PFAS manufacturing facilities, such as 3M's PFAS production at the Cordova Facility.*

230.    *The emission of PFAS resulting from the manufacture of PFAS compounds and other products that are produced from PFAS compounds at the Cordova Facility, which injured and continue to injure human, plant, aquatic, and/or animal life, and human, plant, aquatic, and/or animal health, or which have unreasonably interfered and continue to interfere with the enjoyment of life or property, constitutes air pollution, as defined in Section 3.115 of the Act, 415 ILCS 5/3.115 (2020).*

231.    *Defendant 3M, by its actions as alleged herein, has violated Section 9(a) of the Act, 415 ILCS 5/9(a) (2020), and Section 201.141 of the Board Regulations, 35 Ill. Adm. Code 201.141.*

232.    *Violations of the pertinent environmental statutes and regulations will continue until and unless this Court grants equitable relief in the form of an immediate and, after trial, permanent injunction.*

*WHEREFORE, Plaintiff, PEOPLE OF THE STATE OF ILLINOIS, respectfully requests that this Court enter an Order:*

*(a) Finding that 3M violated Section 9(a) of the Act, 415 ILCS 5/9(a) (2020), and Section 201.141 of the Board Regulations, 35 Ill. Adm. Code 201.141;*

*(b) Enjoining 3M from committing any further violations of Section 9(a) of the Act, 415 ILCS 5/9(a) (2020), and Section 201.141 of the Board Regulations, 35 Ill. Adm. Code 201.141;*

A157

*(c) Ordering that 3M take immediate, necessary action to correct its violations of Section 9(a) of the Act, 415 ILCS 5/9(a) (2020), and Section 201.141 of the Board Regulations, 35 Ill. Adm. Code 201.141, which would include, without limitation, the investigation and remediation of all PFAS contamination at and around the Cordova Facility;*

*(d) Assessing a civil penalty of Fifty Thousand Dollars ($50,000.00) against 3M for each of its violation of the Act and pertinent regulations, and an additional civil penalty of Ten Thousand Dollars ($10,000.00) for each day of violation;*

*(e) Ordering 3M, pursuant to 415 ILCS 5/42(f) (2020) to pay all costs, including oversight, sampling, and clean-up costs, and attorney, expert witness, and consultant fees expended by the Plaintiff in its pursuit of this action; and*

*(f) Granting such other and further relief as this Court deems appropriate and just.*

## COUNT VI
### RESTORATION OF AQUATIC LIFE AND WILDLIFE
### UNDER THE FISH AND WILDLIFE CODES

233.    The State repeats, realleges, and incorporates by reference each allegation contained in Paragraphs 1-180, above, as though fully set forth herein.

234.    Section 1-130 of the Fish Code, 515 ILCS 5/1-130 (2020), provides as follows:

Cooperation with EPA.  The Department is authorized to cooperate with the Environmental Protection Agency of the State of Illinois in making pollution investigations and reports of pollution investigations.

235.    Section 1.5 of the Wildlife Code, 520 ILCS 5/1.5 (2020), provides as follows:

The Department is authorized to cooperate with the Environmental Protection Agency of the State of Illinois in making pollution investigations and making reports thereof.

236.    Section 1.50 of the Fish Code, 515 ILCS 5/1-150 (2020), provides, in pertinent part, as follows:

Preservation of aquatic life; actions to enforce Code. The Department shall take all measures necessary for the conservation, distribution, introduction, and restoration of aquatic life. * * * The Department shall also bring or cause to be brought actions and proceedings, in the name and by the authority of the People of the State of Illinois, to enforce this Code, including administrative rules, and to recover any and all fines and penalties provided for. * * *

237. Section 1.20 of the Fish Code, 515 ILCS 5/1-20 (2020), provides in pertinent part,

the following definition:

"Aquatic life" means all fish, mollusks, crustaceans, algae, aquatic plants, aquatic invertebrates, and any other aquatic animals or plants that the Department identifies in rules adopted after consultation with biologists, zoologists, or other wildlife experts. * * *

238. Section 5-5 of the Fish Code, 515 ILCS 5/5-5 (2020), provides, in pertinent part, as

follows:

If any person causes any waste, sewage, thermal effluent, or any other pollutant to enter into, or causes or allows pollution of, any waters of this State so as to kill aquatic life, the Department, through the Attorney General, may bring an action against that person and recover the value of and the related costs in determining the value of the aquatic life destroyed by the waste, sewage, thermal effluent, or pollution. Any money so recovered shall be placed into the Wildlife and Fish Fund in the State Treasury.

239. Section 1-70 of the Fish Code, 515 ILCS 5/1-70 (2020), provides the following

definition:

"Person" includes the plural "persons", females as well as males, and shall extend and be applied to clubs, associations, corporations, firms, and partnerships as well as individuals.

240. 3M, a corporation, is a "person" as that term is defined in Section 1-70 of the Code,

515 ILCS 5/1-70 (2020).

241. Section 1-10 of the Wildlife Code, 520 ILCS 5/1-10 (2020), provides, in pertinent

part, as follows:

The Department shall take all measures necessary for the conservation, distribution, introduction and restoration or birds and mammals. The Department also shall

A159

bring or cause to be brought, actions and proceedings, in the name, and by the authority, of the People of the State of Illinois, to enforce the provisions of this Act, including administrative rules, and to recover any and all fines and penalties hereinafter provided for. * * *

242.    By causing or allowing the release of PFAS from the Cordova Facility, 3M adversely affected the aquatic life, wildlife, habitat, and natural resources of the Mississippi River corridor and its watershed system at and around the Cordova Facility ("Mississippi River System").

243.    As a result of its conduct as alleged herein, 3M is thus liable for the value of the adverse impact on aquatic life and the related costs in determining the value of the aquatic life adversely impacted by the release of PFAS, pursuant to Section 5-5 of the Fish Code, 515 ILCS 5/5-5 (2020).

244.    Pursuant to Section 1-150 of the Fish Code, 515 ILCS 5/1-150 (2020), and Section 1.10 of the Wildlife Code, 520 ILCS 5/1-10 (2020), 3M is also liable for the restoration of the aquatic life in and the wildlife dependent upon the Mississippi River System at and around the Cordova Facility.

WHEREFORE, Plaintiff, PEOPLE OF THE STATE OF ILLINOIS, respectfully requests that this Court enter an Order:

(a) Finding that 3M has caused the death and destruction of aquatic life in the Mississippi River System at and around the Cordova Facility, has adversely affected the aquatic life and natural resources present in the Mississippi River System at and around the Cordova Facility, and has adversely affected the wildlife dependent upon the Mississippi River system at and around the Cordova Facility;

(b) Ordering 3M to pay the Illinois Department of Natural Resources to conduct an assessment of injury and damage determination relative to restoring the aquatic life, wildlife,

habitat, and other natural resources lost or destroyed in the Mississippi River System at and around the Cordova Facility and to compensate the Illinois Department of Natural Resources for injury and damage to aquatic life, wildlife, habitat, and other natural resources lost or destroyed in the Mississippi River System at and around the Cordova Facility pursuant to Section 1-150 of the Fish Code, 515 ILCS 5/1-150 (2020), and Section 1-10 of the Wildlife Code, 520 ILCS 5/1-10 (2020); and

(c) Granting such other and further relief as this court deems appropriate and just.

<u>COUNT VII</u>
**NEGLIGENCE**

245.    The State repeats, realleges, and incorporates by reference each allegation contained in Paragraphs 1-180, above, as though fully set forth herein.

246.    3M had a duty to the State to exercise due care in the manufacture, disposal, discharge, and emission of PFAS, waste containing PFAS, and products containing PFAS.

247.    3M breached its duty of care in that it negligently, carelessly, and/or recklessly manufactured and disposed of, discharged and emitted PFAS at and around the Cordova Facility. 3M directly and proximately caused PFAS to contaminate the property under the jurisdiction of the State and its surface waters, groundwater, drinking water, wetlands, aquatic life, wildlife, marine resources, soil, sediment, and other natural resources, thereby causing a threat to human health and the environment, despite its years-long knowledge that PFAS chemicals persist in the environment and are harmful to human health and the environment.

248.    As a direct and proximate result of 3M's acts and omissions as alleged herein, the State has suffered monetary losses and damages in amounts to be proven at trial.

WHEREFORE, Plaintiff, PEOPLE OF THE STATE OF ILLINOIS, respectfully requests that this Court enter an Order:

(a) Finding that 3M's actions alleged herein constituted, and continue to constitute, negligent acts;

(b) Holding 3M liable for all past and future natural resource damages, loss-of use damages, response activity costs, costs of investigation, costs of testing and monitoring, costs of providing water from an alternate source, costs of installing and maintaining an early warning system to detect PFAS before it reaches wells, costs of remediating PFAS from natural resources at and around the Cordova Facility including groundwater, surface waters, soils, sediments, and other natural resources, costs of remediating PFAS contamination at and around the Cordova Facility, any other costs or other expenditures incurred to address PFAS contamination and injury at and around the Cordova Facility, interest on the damages according to law, any applicable civil penalties, and any other relief necessary to remedy PFAS contamination at and around the Cordova Facility;

(c) Ordering 3M to immediately undertake the necessary action that will result in a final and permanent abatement of the damage caused by its negligent acts, which would include, without limitation, the investigation and remediation of all PFAS contamination at and around the Cordova Facility;

(d) Ordering 3M to pay all costs, including oversight, sampling, assessment, restoration, and clean-up costs, and attorney, expert witness, and consultant fees expended by Plaintiff in its pursuit of this action; and

(e) Granting such other and further relief as this Court deems appropriate and just.

## COUNT VIII
### TRESPASS

249.     The State repeats, realleges, and incorporates by reference each allegation contained in Paragraphs 1-180, above, as though fully set forth herein.

250.    The PFAS manufactured, disposed of, discharged, and emitted by 3M affecting the State's property and its surface waters, groundwater, drinking water, wetlands, aquatic life, wildlife, marine resources, soil, sediment, and other natural resources constitutes an unauthorized direct and immediate physical intrusion of property of which the State is a trustee.

251.    The trespass of PFAS alleged herein has varied over time and has not ceased.

252.    PFAS that 3M disposed of, discharged, emitted, released, and/or otherwise handled, supplied, and/or used continues to be located on or in the State's property and its surface water, groundwater, drinking water, wetlands, aquatic life, wildlife, marine resources, soil, sediment, and other natural resources.

253.    3M knew with substantial certainty that its acts would contaminate the State's property and its surface waters, groundwater, drinking water, wetlands, aquatic life, wildlife, marine resources, soil, sediment, and other natural resources.

254.    3M is liable for trespass.

255.    The State has not consented to and does not consent to the trespass alleged herein.

256.    The State has a duty to protect, enhance and restore the environment, its natural resources and to protect the health and welfare of its inhabitants.

257.    Accordingly, the State is bringing this action for the invasion of its exclusive possessory interests in the State's natural resources, in addition to its interest in the integrity of the State's natural resources.

258.    As long as property and natural resources under the jurisdiction of the State remain contaminated due to 3M's conduct, the trespass continues.

259.    As a direct and proximate result of 3M's acts and omissions as alleged herein, the State has suffered monetary losses and damages in an amount to be proven at trial.

A163

WHEREFORE, Plaintiff, PEOPLE OF THE STATE OF ILLINOIS, respectfully requests that this Court enter an Order:

(a) Finding that 3M's actions alleged herein constituted, and continue to constitute, a trespass;

(b) Holding 3M liable for all past and future natural resource damages, loss-of use damages, response activity costs, costs of investigation, costs of testing and monitoring, costs of providing water from an alternate source, costs of installing and maintaining an early warning system to detect PFAS before it reaches wells, costs of remediating PFAS from natural resources including groundwater, surface waters, soils, sediments, and other natural resources, costs of remediating PFAS contamination at and around the Cordova Facility, any other costs or other expenditures incurred to address PFAS contamination and injury at and around the Cordova Facility, interest on the damages according to law, any applicable civil penalties, and any other relief necessary to remedy PFAS contamination at and around the Cordova Facility;

(c) Ordering 3M to immediately undertake the necessary action that will result in a final and permanent abatement of the trespass, which would include, without limitation, the investigation and remediation of all PFAS contamination at and around the Cordova Facility;

(d) Ordering 3M to pay all costs, including oversight, sampling, assessment, restoration, and clean-up costs, and attorney, expert witness, and consultant fees expended by Plaintiff in its pursuit of this action; and

(e) Granting such other and further relief as this Court deems appropriate and just.

## COUNT IX
## COMMON LAW PUBLIC NUISANCE

260.    The State repeats, realleges, and incorporates by reference each allegation contained in Paragraphs 1-180, above, as though fully set forth herein.

261.    The Illinois Constitution provides the People of the State of Illinois a common right to a healthful environment.  Ill. Const. art XI, sec. 1 (1970).

262.    3M, by its actions, caused an unreasonable and substantial prejudice to the public health and welfare and the environment.  To wit, by its conduct, alleged herein, 3M has, through its actions, manufactured, disposed of, discharged, and emitted PFAS in a way that has the caused the pollution of the surface water, groundwater, drinking water, wetlands soils, and sediments at and around the Cordova Facility including, but not limited to the Mississippi River System.

263.    These actions have thereby threatened harm to area residents and interfered with their use and enjoyment of the environment and their homes and other properties.

264.    As a consequence of 3M's actions as alleged herein, 3M has created and maintained, and continues to create and maintain, a public nuisance at common law.

WHEREFORE, Plaintiff, PEOPLE OF THE STATE OF ILLINOIS, respectfully requests that this Court enter an Order:

(a) Finding that 3M's actions alleged herein constituted a common law public nuisance;

(b) Enjoining 3M from further acts constituting a common law public nuisance;

(c) Ordering 3M to immediately undertake the necessary action that will result in a final and permanent abatement of the common law public nuisance, which would include, without limitation, the investigation and remediation of all PFAS contamination at and around the Cordova Facility and assessment and restoration of impacted natural resources;

(d) Ordering 3M to pay all costs, including oversight, sampling, assessment, restoration, and clean-up costs, and attorney, expert witness, and consultant fees expended by Plaintiff in its pursuit of this action; and

(e) Granting such other and further relief as this Court deems appropriate and just.

A165

### COUNT X[47]
### COMMON LAW PROHIBITION ON UNJUST ENRICHMENT

265.    *The State repeats, realleges, and incorporates by reference each allegation contained in Paragraphs 1-180, above, as though fully set forth herein.*

266.    *3M has knowingly and unjustly retained a benefit to the State of Illinois's detriment.*

267.    *3M's retention of the benefit violates the fundamental principles of justice, equity, and good conscience.*

268.    *By continuing to manufacture and dispose of, discharge, and emit PFAS contaminated water, waste, and air emissions, despite the fact that 3M was aware that PFAS was hazardous to human health and the environment, 3M has unjustly enriched itself at the State's expense.*

269.    *Because of 3M's failure to make the State aware of the harmful nature of PFAS, and 3M's manufacture and disposal of PFAS at the Cordova Facility, 3M obtained enrichment it would not have otherwise obtained.*

270.    *The enrichment was without justification and the State lacks a remedy provided by law.*

271.    *Unjust enrichment arises not only where an expenditure by one party adds to the property of another, but also where the expenditure saves the other from expense or loss.*

272.    *To address PFAS contamination in the State of Illinois in order to protect its residents, its environment, and its natural resources, the State has incurred, and continues to incur, substantial costs in investigating and responding to PFAS contamination at and from the Cordova Facility.*

---

[47] On March 21, 2025, the Court partially granted 3M's Motion to Dismiss, dismissing Counts V and X of the People's Complaint. The People replead Counts V and X only for the purpose of preserving these claims on appeal and have identified them in underlined italics.

273.    *3M has received a benefit from the State's response activities because 3M should bear the cost of investigating and cleaning up the PFAS contamination caused by or related to the manufacture, use, and disposal, discharge, and emission of PFAS and PFAS-containing products at the Cordova Facility.*

274.    *3M's misconduct alleged in this case does not concern a discrete event or discrete emergency of the sort that the State would reasonably expect to occur and is not part of the normal and expected costs of the State's existence.  The State alleges wrongful acts which are neither discrete nor of the sort that can reasonably be expected.*

275.    *The State has incurred expenditures for relief over and above the State's ordinary services.*

276.    *The principles of justice and established common law require 3M to reimburse the State for performing a duty properly owed by 3M as a result of its conduct, as alleged herein.*

WHEREFORE, Plaintiff, PEOPLE OF THE STATE OF ILLINOIS, respectfully requests that this Court enter an Order:

(a) Awarding compensatory damages in an amount sufficient to fairly and completely compensate the State for all damages;

(b) *Awarding disgorgement or compensation for 3M's unjust enrichment of profits which directly result from the wrongful acts described above;*

(c) Entering a declaratory judgment requiring 3M to abate the statutory violations alleged above, trespass, and public nuisance caused by the PFAS contamination; and

(d) Granting such other and further relief as this Court deems appropriate and just.

A167

**REQUEST FOR RELIEF**

WHEREFORE, in addition to the relief requested in each individual Cause of Action listed above, Plaintiff, PEOPLE OF THE STATE OF ILLINOIS, seeks judgment in its favor and against 3M for:

A. Compensatory damages arising from PFAS contamination and injury of natural resources and property under the jurisdiction of the State, including groundwater, surface waters, wetlands, drinking water supplies, biota, wildlife, aquatic life, and their associated soils, sediments, and uses, and other State natural resources and property, according to proof, including, but not limited to:

(i)     natural resource damages;

(ii)    loss-of use damages;

(iii)   past and future response activity costs;

(iv)    costs of investigation;

(v)     costs of testing and monitoring;

(vi)    costs of providing water from an alternate source;

(vii)   costs of installing and maintaining approved drinking water treatment systems;

(viii)  costs of installing and maintaining an early warning system to detect PFAS before it reaches wells;

(ix)    costs of remediating PFAS from natural resources and restoration of these natural resources, including groundwater, surface waters, wetlands, soils, sediments, and other natural resources;

(x)     remedial action at and around the Cordova Facility, including cleanup of PFAS contamination;

 (xi) any other costs or other expenditures incurred to address PFAS contamination and injury at and around the Cordova Facility; and

 (xii) interest on the damages according to law;

B. Injunctive relief to address past, present, and future PFAS contamination by:

 a. ordering 3M to implement a program of ongoing public outreach and information-sharing efforts to provide effective communication to the public and local units of government regarding the status and progress of response activities related to 3M's releases of PFAS into the environment;

 b. ordering 3M to institute protective measures to prevent endangerment to human health and the environment including, but not limited to: (a) sampling for PFAS in drinking water using U.S. EPA-approved Method 537 version 1.1, as written, including any modifications allowed therein, or any subsequent U.S. EPA-approved method; (b) connection to municipal drinking water supplies; and (c) provision and maintenance of drinking water treatment systems, including regular sampling; and

 c. ordering 3M to complete the investigation, characterization, and remediation of the PFAS released into the environment from its manufacturing processes and disposal practices, identify pathways of exposure to natural resources, restore natural resources that have been damaged or impacted by PFAS, and analyze the impact of PFAS on drinking water wells, surface waters, stream biota, groundwater, soils, sediments, flora, and fauna, including sportfish and other wildlife consumed by the public, subject to the approval of the State;

A169

C. Statutory penalties, fines, and any other relief available under the Illinois Environmental Protection Act;

D. Costs (including reasonable attorney fees, court costs, and other expenses of litigation);

E. Prejudgment interest; and

F. Any other and further relief as the Court deems just, proper, and equitable.

## JURY DEMAND

Plaintiff, People of the State of Illinois, *ex rel.* Kwame Raoul, Attorney General of the State

of Illinois, demands a trial by jury on all claims herein so triable.

Dated: April 7, 2025

PEOPLE OF THE STATE OF ILLINOIS,
   *ex rel.*  KWAME RAOUL, Attorney
   General of the State of Illinois

MATTHEW J.  DUNN, Chief
Environmental Enforcement/Asbestos
Litigation Division

By:    */s/ Daniel R. Flynn*_____
       One of their attorneys

Stephen J.  Sylvester
Ellen F.  O'Laughlin
Karen Howard
OFFICE OF THE ILLINOIS ATTORNEY GENERAL
Environmental Bureau
69 West Washington Street, Suite 1800
Chicago, Illinois 60602
(312) 814-2550
stephen.sylvester@ilag.gov
ellen.olaughlin@ilag.gov
karen.howard@ilag.gov

Adam J.  Levitt
Daniel Rock Flynn
Amy E. Keller
Diandra ("Fu") Debrosse*
Anna Claire Skinner**
Special Assistant Attorneys General
Elizabeth Claire Carpenter
James T. Crisafulli**
DICELLO LEVITT LLP
Ten North Dearborn Street, Sixth Floor
Chicago, Illinois 60602
(312) 214-7900
alevitt@dicellolevitt.com
dflynn@dicellolevitt.com
akeller@dicellolevitt.com
fu@dicellolevitt.com
askinner@dicellolevitt.com
ecarpenter@dicellolevitt.com
jcrisafulli@dicellolevitt.com

Joseph M.  Callow, Jr.\*\*
Gregory M.  Utter\*\*
Special Assistant Attorneys General
**Callow + Utter law group**
8044 Montgomery Road, Suite 170
Cincinnati Ohio 45236
jcallow@callowandutter.com
gmutter@callowandutter.com

Richard W.  Fields\*
Martin Cunniff\*
Special Assistant Attorneys General
**Fields, Han & Cunniff LLC**
1700 K Street NW, Suite 810
Washington, DC  20006
(833) 382-9816
fields@fhcfirm.com
martin.cunniff@fhcfirm.com

*Motions for admission pro hac vice to be filed*
\*\* *Admitted pro hac vice*

## <u>CERTIFICATE OF SERVICE</u>

I, Daniel R. Flynn, the undersigned, under penalties of perjury, hereby certify that on this 7th day of April 2025, I delivered a copy of the **First Amended Complaint** to the following, via electronic mail:


Daniel L.  Ring
MAYER BROWN LLP
71 South Wacker Drive
Chicago, IL 60606
(312) 782-0600
dring@mayerbrown.com

*Counsel for Defendant 3M Company*


Respectfully submitted,


*/s/Daniel R. Flynn*
Daniel R.  Flynn

E-FILED
Thursday, 23 October, 2025  05:18:16 PM
Clerk, U.S. District Court, ILCD

# EXHIBIT D

## IN THE CIRCUIT COURT OF THE FOURTEENTH JUDICIAL CIRCUIT
## ROCK ISLAND COUNTY, ILLINOIS

PEOPLE OF THE STATE OF ILLINOIS,
*ex rel.* KWAME RAOUL, Attorney
General of the State of Illinois,

        Plaintiff,

    v.

3M Company, a Delaware Corporation,

        Defendant.

Case No. 2022 LA 16

## DEFENDANT 3M COMPANY'S FIRST SET OF REQUESTS FOR ADMISSION TO PLAINTIFF

    Defendant 3M Company ("3M"), by and through its attorneys, hereby propounds and serves upon Plaintiff People of the State of Illinois, *ex rel.* Kwame Raoul, Attorney General of the State of Illinois ("Plaintiff"), the following First Set of Requests for Admission (collectively, the "Requests," and each a "Request") pursuant to Illinois Supreme Court Rule 216. 3M requests that Plaintiff produce answers to the Requests within twenty-eight (28) days of service hereof.

    **WARNING: If you fail to serve the response required by Rule 216 within 28 days after you are served with this document, all the facts set forth in the requests will be deemed true and all the documents described in the requests will be deemed genuine.**

    These Requests are to be answered in accordance with the following definitions and instructions, which are hereby incorporated by reference into each Request.

## DEFINITIONS

1.    "3M" means 3M Company.

2.    "Action" means the above-captioned litigation.

3.    "AFFF" means aqueous film forming foam and its fluorosurfactant components.

4.    "Complaint" means the People of the State of Illinois' First Amended Complaint filed in this Action on April 7, 2025, in the Circuit court of the Fourteenth Judicial Circuit, Rock Island County, Illinois.

5.    "Cordova Facility" means the 3M Cordova Facility, located at 22614 Route 84 North, Cordova, Illinois 61242 (Rock Island County).

6.    "Groundwater" shall have the meaning set forth in 415 ILCS 5/3.210 and 35 Ill. Adm. Code 742.200 and include all such water for which You are pursuing claims or seeking relief in this Action.

7.    "Landfill" means any open or closed "sanitary landfill" as defined at 415 ILCS 5/3.445, "hazardous waste disposal facility" as defined at 415 ILCS 5/3.225, or other waste disposal sites for which You are pursuing claims or seeking relief in this Action.

8.    "Mississippi River" shall include, solely for purposes of these Requests, any portions of the Mississippi River for which You are pursuing claims or seeking relief in this Action.

9.    "PFAS" means, solely for purposes of these Requests, the compounds listed in Paragraph 10 of the Complaint, *including* any such compounds or other PFAS derived from or contained in AFFF.  For purposes of these Requests, "PFAS" expressly does not exclude PFOS, PFOA, or any other form of PFAS from AFFF as alleged in Paragraph 11 of the Complaint.

10.    "Public Water System(s)" means any drinking water system that meets the definition set forth in 42 U.S.C. § 300f(4)(A) for which You are pursuing claims or seeking relief in this Action.

11.    "Release" shall mean any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, or disposing of any Contaminant into the environment, or the abandonment or discarding of barrels, containers, and other closed receptacles containing any Contaminant.

12.    "Resource(s) at Issue" means any and all natural resource(s) for which You are pursuing claims or seeking relief in this Action, including but not limited to Groundwater, Surface Water, Wetlands, wildlife, aquatic life, biota, soil, sediment, or air as alleged in the Complaint, including but not limited to Paragraphs 145 to 149.

13.    "Surface Water" means any pond, lake, reservoir, stream, creek or river that meets the definition set forth in 525 ILCS 45/4 for which You are pursuing claims or seeking relief in this Action.

14.    "Water Treatment Facility" means any facility that meets the definition set forth in 35 ILCS 200/11-135 for which You are pursuing claims or seeking relief in this Action.

15.    "Well" means any and all public wells, private wells, domestic wells, and/or monitoring wells, including all "private water systems" that meet the definition set forth in 415 ILCS 55/9, for which You are pursuing claims or seeking relief in this Action.

16.    "Wetland" means any land that meets the definition set forth in 20 ILCS 830/1-6(a) for which You are pursuing claims or seeking relief in this Action.

17.    "You," "Your," "Yours," "Plaintiff," and "State" mean Plaintiff People of the State of Illinois, and any of its agencies, departments, subdivisions, officers, officials, employees, or agents.

## **INSTRUCTIONS**

1.     These Requests are to be construed reasonably, in good faith, and according to the meaning that the plain language of each Request.

2.     To the extent not otherwise defined, all words shall have their usual and ordinary meaning as the context of the Request would indicate and shall be construed to have the broadest meaning permitted under the Illinois Supreme Court Rules, Illinois Code of Civil Procedure, and Local Rules.

3.     The following rules of construction shall apply to these Requests, and in no event shall these rules of construction be applied to narrow the scope of a Request:

     (a)  The use of the singular form of any word includes the plural, and vice versa.

     (b) The use of the past tense includes the present tense, and vice versa,

     (c)  "All," "any," "each," and "every" shall each be construed to mean "all, any, each, and every."

     (d)  "And" and "or" shall be construed either disjunctively or conjunctively.

     (e)  "Include," "includes," and "including" shall be construed to mean those terms, in each case, without limitation.

4.     If you object to any Request, then: (a) specify the portion of such Request that is claimed to be objectionable and set forth the nature and basis of the objection with sufficient particularity to permit the Court to rule on the validity of the objection; and (b) respond to any portion of such Request that is not claimed to be objectionable.  If, in answering these Requests, you believe a Request or a definition or instruction applicable thereto is ambiguous, do not use such an objection as a basis for refusing to respond; rather set forth as part of the response the language you claim is ambiguous and the interpretation you have used to respond to the Request.

5.      If a Request is not admitted, the answer must specifically deny it or state in detail why you cannot truthfully admit or deny the Request. A denial must fairly respond to the substance of the matter and must specify the part of the Request admitted and qualify or deny the rest. You may only assert lack of knowledge or information as a reason for failing to admit or deny a Request if you state in response to the Request that you have made reasonable inquiry and that the information you know or can readily obtain is insufficient to enable you to admit or deny.

6.      These Requests are continuing in nature so as to require supplemental and/or amended responses in accordance with Ill. Sup. Ct. R. 214(d).

7.      Unless otherwise specified, the relevant time period for any Request is from January 1, 1970 to the present. *See* Complaint ¶ 34.

## REQUESTS FOR ADMISSION

**Request for Admission No. 1:** Admit that PFAS Released to the environment in any media, including from the use or Release of AFFF, can commingle or mix in environmental media with PFAS derived from other AFFF and non-AFFF use or Release.

**Request for Admission No. 2:** Admit that You do not seek any recovery or relief of any kind in this Action for harm or damage of any kind to any Landfill, Public Water System, Water Treatment Facility, Well, Resource at Issue, or the Mississippi River where any PFAS, even a morsel, derived from AFFF use or Release is present.

**Request for Admission No. 3:** Admit that You do not seek any recovery or relief of any kind in this Action for harm or damage of any kind to any Landfill, Public Water System, Water Treatment Facility, Well, Resource at Issue, or the Mississippi River where there is any PFAS that was not produced, manufactured, used, or Released at or from the Cordova Facility.

**Request for Admission No. 4:** Admit that You do not seek any recovery or relief of any kind in this Action for harm or damage of any kind to any Landfill, Public Water System, Water Treatment Facility, Well, Resource at Issue, or the Mississippi River where there is PFAS derived from the use or Release of AFFF that has mixed with PFAS unrelated to the use or Release of AFFF.

**Request for Admission No. 5:** Admit that You do not seek any recovery or relief of any kind in this Action for harm or damage of any kind to any Landfill, Public Water System, Water Treatment Facility, Well, Resource at Issue, or the Mississippi River where there is any PFAS that 3M produced, manufactured, or used to manufacture a product for use by the United States

government pursuant to a federal specification or standard, even if that PFAS was Released at or from the Cordova Facility.

**Request for Admission No. 6:** Admit that You are unable to show that 100% of the PFAS detected at or around the Cordova Facility is derived from non-AFFF PFAS or PFAS-containing products that 3M produced, manufactured, used, or Released at or from the Cordova Facility.

**Request for Admission No. 7:** Admit that You are unable to show that 100% of the PFAS detected in the Mississippi River is derived from non-AFFF PFAS products that 3M produced, manufactured, used, or Released at or from the Cordova Facility.

**Request for Admission No. 8:** Admit that You are unable to show that 100% of the PFAS detected in any Resource at Issue is derived from non-AFFF PFAS products that 3M produced, manufactured, used, or Released at or from the Cordova Facility.

**Request for Admission No. 9:** Admit that You are unable to show that 100% of the PFAS detected in any Landfill is derived from non-AFFF PFAS products that 3M produced, manufactured, used, or Released at or from the Cordova Facility.

**Request for Admission No. 10:** Admit that You are unable to show that 100% of the PFAS detected in any Public Water System is derived from non-AFFF PFAS products that 3M produced, manufactured, used, or Released at or from the Cordova Facility.

**Request for Admission No. 11:** Admit that You are unable to show that 100% of the PFAS detected in any Water Treatment Facility is derived from non-AFFF PFAS products that 3M produced, manufactured, used, or Released at or from the Cordova Facility.

**Request for Admission No. 12:** Admit that You are unable to show that 100% of the PFAS detected in any Well is derived from non-AFFF PFAS products that 3M produced, manufactured, used, or Released at or from the Cordova Facility.

Dated: August 28, 2025                                    Respectfully submitted,

                                                          */s/ Daniel L. Ring*
                                                          Daniel L. Ring
                                                          JENNER & BLOCK LLP
                                                          353 North Clark Street
                                                          Chicago, Illinois 60654
                                                          (312) 923-2625
                                                          dring@jenner.com

                                                          *Counsel for Defendant 3M Company*

## <u>CERTIFICATE OF SERVICE</u>

I, Daniel L. Ring, hereby certify that on August 28, 2025, a copy of the foregoing was

served on the following via electronic mail:

Stephen J. Sylvester
Ellen F. O'Laughlin
Karen Howard
OFFICE OF THE ILLINOIS ATTORNEY
GENERAL
Environmental Bureau
69 West Washington Street, Suite 1800
Chicago, IL 60602
stephen.sylvester@ilag.gov
ellen.olaughlin@ilag.gov
karen.howard@ilag.gov

Adam J. Levitt
Daniel Rock Flynn
Amy E. Keller
Diandra Debrosse Zimmerman
Anna Claire Skinner
Elizabeth Carpenter
James Crisafulli
Special Assistant Attorneys General
DICELLO LEVITT LLP
Ten North Dearborn Street, Sixth Floor
Chicago, IL 60602
alevitt@dicellolevitt.com
dflynn@dicellolevitt.com
akeller@dicellolevitt.com
fu@dicellolevitt.com
askinner@dicellolevitt.com
ecarpenter@dicellolevitt.com
jcrisafulli@dicellolevitt.com

Joseph M. Callow, Jr.
Gregory M. Utter
Special Assistant Attorneys General
Callow & Utter, LLC
8044 Montgomery Road, Suite 170
Cincinnati Ohio 45236
jcallow@callowandutter.com
gmutter@callowandutter.com

Richard W. Fields
Martin Cunniff
Special Assistant Attorneys General
FIELDS HAN & CUNNIFF LLC
1700 K. Street NW, Suite 810
Washington, DC 20006
fields@fhcfirm.com
martincunniff@fhcfirm.com

/s/ *Daniel L. Ring*
Daniel L. Ring
*Counsel for Defendant 3M Company*

E-FILED
Thursday, 23 October, 2025  05:18:16 PM
Clerk, U.S. District Court, ILCD

# EXHIBIT E

**IN THE CIRCUIT COURT OF THE FOURTEENTH JUDICIAL CIRCUIT**
**ROCK ISLAND COUNTY, ILLINOIS**

| | |
|---|---|
| PEOPLE OF THE STATE OF ILLINOIS, *ex rel.* KWAME RAOUL, Attorney General of the State of Illinois, <br><br>                Plaintiff, <br>      v. <br><br> 3M Company, a Delaware Corporation, <br><br>             Defendant. | Case No. 2022 LA 16 |

**PEOPLE OF THE STATE OF ILLINOIS' RESPONSES**
**AND OBJECTIONS TO DEFENDANT 3M COMPANY'S**
**FIRST SET OF REQUESTS FOR ADMISSION TO PLAINTIFF**

NOW COMES, Plaintiff, People of the State of Illinois, *ex rel.* Kwame Raoul, Attorney General of the State of Illinois ("People" or "State"), by and through their attorneys, and pursuant to Illinois Supreme Court Rule 216, hereby serve their responses and objections to Defendant 3M Company's ("3M" or "Defendant") First Set of Requests for Admission to Plaintiff ("Requests"), and state as follows:

The People's objections and responses are based on their investigations and discovery to date and their reading of the Requests. The People's objections to the Requests are based upon information that is presently known and available to the People and their counsel following a reasonable inquiry. The People expressly reserve the right to continue their discovery and investigation of the facts, witnesses, and supporting documents that may reveal additional grounds for answering or objecting. The People's investigation into 3M's violations and tortious liability is continuing, and the People reserve the right to change and/or supplement these responses as their investigation continues and pursuant to the Illinois Supreme Court Rules.

To the extent the People respond to any part of a particular Request, the People do not intend for any such response to waive any or all objections to that Request or any other Request herein.

To the extent the People object, and to the extent that 3M takes issue with the objection, the People are willing and prepared to meet and confer with 3M to determine whether a reasonable, mutually acceptable compromise might be reached that is consistent with the terms of the Order Governing Protocol for Discovery of Documents and Electronically Stored Information and Confidentiality Order ("Protective Order") entered by the Court on November 4, 2024, and the Stipulated Joint Protocol Governing Discovery of Documents and Electronically Stored Information ("ESI Order") entered by the Court on July 9, 2025.

## OBJECTIONS TO DEFINITIONS

1.       Defendant defines "Groundwater," "Landfill," "Public Water System," "Resource at Issue," "Surface Water," "Water Treatment Facility," "Well," and "Wetland" as the statutory definition of each term "for which [the State is] pursuing claims or seeking relief" in this case. The People object to these definitions to the extent these definitions are characterized as the only Landfills, Public Water Systems, Resources at Issue, Surface Waters, Water Treatment Facilities, Wells, and Wetlands for which the People are seeking relief. The People do not yet have custody or control of all documents and information required to respond to the Requests that use these definitions and do not currently know every "Landfill," "Public Water System," "Resource at Issue," "Surface Water," "Water Treatment Facility," "Well," and "Wetland" at issue in the case. The People further respond that, through discovery to date, 3M knows of "Landfill[s]," "Public Water System[s]," "Resource[s] at Issue," "Surface Water[s]," "Water Treatment Facilit[ies]," "Well[s]," and "Wetland[s]" at issue in the case. This is the subject of fact and expert discovery that is proceeding consistent with the Court's July 28, 2025 Case Management Order. The

documents, information, and data required to completely respond to these Requests are in the possession of 3M and are also the subject of expert analysis and review, and the People's expert reports are currently due on March 4, 2026. Until such time as complete information is provided through fact discovery, fact discovery proceeds, and their experts have completed their review of the relevant documents, information, and data, the People are not able to completely respond to Requests which rely on these objectionable definitions.

2.      The People object to 3M's definition of "PFAS." 3M's definition of PFAS is inconsistent with the People's definition of PFAS as outlined in paragraphs 10 and 11 of their First Amended Complaint. The People will continue to use the definition of PFAS as contained in the First Amended Complaint ("Complaint") in responding to these Requests.

3.      The People object to 3M's definition of "AFFF."  Certain Requests reference or use the term "AFFF" generally when also referencing language from the Seventh Circuit's decision in this matter, *Illinois ex rel. Raoul v. 3M Co.*, 111 F.4th 846 (7th Cir. 2024). 3M removed this case based on an argument that military-specification aqueous film-forming foam ("mil-spec AFFF") from the Rock Island Arsenal would mix or commingle with PFAS contamination caused by operations at the Cordova Facility. The People agreed, at oral argument on 3M's appeal of Judge Darrow's decision remanding this case back to this Court, that they would not seek relief from 3M for mixed PFAS contamination – in other words, PFAS contamination arising from both the Cordova Facility and from mil-spec AFFF from the Rock Island Arsenal. The People also agreed that a factfinder will not need to apportion PFAS contamination caused by operations at the Cordova Facility and mil-spec AFFF contamination caused by mil-spec AFFF from the Rock Island Arsenal. The People intend to proceed in this litigation consistent with the representation made to the Seventh Circuit. The People anticipate that expert testimony will show (1) operations

at the Cordova Facility have caused PFAS contamination, and (2) this PFAS contamination is separate from any mil-spec AFFF contamination from the Rock Island Arsenal. The People deny that there is any evidence that PFAS released from the Cordova Facility has mixed or commingled with mil-spec AFFF contamination from the Rock Island Arsenal such that the source of the contamination cannot be identified, and the People expect that this will be the subject of expert testimony at the conclusion of fact discovery. The People expect that they will present expert testimony on this issue after the close of fact discovery and in accordance with the July 28, 2025 Case Management Order.

## OBJECTIONS TO INSTRUCTIONS

1.    To the extent that it purports to impose on the People additional obligations beyond those in the Illinois Supreme Court Rules and the Orders of this Court, including the Protective Order and the ESI Order, the People object to each Instruction.

2.    The production of privileged or work-product protected documents or information, whether inadvertent or otherwise, is not a waiver of the privilege in this Action or in any other federal or state proceeding. This provision shall be interpreted to provide the maximum protection allowed by Illinois Supreme Court Rule 201(p) and Rule of Evidence 502(b) and (d).

## RESPONSES AND OBJECTIONS TO REQUESTS

**Request for Admission No. 1:** Admit that PFAS Released to the environment in any media, including from the use or Release of AFFF, can commingle or mix in environmental media with PFAS derived from other AFFF and non-AFFF use or Release.

**Response:** In addition to their Objections to Definitions and Instructions, the People object to this Request as not stated with reasonable specificity because the terms "media," "environmental media," "commingle," and "mix" are undefined, vague, and ambiguous and subject to multiple interpretations as used herein. To the extent that any further response to this Request is required,

the People admit Request for Admission No. 1 to the extent that it is a broad statement about the potential and theoretical possibility for PFAS Released into the environment in any media to be present at measurable amounts with PFAS already existing in the media where they are Released. The People respond that "[c]an" and "[i]n any media" are broad terms and the People admit that it is possible that there is a potential for one or more PFAS to be present at measurable amounts with one or more other PFAS in a media. At the same time, for purposes of this Action, the People anticipate that expert testimony will identify PFAS contamination caused by operations at the Cordova Facility and/or Released from the Cordova Facility, and that the PFAS contamination at issue in this Action can be identified and traced back to the Cordova Facility, even if there are other contaminants in the same media. Further responding, the People believe that this Request seeks a response that is and will be related to the expected subject of expert testimony. *See* Objections to Definitions No. 3. Further responding, to the extent that the Request is not admitted above, it is denied.

**Request for Admission No. 2:** Admit that You do not seek any recovery or relief of any kind in this Action for harm or damage of any kind to any Landfill, Public Water System, Water Treatment Facility, Well, Resource at Issue, or the Mississippi River where any PFAS, even a morsel, derived from AFFF use or Release is present.

**Response:**   In addition to their Objections to Definitions and Instructions, including without limitation the Objection to the definition of AFFF, the People object to this Request as not stated with reasonable specificity because the terms "derived" and "present" are undefined, vague, and ambiguous and subject to multiple interpretations as used herein. The People further object to this Request because it calls for a legal conclusion. To the extent that any further response is required to this Request, the People admit only that they are not seeking any recovery or relief in this Action for harm or damage derived from mil-spec AFFF contamination from the Rock Island Arsenal. As pleaded in the People's Complaint and as represented to the Seventh Circuit, the People intend to

seek in this Action recovery and relief for harm and damage to Illinois' environment and natural resources at and around the Cordova Facility – including, without limitation, to the surrounding land, water, and natural resources; Landfills, Public Water Systems, Water Treatment Facilities, Wells, Resources at Issue; and/or the Mississippi River – caused by PFAS contamination from the Cordova Facility. Further responding, the People anticipate that expert testimony will identify PFAS contamination caused by operations at the Cordova Facility. Further responding, this Request seeks a response that is and will be the expected subject of expert testimony. Further responding, to the extent that the Request is not admitted above, it is denied.

**Request for Admission No. 3:** Admit that You do not seek any recovery or relief of any kind in this Action for harm or damage of any kind to any Landfill, Public Water System, Water Treatment Facility, Well, Resource at Issue, or the Mississippi River where there is any PFAS that was not produced, manufactured, used, or Released at or from the Cordova Facility.

**Response:**  In addition to their Objections to Definitions and Instructions, including without limitation the Objection to the definition of AFFF, the People further object to this Request because it calls for a legal conclusion. To the extent that any further response is required to this Request, as outlined in the People's Complaint and as represented to the Seventh Circuit, the People admit that they intend to seek in this Action recovery and relief for harm and damage to Illinois' environment and natural resources at and around the Cordova Facility – including, without limitation, to the surrounding land, water, and natural resources; any Landfills, Public Water Systems, Water Treatment Facilities, Wells, and Resources at Issue; and/or the Mississippi River – caused by PFAS contamination from the Cordova Facility. The People admit that they are not seeking in this Action any recovery or relief for harm or damage of any kind derived from mil-spec AFFF contamination from the Rock Island Arsenal. Further responding, the People anticipate that expert testimony will identify PFAS contamination caused by operations at the Cordova Facility and will identify PFAS that were produced, manufactured, used, or Released at or from

the Cordova Facility. Further responding, this Request seeks a response that is and will be the expected subject of expert testimony. Further responding, to the extent that the Request is not admitted above, it is denied.

**Request for Admission No. 4:** Admit that You do not seek any recovery or relief of any kind in this Action for harm or damage of any kind to any Landfill, Public Water System, Water Treatment Facility, Well, Resource at Issue, or the Mississippi River where there is PFAS derived from the use or Release of AFFF that has mixed with PFAS unrelated to the use or Release of AFFF.

**Response:**  In addition to their Objections to Definitions and Instructions, the People object to this Request as not stated with reasonable specificity because the terms "derived," "use," "mixed," and "unrelated" are undefined, vague, and ambiguous and subject to multiple interpretations as used herein. The People further object to this Request because it calls for a legal conclusion.  To the extent that any further response is required to this Request, *see* Objection to Definition No. 3. As outlined in the People's Complaint and as represented to the Seventh Circuit, the People admit that they intend to seek recovery and relief in this Action for harm and damage to Illinois' environment and natural resources at and around the Cordova Facility – including, without limitation, to the surrounding land, water and natural resources; any Landfill, Public Water System, Water Treatment Facility, Well, Resource at Issue, and/or the Mississippi River – caused by PFAS contamination from the Cordova Facility. The People admit that they are not seeking any recovery or relief in this Action for harm or damage of any kind derived from mil-spec AFFF contamination from the Rock Island Arsenal. Further responding, the People believe that expert testimony can identify PFAS contamination from the Cordova Facility. Further responding, the People respond that they believe that expert testimony can identify PFAS contamination caused by operations at the Cordova Facility and can identify PFAS that was produced, manufactured, used, or Released at or from the Cordova Facility. Further responding, even if other contamination is present, the People respond that they believe expert testimony can identify PFAS contamination caused by

operations at the Cordova Facility and can identify PFAS that was produced, manufactured, used, or Released at or from the Cordova Facility. Further responding, the People believe that this Request seeks a response that is and will be the expected subject of expert testimony. Further responding, to the extent that the Request is not admitted above, it is denied.

**Request for Admission No. 5:** Admit that You do not seek any recovery or relief of any kind in this Action for harm or damage of any kind to any Landfill, Public Water System, Water Treatment Facility, Well, Resource at Issue, or the Mississippi River where there is any PFAS that 3M produced, manufactured, or used to manufacture a product for use by the United States government pursuant to a federal specification or standard, even if that PFAS was Released at or from the Cordova Facility.

**Response:** In addition to their Objections to Definitions and Instructions, including without limitation the Objection to the definition of AFFF, the People object to this Request as not stated with reasonable specificity because the terms "derived," "use," "mixed," and "unrelated" are undefined, vague, and ambiguous and subject to multiple interpretations as used herein. The People further object to this Request because it calls for a legal conclusion. The People further object to this Request to the extent that the Request assumes facts not in evidence and contrary to evidence. To the extent that any further response is required to this Request, as outlined in the People's Complaint and as represented to the Seventh Circuit, the People admit that they intend to seek in this Action recovery and relief for harm and damage caused by PFAS contamination from the Cordova Facility. The People admit that they are not seeking in this Action any recovery or relief for harm or damage of any kind derived from mil-spec AFFF contamination from the Rock Island Arsenal. Further responding, to the extent that the Request is not admitted above, it is denied. Furthermore, 3M has represented that no AFFF (including mil-spec AFFF) was manufactured at the Cordova Facility. Based on 3M's representations, counsel for the People are not aware of any "PFAS that 3M produced, manufactured, or used to manufacture a product for use by the United States government pursuant to a federal specification or standard" at the Cordova

Facility. Counsel for the People are not aware of any federal specification or standard for PFAS, and 3M has not identified a federal specification or standard to date. The People specifically reserve the right to amend or modify this Response if 3M's representations to date are proven false.

**Request for Admission No. 6:** Admit that You are unable to show that 100% of the PFAS detected at or around the Cordova Facility is derived from non-AFFF PFAS or PFAS-containing products that 3M produced, manufactured, used, or Released at or from the Cordova Facility.

**Response:**   In addition to their Objections to Definitions and Instructions, including without limitation the Objection to the definition of AFFF, the People incorporate herein the Objections to Definition No. 3 and the Objections and Responses to Requests No. 1–5 above. The People specifically object to this Request as not stated with reasonable specificity because the undefined term "derived" is vague and ambiguous and subject to multiple interpretations as used herein. To the extent that any further response to this Request is required, the People deny the Request for Admission No. 6. Further responding, the People deny that this Request is consistent with their legal obligations to establish liability on the claims asserted in the People's Complaint.

**Request for Admission No. 7:** Admit that You are unable to show that 100% of the PFAS detected in the Mississippi River is derived from non-AFFF PFAS products that 3M produced, manufactured, used, or Released at or from the Cordova Facility.

**Response:** In addition to their Objections to Definitions and Instructions, including without limitation the Objection to the definition of AFFF, the People incorporate herein the Objections to Definition No. 3 and the Objections and Responses to Requests No. 1–6 above. The People specifically object to this Request as not stated with reasonable specificity because the undefined term "derived" is vague and ambiguous and subject to multiple interpretations as used herein. To the extent that any further response to this Request is required, the People deny the Request for Admission No. 7. Further responding, the People deny that this Request is consistent with their legal obligations to establish liability on the claims asserted in the People's Complaint.

**Request for Admission No. 8:** Admit that You are unable to show that 100% of the PFAS detected in any Resource at Issue is derived from non-AFFF PFAS products that 3M produced, manufactured, used, or Released at or from the Cordova Facility.

**Response:**    In addition to their Objections to Definitions and Instructions, including without limitation the Objection to the definition of AFFF, the People incorporate herein the Objections to Definition No. 3 and the Objections and Responses to Requests No. 1–7 above. The People specifically object to this Request as not stated with reasonable specificity because the undefined term "derived" is vague and ambiguous and subject to multiple interpretations as used herein. To the extent that any further response to this Request is required, the People deny the Request for Admission No. 8. Further responding, the People deny that this Request is consistent with their legal obligations to establish liability on the claims asserted in the People's Complaint.

**Request for Admission No. 9:** Admit that You are unable to show that 100% of the PFAS detected in any Landfill is derived from non-AFFF PFAS products that 3M produced, manufactured, used, or Released at or from the Cordova Facility.

**Response:**    In addition to their Objections to Definitions and Instructions, including without limitation the Objection to the definition of AFFF, the People incorporate herein the Objections to Definition No. 3 and the Objections and Responses to Requests No. 1–8 above. The People specifically object to this Request as not stated with reasonable specificity because the undefined term "derived" is vague and ambiguous and subject to multiple interpretations as used herein. To the extent that any further response to this Request is required, the People deny the Request for Admission No. 9. Further responding, the People deny that this Request is consistent with their legal obligations to establish liability on the claims asserted in the People's Complaint.

**Request for Admission No. 10:** Admit that You are unable to show that 100% of the PFAS detected in any Public Water System is derived from non-AFFF PFAS products that 3M produced, manufactured, used, or Released at or from the Cordova Facility.

A192

**Response:**  In addition to their Objections to Definitions and Instructions, including without limitation the Objection to the definition of AFFF, the People incorporate herein the Objections to Definition No. 3 and the Objections and Responses to Requests No. 1–9 above. The People specifically object to this Request as not stated with reasonable specificity because the undefined term "derived" is vague and ambiguous and subject to multiple interpretations as used herein. To the extent that any further response to this Request is required, the People deny the Request for Admission No. 10. Further responding, the People deny that this Request is consistent with their legal obligations to establish liability on the claims asserted in the People's Complaint.

**Request for Admission No. 11:** Admit that You are unable to show that 100% of the PFAS detected in any Water Treatment Facility is derived from non-AFFF PFAS products that 3M produced, manufactured, used, or Released at or from the Cordova Facility.

**Response:**  In addition to their Objections to Definitions and Instructions, including without limitation the Objection to the definition of AFFF, the People incorporate herein the Objections to Definition No. 3 and the Objections and Responses to Requests No. 1–10 above. The People specifically object to this Request as not stated with reasonable specificity because the undefined term "derived" is vague and ambiguous and subject to multiple interpretations as used herein. To the extent that any further response to this Request is required, the People deny the Request for Admission No. 11. Further responding, the People deny that this Request is consistent with their legal obligations to establish liability on the claims asserted in the People's Complaint.

**Request for Admission No. 12:** Admit that You are unable to show that 100% of the PFAS detected in any Well is derived from non-AFFF PFAS products that 3M produced, manufactured, used, or Released at or from the Cordova Facility.

**Response:**  In addition to their Objections to Definitions and Instructions, including without limitation the Objection to the definition of AFFF, the People incorporate herein the Objections to Definition No. 3 and the Objections and Responses to Requests No. 1–11 above. The People

specifically object to this Request as not stated with reasonable specificity because the undefined

term "derived" is vague and ambiguous and subject to multiple interpretations as used herein. To

the extent that any further response to this Request is required, the People deny the Request for

Admission No. 12.  Further responding, the People deny that this Request is consistent with their

legal obligations to establish liability on the claims asserted in the People's Complaint.


Dated: September 24, 2025                          PEOPLE OF THE STATE OF ILLINOIS,
                                                   *ex rel.* KWAME RAOUL, Attorney General
                                                   of the State of Illinois

                                                   MATTHEW J. DUNN, Chief
                                                   Environmental Enforcement/Asbestos
                                                   Litigation Division

                              By:      */s/ Daniel R. Flynn*
                                       Daniel R. Flynn
                                       One of their attorneys


Stephen J. Sylvester
Ellen F. O'Laughlin
Karen Howard
**OFFICE OF THE ILLINOIS ATTORNEY GENERAL**
Environmental Bureau
69 West Washington Street, Suite 1800
Chicago, Illinois 60602
(312) 814-2550
stephen.sylvester@ilag.gov
ellen.olaughlin@ilag.gov
karen.howard@ilag.gov

Adam J. Levitt
Daniel Rock Flynn
Amy E. Keller
Diandra Debrosse Zimmerman*
Anna Claire Skinner**
Special Assistant Attorneys General
**DICELLO LEVITT LLP**
Ten North Dearborn Street, Sixth Floor

Chicago, Illinois 60602
(312) 214-7900
alevitt@dicellolevitt.com
dflynn@dicellolevitt.com
akeller@dicellolevitt.com
fu@dicellolevitt.com
askinner@dicellolevitt.com

Joseph M. Callow, Jr.**
Gregory M. Utter**
Special Assistant Attorneys General
**CALLOW + UTTER LAW GROUP**
8044 Montgomery Road, Suite 170
Cincinnati Ohio 45236
jcallow@callowandutter.com
gmutter@callowandutter.com

Richard W. Fields*
Martin Cunniff*
Special Assistant Attorneys General
**FIELDS, HAN & CUNNIFF LLC**
1700 K Street NW, Suite 810
Washington, DC  20006
(833) 382-9816
fields@fhcfirm.com
martin.cunniff@fhcfirm.com

*Motions for admission pro hac vice to be filed*
** *Admitted pro hac vice*

## IN THE CIRCUIT COURT OF THE FOURTEENTH JUDICIAL CIRCUIT ROCK ISLAND COUNTY, ILLINOIS

PEOPLE OF THE STATE OF ILLINOIS,
*ex rel*. KWAME RAOUL, Attorney
General of the State of Illinois,

        Plaintiff,

v.

3M COMPANY, a Delaware Corporation,

        Defendant.

Case No. 2022 LA 16

## VERIFICATION OF JENNIFER GUELFO TO PEOPLE OF THE STATE OF ILLINOIS' RESPONSES AND OBJECTION TO DEFENDANT 3M COMPANY'S FIRST SET OF REQUESTS FOR ADMISSION TO PLAINTIFF

I, Jennifer Guelfo, holding the position of Associate Professor at Texas Tech University, under penalties as provided by law pursuant to Section 1-109 of the Code of Civil Procedure, certify that, to the best of my knowledge, information, and belief: (a) the denials set forth in the People of the State of Illinois' Responses and Objections to Defendant 3M Company's First Set of Requests for Admission ("Responses") are true and correct; and (b) to the extent any of the People's Responses are based on lack of knowledge, such lack of knowledge is true and correct. Counsel for the People of the State of Illinois prepared all legal objections in the People of the State of Illinois' Responses and Objections to Defendant 3M Company's First Set of Requests for Admission.

Date: September 24, 2025

_____
Jennifer Guelfo
Associate Professor

A196